AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court

**NORTHERN**      DISTRICT OF      **CALIFORNIA**

**FILED**

JUL 2 0 2006

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA

V.

GREGORY L. REYES and
STEPHANIE JENSEN

(Name and Address of Defendant)

**CRIMINAL COMPLAINT**

CASE NUMBER:

3 06 70450 **EMC**

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about _____2000-2004_____ in _____Santa Clara_____ county, in the _____Northern_____ District of _____California_____ defendant(s) did, (Track Statutory Language of Offense)

See Exhibit 1 to the Affidavit in Support of Complaint by FBI Special Agent Joseph Schadler (which is attached hereto and incorporated herein by reference).

in violation of Title ____15____ United States Code, Section(s) __78j(b) and 78ff__.

I further state that I am a(n) _____FBI Special Agent_____ and that this complaint is based on the following facts:
*Official Title*

See Affidavit in Support of Complaint by FBI Special Agent Joseph Schadler (which is attached hereto and incorporated herein by reference).

Continued on the attached sheet and made a part hereof:    ☒ Yes    ☐ No

Approved As To Form:    _Steskal_
AUSA: Christopher Steskal

Name/Signature of Complainant:    Joseph Schadler

Sworn to before me and subscribed in my presence,

Date: 7/20/06

at    San Francisco, CA
City and State

Edward M. Chen
United States Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

This form was electronically produced by Elite Federal Forms, Inc.

**AFFIDAVIT IN SUPPORT OF COMPLAINT**

I, Joseph Schadler, a Special Agent with the Federal Bureau of Investigation, being duly sworn, state as follows:

I.   INTRODUCTION AND PURPOSE OF AFFIDAVIT.

1.      I have been employed as a Special Agent of the Federal Bureau of Investigation for over seven years, and I am currently assigned to a white collar crime squad in the San Francisco division.  I have participated in investigations regarding securities fraud, health care fraud, insurance fraud, internet fraud, and environmental crimes, and have received training and instruction in the conduct of such investigations.  I am authorized to investigate violations of laws of the United States, and I am authorized to execute warrants and complaints issued under the authority of the United States.

2.      I make this affidavit in support of a criminal complaint against GREGORY L. REYES and STEPHANIE JENSEN.  As set forth below, there is probable cause to conclude that beginning in or about 2000, and continuing up to in or about 2004, in the Northern District of California and elsewhere, the defendants GREGORY L. REYES and STEPHANIE JENSEN did knowingly and willfully, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities issued by Brocade Communications Systems, Inc. ("Brocade"), in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud as to a material matter; (b) making and causing Brocade to make untrue statements of material fact and omitting to state facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon purchasers of Brocade securities, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.

II.  BASIS FOR KNOWLEDGE.

3.       In approximately January 2005, attorneys representing the Audit Committee for the Board of Directors of Brocade disclosed to me and others that they had conducted an internal investigation relating to the possible backdating of stock option grants at the company.  Following the disclosures by the Audit Committee, I and others interviewed numerous witnesses familiar with Brocade's stock option granting practices.  I have also reviewed numerous documents relating to Brocade's stock option granting practices and Brocade's public filings.  In addition, I have spoken with Brocade's outside auditor and other witnesses familiar with the accounting principles described below.

4.       The facts sets forth herein are not meant to be inclusive of all information gathered by me in connection with the investigation described below.  Rather, these facts are meant to provide information sufficient for the purpose of this affidavit.  I have set forth those facts that I deem necessary to establish probable cause to believe that the above-mentioned violation has been committed.

III.  STATEMENT OF PROBABLE CAUSE.

5.       At all times relevant to this Complaint, the following facts are true to the best of my knowledge and belief:

A.  Introduction.

6.       As described in more detail below, beginning in or about 2000 and continuing to in or about 2004, within the Northern District of California, and elsewhere, the defendants GREGORY L. REYES, STEPHANIE JENSEN, and others knowingly and intentionally devised, and intended to devise, a scheme and artifice to defraud Brocade, its Board, its shareholders, its auditors, the public, and the SEC as to a material matter.  It was part of the scheme and artifice to defraud that REYES, JENSEN, and others, directly and indirectly:

a.       backdated Committee meeting minutes of the Board of Directors and similar documents so that it appeared that the Committee met and stock options were granted and priced at the market value of Brocade's stock on dates when the value of Brocade's stock was relatively low, when in fact no such meetings occurred and the options were not granted on those dates; and

b.       backdated employment offer letters and other personnel records for certain

1   employees so that those employees could be placed on stock option grants that were purportedly

2   made and priced when the market value of Brocade's stock was relatively low and so that it appeared

3   that those employees were actually employed by Brocade on the grant dates, when in fact they were

4   not; and

5          c.      made and caused to be made fraudulent entries into Brocade's financial books

6   and records.

7          d.      made and caused to be made materially false and misleading statements and

8   material omissions to outside auditors; and

9          e.      filed and caused to be filed materially false and misleading financial

10  statements with the SEC.

11         7.      As described in more detail below, the object and purpose of the scheme to defraud

12  was to grant Brocade employees valuable in-the-money stock options while hiding the true nature and

13  value of the stock option grants from Brocade, its Board, its shareholders, its auditors, the public, and

14  the SEC and while avoiding the recognition of a compensation expense in Brocade's financial

15  statements.

16  B.  The Company.

17         8.      Brocade was a Delaware corporation with its headquarters in San Jose, California.

18  Brocade developed, marketed, sold, and supported data storage networking products and services.

19         9.      Brocade was a publicly held corporation whose shares were registered with and traded

20  under the symbol "BRCD" on the National Association of Securities Dealers Automated Quotation

21  system ("NASDAQ"), a national securities exchange that uses the means and instrumentalities of

22  interstate commerce and the mails.

23         10.     As a public company, Brocade was required to comply with regulations of the United

24  States Securities and Exchange Commission (the "SEC").  Those regulations are designed to protect

25  members of the investing public by, among other things, ensuring that a company's financial

26  information is accurately recorded and disclosed to the public.

27         11.     Under SEC regulations, Brocade and its officers also had a duty to:  (a) make and

28  keep books, records and accounts that fairly and accurately reflected the company's business

-3-

transactions; (b) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that the company's transactions were recorded as necessary to permit preparation of reliable financial statements; and (c) file quarterly reports (on Form 10-Q) and annual reports (on Form 10-K) with the SEC. Brocade's Form 10-K included audited financial statements, which reflected any charges associated with compensating employees.

12.     Between May 1999 and June 2002, Arthur Andersen LLP, a public accounting firm, acted as the outside auditors of Brocade's financial statements. Between June 2002 and the present, KPMG LLP, a public accounting firm, acted as the outside auditors of Brocade's financial statements.

13.     Brocade's fiscal year ended on the last Saturday in the month of October.

C.  The Defendants.

14.     REYES served as Chief Executive Officer ("CEO") of Brocade from July 1998 until January 2005. REYES was also President and a member of Brocade's Board of Directors from July 1998 to May 2001. From May 2001 until January 2005, REYES served as Chairman of the Board of Directors of Brocade. From January 2005 to July 2005, REYES continued as a member of the Board of Directors of Brocade and acted as a consultant to the company. He left the company in July 2005.

15.     JENSEN served as Vice President of Human Resources ("HR") for Brocade from October 1999 until February 2004. Beginning in 2000, JENSEN reported directly to REYES. JENSEN worked as a consultant to Brocade from February 2004 until August 2004, when she retired from Brocade.

D.  Brocade's Purported Stock Option Granting Practices And Procedures.

16.     Beginning in May 1999, Brocade became a public company and its business quickly experienced substantial growth. Like other technology companies in Silicon Valley, Brocade faced significant competition to hire and retain qualified personnel. Brocade's management believed that Brocade's success depended in part on Brocade's ability to hire and retain qualified personnel.

17.     Brocade used stock options to recruit and retain qualified personnel. Those stock options gave employees the right to purchase Brocade stock in the future at a set exercise or "strike" price. Through stock options, Brocade's management and Board hoped to create an incentive for

1  Brocade's employees to contribute to Brocade's success by sharing in the potential future appreciation

2  of Brocade's stock.

3      18.      As CEO and a member of Brocade's Board, REYES was granted sole authority from

4  Brocade's Board to grant stock options to all Brocade employees except for certain officers and

5  directors.  As such, REYES was the Compensation Committee for the Board of Directors – in effect,

6  a "committee of one" – for purposes of granting stock options to such employees.

7      E.  Relevant Accounting Rules And Brocade's Public Disclosures.

8      19.      As a matter of practice, Brocade did not record any compensation expenses in its

9  publicly filed financial statements for the millions of stock options it granted to employees because it

10  purported to grant the options at a price equal to the market price of Brocade's stock on the dates of

11  the grants and because it claimed that the recipients of the stock options were employees on the dates

12  of the grants.

13      20.      Brocade's public filings represented that Brocade accounted for its stock option grants

14  in accordance with generally accepted accounting principles ("GAAP"), including Accounting

15  Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25").  Under

16  GAAP, a company was not required to record any compensation expenses for an employee stock

17  option grant where, among other things, the exercise price of the grant was equal to the market price

18  of the company's stock on the date of the grant.  Such stock option grants are "at-the-money" because

19  they have no intrinsic value on the date of the grant.  In contrast, a company was required to record a

20  compensation expense for a stock option grant where the exercise price of the grant was less than the

21  market price of the company's stock on the date of the grant.  Such stock option grants are "in-the-

22  money" because they have intrinsic value on the date of the grant.  In addition, under GAAP, a

23  company that granted stock options to a non-employee was required to recognize a compensation

24  expense.  Likewise, a company was required to recognize a compensation expense if it cancelled an

25  existing stock option grant and reissued the stock options to an employee at a more favorable price.

26      21.      In Brocade's Forms 10-K for its fiscal years 2000, 2001, 2002, and 2003, signed by

27  REYES, Brocade stated that it followed GAAP, including APB 25 whereby the difference between

28  the exercise price and the fair market value at the date of grant is recognized as compensation

-5-

1   expense. Except in a few minor instances, Brocade did not disclose any compensation expenses in

2   connection with its stock option grants in its SEC filings.

3       F.   Brocade's Purported Stock Option Granting Process.

4           22.   According to an August 2000 e-mail circulated by JENSEN and other documents,

5   JENSEN and REYES purported to adhere to the following procedures and practices (among others)

6   when REYES exercised his delegated authority to grant stock options to new hires: (1) stock options

7   would only be granted to a person once his or her employment at Brocade actually commenced,

8   whether in a full-time or part-time capacity; (2) the stock option grant would be subject to Committee

9   approval of the Board of Directors, that is, approval by REYES acting on behalf of the Compensation

10   Committee; (3) the exercise price of the stock options would be set on the date the Committee met;

11   and (4) the exercise price of the stock options would be equal to the market value of Brocade's stock

12   on the grant date, that is, the date the Committee met and approved the stock options.

13       G.   Brocade's Actual Stock Opting Granting Process.

14           23.   According to witnesses who worked within Brocade's HR department, Brocade did

15   not actually follow the above described process. Rather, REYES and JENSEN often waited until the

16   end of the fiscal quarter before granting the stock options. JENSEN's staff routinely printed out the

17   historical closing prices for Brocade's stock and highlighted the low dates during the quarter. They

18   provided the historical pricing information to JENSEN with a draft of the Committee meeting

19   minutes approving stock option grants for the employees who were eligible for grants. JENSEN or

20   her staff gave the historical pricing information to REYES with the meeting minutes. REYES

21   routinely signed the meeting minutes and dated the minutes as if the meetings occurred on the

22   highlighted low dates and the stock options were priced at the market value of Brocade's stock on

23   those dates.

24           24.   By June 2003, the above described practice for pricing stock option grants had

25   become so routine that an HR employee prepared a memorandum describing the practice. The

26   memorandum explicitly directs the HR employees to recommend a pricing date by printing out

27   historical closing prices for Brocade's stock and identifying the closing price that is the lowest since

28   the last pricing date. This memorandum was shared by lower level HR employees who helped

-6-

1   implement the process. The above-described process continued into 2004.

2       25.     The following are examples of stock option grants where REYES and JENSEN

3   backdated the Committee meeting minutes of the Board of Directors to make the minutes appear as if

4   the stock options were granted at the market value of Brocade's stock on the date of the grant when in

5   fact they were not. The following is based upon my review of e-mails and the witness interviews that

6   I have conducted.

7           a.     In January 2002, which was near the close of Brocade's first quarter for 2002,

8   REYES and JENSEN backdated the Committee meeting minutes approving a stock option grant to

9   October 30, 2001 when Brocade's stock closed at $24.20, which was the lowest price for Brocade's

10  stock during the first quarter of 2002. That grant included some employees who did not interview for

11  a position at Brocade until January 2002. REYES and JENSEN then backdated the Committee

12  meeting minutes approving another grant to November 28, 2001 so that employees hired between

13  October 30, 2001 and November 28, 2001 could receive a stock option price of $28.82, which was

14  the lowest closing price for Brocade's stock between October 30 and November 28. REYES and

15  JENSEN also backdated the Committee meeting minutes approving yet another grant to January 22,

16  2002 so that employees hired between November 28, 2001 and January 22, 2002 could receive a

17  stock option price of $31.76.

18          b.     On or about March 13, 2002 or later, and during Brocade's second quarter for

19  2002, REYES and JENSEN decided to price another stock option grant. After that day, REYES and

20  JENSEN caused to be prepared Committee meeting minutes approving the stock option grant. They

21  backdated the Committee meeting minutes to February 28, 2002. On that day, Brocade's stock closed

22  at $21.97, which was the lowest price for Brocade's stock during the second quarter of 2002.

23      26.     JENSEN told HR employees who reported to her that they should not discuss stock

24  option grants using e-mail.

25      27.     When interviewed by the attorneys representing Brocade's Audit Committee at the

26  end of 2004, JENSEN stated that she was personally involved with REYES's stock pricing decisions

27  approximately ninety percent of the time. She said that she would sit down with REYES with a chart

28  showing historical closing prices for Brocade's stock. She would identify for REYES the date when

-7-

Brocade's stock closed at a low price.  REYES then priced the stock options as if the Committee met on the low date.  JENSEN stated that she cautioned REYES not to always pick the low dates because it looked suspicious.

H.  The Backdated Employment Offer Letters.

28.    The documentary evidence and witness statements also indicate that REYES and JENSEN caused employment offer letters and similar records to be backdated so that certain employees could be placed on earlier stock option grants that were purportedly made and priced when the market value of Brocade's stock was relatively low and so that it appeared that those employees were actually employed by Brocade on the dates of the grants.

29.    The following is an example of one such occurrence.  The documents and witness statements show that at the end of January 2002, Employee One was recruited by Brocade to a high level sales position.  On February 1, 2002, REYES interviewed Employee One.  After the interview, REYES approved the hiring of Employee One.  REYES directed JENSEN and her staff to price Employee One's stock options based on the value of Brocade's stock in the first quarter of 2002, which was below $30.00 per share.  At the time that Employee One was offered employment at Brocade in February 2002, Brcoade's stock was trading for over $30 a share.

30.    JENSEN falsified hiring documents so that Employee One could receive stock options priced as if they were granted in Broacde's first quarter of 2002.  JENSEN caused Employee One's offer letter to be backdated so that it was dated November 28, 2001.  The letter offered Employee One a stock option grant of 285,000 shares of Brocade stock subject to Committee approval and provided that the exercise price would be the fair market value of Brocade's stock on the date of the grant.  Employee One was directed by JENSEN's staff to sign the offer letter and date his signature so that it appeared that he was employed as of November 28, 2001.  In fact, Employee One did not receive an offer of employment or accept such an offer until February 2002.

31.    After Employee One accepted employment in February 2002 and signed the backdated November 28, 2001 offer letter, REYES and JENSEN prepared Committee meeting minutes for the Board of Directors dated November 28, 2001 that included the stock option grant of 285,000 shares to Employee One.  The Committee meeting minutes priced the stock option grant

-8-

using the closing price of Brocade's stock on November 28, 2001, which was $28.82 a share.

REYES then signed the backdated Committee meeting minutes approving the grant.

32.     At the end of March 2002, Employee One threatened to leave Brocade and accept an employment offer at a competitor of Brocade.  REYES personally intervened and renegotiated the terms of Employee One's employment at Brocade.  Employee One agreed to remain at Brocade based upon the renegotiated terms.

33.     After Employee One agreed to remain at Brocade, JENSEN prepared a new offer letter for Employee One that described a new stock option grant of 500,000 shares and a new loan for up to $1,211,000 and dated the offer letter January 28, 2002 when in truth the new offer was made at the end of March 2002.  JENSEN directed Employee One to sign the offer letter and date it as if the offer had been made and accepted at the end of January 2002.

34.     After Employee One accepted the new offer of employment at the end of March 2002, REYES and JENSEN prepared Committee meeting minutes for the Board of Directors dated February 28, 2002 that included the new stock option grant of 500,000 shares to Employee One.  The Committee meeting minutes priced the stock option grant using the closing price of Brocade's stock on February 28, 2002, which was $21.97 per share and the lowest closing price for Brocade's stock during the second quarter of 2002.  REYES then signed the backdated Committee meeting minutes approving the grant to Employee One.  REYES and JENSEN also prepared a new version of the November 28, 2001 Committee meeting minutes that omitted the earlier stock option grant to Employee One.  REYES then signed the new, backdated Committee meeting minutes for November 28, 2001 that omitted any reference to the Employee One stock option grant.

35.     When an HR employee questioned JENSEN about the legality of Brocade's practice of backdating an employee offer letter, JENSEN responded that she did not care and that HR did it because that is what REYES wants.

I.    False Statements To Brocade's Auditors And Others.

36.     The backdated and altered Committee meeting minutes, employment offer letters, and similar documents described above were provided to Brocade's finance department and outside auditors.  Brocade's finance department and outside auditors relied on the dates and prices entered on

1   those documents to prepare Brocade's books and records and its financial statements. Moreover,

2   because the documents were backdated and altered, Brocade's finance department and auditors did

3   not record compensation expenses for its stock option grants or otherwise disclose the true nature of

4   Brocade's stock option grants and stock option granting process.

5         37.     The documents that I have reviewed and the witness statements indicate that REYES

6   and JENSEN knew that the backdated Committee meeting minutes and similar documents were

7   provided to Brocade's finance department and outside auditors. In addition, witnesses have stated

8   that they told REYES and JENSEN that Brocade would incur a compensation expense if it granted

9   in-the-money stock options, granted stock options to a non-employee, repriced an existing stock

10  option grant, or canceled an existing stock option grant and regranted the stock options with a more

11  favorable exercise price. One such witness from Brocade's finance department told REYES that he

12  could not backdate a stock option grant to an earlier date when Brocade's stock was trading at a lower

13  price, and that if he did so, Brocade would have to record a compensation charge. REYES and

14  JENSEN also told witnesses that Brocade did not want to incur compensation expenses in connection

15  with its stock option grants.

16        38.     When interviewed by the attorneys representing Brocade's Audit Committee in early

17  2005, REYES admitted that he knew that in-the-money stock options have accounting implications.

18  However, REYES did not admit to the process that he used to price stock option grants that is

19  described above. Rather, he claimed that he actually approved and granted the options on the dates

20  reflected in the Committee meeting minutes and similar documents. REYES claimed that he never

21  picked a date for granting stock options after the fact. He claimed that he did not recall reviewing

22  historical closing prices for Brocade's stock when pricing stock options.

23  J.   The Restatement.

24        39.     In or about January 2005, the Audit Committee of Brocade's Board made a

25  preliminary determination that Brocade and its auditors could not rely on the accuracy of the

26  Committee meeting minutes signed by REYES. To calculate the stock-based compensation expenses

27  for its stock option grants using the "fixed" accounting method disclosed in its previous financial

28  statements, Brocade was required to determine the actual grant date for each stock option grant.

1    However, REYES's and JENSEN's backdating scheme prevented Brocade from determining the

2    dates when the stock option grants were actually made.  Thus, Brocade could not calculate the

3    appropriate stock-based compensation expense using "fixed" accounting under APB 25.

4         40.    Because REYES's and JENSEN's backdating scheme prevented Brocade from

5    determining the actual dates when REYES granted stock options, Brocade decided to restate its

6    financials to record stock-based compensation expenses using an alternate accounting method called

7    "variable" accounting under APB 25.  Under "variable" accounting, the value of each stock option

8    grant is calculated at the end of each reporting period and results in either a compensation expense or

9    credit depending on whether the exercise price of the stock option grant is below or above the market

10    value of Brocade's stock.

11        41.    On January 24, 2005, Brocade announced that the Audit Committee had completed

12    the internal investigation and that it would restate its financial statements with the following impact:

13    (1) net loss from the 2004 fiscal year increased from $2 million to $32 million; (2) net loss for the

14    fiscal year 2003 increased from $136 million to $147 million; (3) income from fiscal year 2002

15    increased by $60 million to $126 million; and (4) income for fiscal years 1999 through 2001 declined

16    by a total of $304 million.

17        42.    On May 16, 2005, Brocade announced that the Audit Committee had determined that

18    Brocade must extend the restatement of its financial statements to account for additional stock-based

19    compensation expenses for stock options granted from August 2003 through November 2004.  The

20    additional charges resulted in a cumulative increase in stock-based compensation expenses of $0.8

21    million over fiscal year 2003 and 2004.

22

23

24

25

26

27

28

-11-

IV. CONCLUSION.

43.     Based on the foregoing, I have concluded that there is probable cause to believe that beginning in or about 2000, and continuing up to in or about 2004, REYES and JENSEN committed securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.


JOSEPH SCHADLER


Subscribed and sworn to before me this
20th day of July 2006.


EDWARD M. CHEN
United States Magistrate Judge

## EXHIBIT 1

COUNT ONE: 15 U.S.C. §§ 78j(b) and 78ff; 17 C.F.R. §240.10b-5, 18 U.S.C. § 2 (Fraud in

Connection with Brocade Stock; Aiding, Abetting and Willfully Causing)

   Beginning in or about 2000, and continuing up to in or about 2004, in the

Northern District of California and elsewhere, the defendants

GREGORY L. REYES and
STEPHANIE JENSEN

did knowingly and willfully, directly and indirectly, by the use of the means and instrumentalities

of interstate commerce, the mails, and the facilities of national securities exchanges, use and

employ manipulative and deceptive devices and contrivances in connection with the purchase

and sale of securities issued by Brocade, in violation of Title 17, Code of Federal Regulations,

Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud as to a material

matter; (b) making and causing Brocade to make untrue statements of material fact and omitting

to state facts necessary in order to make the statements made, in light of the circumstances under

which they were made, not misleading; and (c) engaging in acts, practices, and courses of

business which operated and would operate as a fraud and deceit upon purchasers of Brocade

securities.

   All in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17,

Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.

Maximum Penalties: 20 years in prison; $5,000,000 fine, or if any person derives pecuniary gain

from the offense, or if the offense results in pecuniary loss to a person other than the defendant, a

fine equal to twice the gross gain or twice the gross loss caused by the offense; 3 years supervised

release; $100 special assessment.

## EXHIBIT 2

The elements of securities fraud are:

First, the defendant used a scheme to defraud someone or made or caused Brocade to make an untrue statement of a material fact or failed to disclose a material fact which resulted in making the statements Brocade made misleading;

Second, the defendant's acts or failure to disclose was in connection with the purchase or sale of Brocade stock;

Third, the defendant used the means and instrumentalities of interstate commerce, including the telephone, wires, or mails or the facilities of a national securities exchange in connection with these acts and omissions or with this failure to disclose, and;

Fourth, the defendant acted knowingly and willfully, that is, with intent to defraud buyers or sellers of securities.

To defraud someone means to make a statement or representation which is untrue and known to the defendant to be untrue, or to knowingly fail to state something which is necessary to make other statements true, and which statement or omission is material to the purchase or sale of stock or securities.

It is not necessary that the defendant made a profit or that anyone actually suffered a loss.

Information is "material" if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision, in other words, if a reasonable investor would find it significant in deciding whether to buy, sell, or hold Brocade securities.