IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 06-00556 CRB |
| Plaintiff, | **ORDER** |
| v. | |
| GREGORY L. REYES, et al., | |
| Defendants. | |

On July 20, 2006, a grand jury returned an indictment against Gregory Reyes and Stephanie Jensen ("Defendants") for their involvement in an alleged scheme to backdate stock options at Brocade Communications Systems, Inc. ("Brocade"). Now pending before the Court is Defendants' motion to dismiss seven of the counts contained therein. Defendants argue that these seven counts must be dismissed because they are "permeated by an invalid theory of honest services fraud." For the reasons set forth below, Defendants' motion is DENIED.

## BACKGROUND

In January of 2005, Brocade restated earnings for fiscal years 2001 through 2004. See Indictment ¶ 31. According to the company's public announcements and its filings with the Securities and Exchange Commission ("SEC"), part of the impetus for this restatement was that the company had not provided a correct accounting of numerous stock options issued to

its officers and employees. Id. ¶¶ 29-32. In response to the restatement, the Department of Justice ("DOJ") launched an investigation into the company's stock option grants.

In July of 2006, a grand jury returned an indictment against two Brocade employees: Gregory Reyes, who served as Chief Executive Officer between July 1998 and January 2005, and Stephanie Jensen, who served as Vice President of Human Resources between October 1999 and February 2004. Id. ¶¶ 7-8. In general terms, the indictment alleges that Reyes and Jensen used backdated grants as "a scheme and artifice to defraud Brocade, its Board, its shareholders, its auditors, the public, and the SEC as to a material matter[;] to obtain money and property for themselves and others by means of materially false and fraudulent pretenses, representations, and promises[;] and to deprive Brocade of its intangible right to their and other employees' honest services." Id. ¶ 16. The indictment sets forth twelve criminal counts, including seven counts that contain allegations of fraudulent conduct. These seven fraud-related counts include one count of securities fraud (Counts Two); two counts of mail fraud (Counts Three and Four); three counts of making false filings with the SEC (Counts Five, Six, and Seven); and one conspiracy count (Count One). The motion now before the Court involves a challenge to the government's allegations of honest services fraud.

## HONEST SERVICES FRAUD

Prior to 1987, federal courts generally interpreted the mail fraud statute as including a prohibition on using the mail to deprive others of "the intangible right of honest services." See, e.g., United States v. Clapps, 732 F.2d 1148, 1152-53 (3d Cir. 1984); United States v. Bohonus, 628 F.2d 1167, 1172 (9th Cir. 1980); United States v. Isaacs, 493 F.2d 1124, 1150 (7th Cir. 1974); United States v. States, 488 F.2d 761, 764-67 (8th Cir. 1973). In 1987, however, the Supreme Court rejected this interpretation of the statute. In McNally v. United States, 483 U.S. 350 (1987), the Court reviewed a criminal conviction obtained under the mail fraud statute against a corrupt public official in the State of Kentucky. The McNally Court rejected the contention that the official's use of the postal service in furtherance of a "self-dealing patronage scheme" fell within the scope of the statute. Id. at 352. "The mail fraud statute clearly protects property rights," wrote Justice White for the majority, "but does

not refer to the intangible right of the citizenry to good government." Id. at 356. The Court held that the mail fraud statute was "to be interpreted broadly insofar as property rights are concerned," but was not to be given "a more extensive reach." Id. at 356 (citing Durland v. United States, 161 U.S. 306 (1896)). While the Court acknowledged that a more expansive prohibition on mail fraud was certainly within the legislature's power to enact, the Court felt that it could adopt such a harsh construction of the criminal statute "only [if] Congress [had] spoken in clear and definite language." Id. at 359-60. Because it could find no such definitive language in the mail fraud statute regarding the intangible right of honest services, the Court reversed the Kentucky public official's conviction. Id. at 361.

The following year, Congress provided precisely such clear and definite language. It added a new provision to the statute, defining mail fraud to include "a scheme or artifice to deprive another of the intangible right of honest services." Anti-Drug Abuse Act of 1988, 100 Pub. L. No. 690, § 7603, 102 Stat. 4181, 4508 (1988) (codified at 18 U.S.C. § 1346). The enactment of this provision thus effectively overturned the McNally decision. As the Sixth Circuit remarked: "The timing and the explicit terms of § 1346 make clear that Congress intended the provision to reinstate the doctrine of intangible rights to honest services. Every court to address the effect of § 1346 has held that it has overruled the holding in McNally." United States v. Frost, 125 F.3d 346, 364 (6th Cir. 1997) (collecting cases). Accord United States v. Frega, 179 F.3d 793, 802-03 & nn.7-8 (9th Cir. 1999).

Contemporary charges of mail fraud, then, are governed by the "pre-McNally landscape," as modified by the courts' interpretation of § 1346. United States v. Williams, 441 F.3d 716, 722 (9th Cir. 2006). Similar to the Sherman Act, which prohibits "every" contract, combination, and conspiracy "in restraint of trade," the mail fraud statute broadly prohibits the deprivation of "honest services." And as with the Sherman Act, Congress has left it to the courts to develop a body of law that defines and refines this expansive statutory language. Compare Standard Oil Co. v. United States, 221 U.S. 1, 59-60, 63-65 (1911), with McNally, 483 U.S. at 363-64 & nn. 1-4 (Stevens, J., dissenting) (observing that courts have "uniformly and consistently read the statute in the same, sensible way").

3

Two recent decisions by the federal courts of appeals have discussed the scope of the statute's prohibition of honest services fraud. In <u>United Sates v. Rybicki</u>, 354 F.3d 124 (2d Cir. 2003) (en banc), the Second Circuit addressed the appeal of two attorneys who had given kickbacks to insurance claims adjusters in exchange for more favorable settlements of their clients' cases. These attorneys were convicted of mail fraud, and specifically on the theory that they had committed honest services fraud. In upholding the attorneys' convictions, the Second Circuit noted that "private-sector honest services cases fall into two general groups, cases involving bribes or kickbacks, and cases involving self-dealing." <u>Rybicki</u>, 354 F.3d at 139. Writing for the en banc court, Judge Sack held:

> [I]n the private sector context, [honest services fraud] means a scheme or artifice to use the mails or wires to enable an officer or employee of a private entity (or a person in a relationship that gives rise to a duty of loyalty comparable to that owed by employees to employers) purporting to act for and in the interests of his or her employer (or of the other person to whom the duty of loyalty is owed) secretly to act in his or her or the defendant's own interests instead, accompanied by a material misrepresentation made or omission of information disclosed to the employer or other person.

<u>Id.</u> at 146-47. In other words, the <u>Rybicki</u> court concluded that honest services fraud entails not only deception, but also some sort of betrayal by the defendant--that is, some action taken by the defendant for his own gain and to the detriment of another party to whom he owes a duty of loyal service.

The Fifth Circuit articulated a similar understanding of the law in <u>United States v. Brown</u>, 459 F.3d 509 (5th Cir. 2006). There, the court addressed an appeal by Enron executives who had been convicted under a theory of honest services fraud. The defendants had been accused of "parking" the company's assets, and thereby temporarily removing them from the company's balance sheet, in order to make Enron appear more profitable than it really was. <u>See</u> 459 F.3d at 513-16. The <u>Brown</u> court reversed their convictions under the mail fraud statute, holding that "the honest-services theory of wire fraud does not extend to the circumstances [of the case]." The rationale for the Fifth Circuit's holding was that, in contrast to "typical bribery and self-dealing cases, [where] there is usually no question that the defendant understood the benefit to him resulting from his misconduct to be at odds with the employer's expectations," the dishonest conduct of the Enron executives was "associated

4

1 with and concomitant to the employer's own immediate interest." Id. at 522. In other words, the Brown court concluded that the Enron executives could not be held criminally liable for their actions--at least, not on a theory of honest services fraud--because those actions ostensibly were aligned with the company's own interests. Id. Because the court could not determine whether the executives' convictions rested on this invalid theory or on another valid theory, it reversed their convictions. Id. at 518, 523 (citing Yates v. United States, 354 U.S. 298 (1957)).

## DEFENDANTS' MOTION

Here, the thrust of Defendants' motion is that the indictment employs an invalid theory of honest services fraud. Specifically, Defendants contend that an indictment for honest services fraud must contain an allegation that the defendant either received "kickbacks" or engaged in "self-dealing." Reply at 6 (citing *Brown* and *Rybicki*). They argue that the government has made no such allegations here, and that its theory of honest services fraud fails as a result.

Moreover, Defendants argue, not only does the indictment fail to allege self-dealing, but it affirmatively describes a scheme in which Reyes and Jensen acted in concert with the company's interests. First, Defendants note that the indictment itself recognizes that "Brocade's success depended in part on Brocade's ability to hire and retain qualified personnel" and that "Brocade used stock options to recruit and retain qualified personnel." Indictment ¶¶ 9-10. Defendants suggest that these allegations constitute a recognition on the government's part that Reyes and Jensen were acting in what they perceived to be the Brocade's best interests. Second, Defendants vigorously assert that, even accepting all the allegations of deceit set forth in the indictment, they "in no way profited from the conduct at issue and at no time acted to the economic detriment of [their] corporate employer." Motion to Dismiss at 2. In fact, they assert that Reyes and Jensen "used stock options [only] for [the] legitimate purpose of recruiting and retaining talent." Reply at 1. They claim that the backdating scheme, even if proved as alleged, was "in conformity with . . . [Brocade's] corporate mission." Motion at 8.

5

According to Defendants, because they were acting in concert with the company's goals, rather than in opposition to them, the government's theory of honest services fraud is invalid. Based on this argument, they contend that the mail fraud charges against them must be dismissed. Further, they argue that the government's use of this improperly expansive theory of honest services fraud requires the dismissal not only of the counts that actually incorporate an alleged violation of honest services fraud, but of *all* fraud-related counts because such counts, they contend, are "infected" with the government's invalid theory. In other words, because it is impossible to discern whether the jury returned the indictment based on the purportedly improper theory of honest services fraud or on some other theory, all of the fraud-related charges must be dismissed.

## DISCUSSION

Even accepting Defendants' reading of the mail fraud statute, the Court is unable to conclude that the indictment is deficient. For even if this Court were to adopt in full the reasoning and holdings of the Second and Fifth Circuits in Rybicki and Brown, the indictment still contains allegations that would satisfy this threshold for criminal liability. The Court therefore assumes, without deciding, that the government must prove beyond a reasonable doubt that Reyes and Jensen engaged in a scheme to backdate stock options in betrayal of Brocade's economic interests and for their own gain instead. Even so, the Court concludes that the government has set forth allegations sufficient to support its charges of honest services fraud, and that all seven fraud-related counts, including the two counts of mail fraud, must be sustained.

First, the Court rejects Defendants' attempt to portray the indictment as tacitly recognizing that Reyes and Jensen acted in the best interests of Brocade. According to Defendants, two paragraphs from the indictment indicate that, even if Reyes and Jensen actually implemented the alleged backdating scheme, they did so for legitimate corporate purposes. Paragraph 9 states:

> Beginning in May 1999, Brocade became a public company and its business quickly experienced substantial growth. Like other technology companies in Silicon Valley, Brocade faced significant competition to hire and retain

6

> qualified personnel. Brocade's management believed that Brocade's success depended in part on Brocade's ability to hire and retain qualified personnel.

Paragraph 10 states:

> Brocade used stock options to recruit and retain qualified personnel. Those stock options gave employees the right to purchase Brocade stock in the future at a set exercise or "strike" price. Through stock options, Brocade's management and Board hoped to create an incentive for Brocade's employees to contribute to Brocade's success by sharing in the potential future appreciation of Brocade's stock.

Defendants suggest that, taken together, these two paragraphs indicate that Reyes and Jensen understood the stock options they issued, even if backdated, as promoting the legitimate corporate purpose of recruiting and retaining qualified personnel.

Defendants' interpretation of the indictment is misguided. These paragraphs say nothing more than that one of Brocade's corporate goals was to "hire and retain qualified personnel" and that the company "used stock options" to accomplish this goal. At most, these paragraphs concede that Brocade management understood stock options as a useful and legitimate device for recruiting new talent. They say nothing of *backdated* stock options, however, much less anything about how Reyes and Jensen perceived their own alleged scheme in relation to the company's economic interests.

To say that Brocade recognized stock options as a legitimate tool for recruiting talent is not to suggest that the company necessarily recognized any use of that tool by Reyes and Jensen as legitimate. Without an allegation that the company in fact condoned *backdating*, as opposed to merely the use of stock options, the indictment cannot be construed as affirmatively recognizing that Defendants were pursuing their alleged backdating scheme in the company's best interests. In fact, the only fair construction of the indictment is that the company did *not* sanction the Defendants' alleged backdating scheme and that Defendants implemented the scheme for their own personal gain. After all, the indictment explicitly alleges that Reyes and Jensen concealed their scheme from the company and its directors. See Indictment ¶ 16 (alleging that the backdated options were "a scheme and artifice to defraud *Brocade, its Board,* its shareholders, its auditors, the public, and the SEC" (emphasis added)); id. ¶ 18 (alleging that Defendants "hid[] the true nature and value of the stock option

7

grants *from Brocade, its Board,* its shareholders, its auditors, the public, and the SEC" (emphasis added)). Thus, although the indictment recognizes the possibility that stock options may be employed in a legitimate fashion to promote a company's interests, it does not necessarily follow, as Defendants contend, that the indictment also therefore recognizes their alleged backdated scheme as furthering legitimate corporate purposes. To hold otherwise would be to hold that the backdating of stock options is *always* consistent with legitimate corporate purposes, no matter the precise features of the alleged scheme. The Court declines to reach such a conclusion here. Simply put, Defendants read too much into the indictment, and the Court finds that the government has not pleaded itself out of a prosecution for honest services fraud because of its allegation that Brocade understood stock options as a useful and legitimate recruitment tool.

In so holding the Court does not mean to suggest anything about what the company or its directors actually knew about the alleged backdating scheme, much less what Reyes or Jensen may have understood about its purposes or consequences. This Court makes no judgment now about whether the backdating of stock options could ever be viewed as consistent with the interests of an employer, nor does it make any pronouncement about whether Defendants reasonably could have viewed their alleged scheme as such. The Court's holding here is limited to the narrow question presented by Defendants' motions: whether the indictment precludes prosecution upon a theory that Defendants' alleged backdating scheme was contrary to Brocade's interests. The Court finds that it does not.

The Court is also unpersuaded that the indictment is deficient for failing to set forth specific allegations regarding "kickbacks," or "self-dealing," or the precise personal benefits that Reyes and Jensen may have reaped from their alleged scheme to backdate stock options. Instead, the Court holds that indictment sufficiently informs Reyes and Jensen of the nature of the charges against them as well as the specific course of conduct giving rise to those charges. Nothing more is required.

As the Supreme Court has explained, the Fifth Amendment's guarantee that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a

presentment or indictment of a grand jury," principally serves three functions. The first function, sometimes considered more illusory than substantive, is to serve as a bulwark between the government and the citizenry by ensuring that a prosecutor possesses a certain modicum of evidence against a suspect before pursuing criminal charges against him. United States v. Mandujano, 425 U.S. 564, 571 (1976) (plurality opinion); Wood v. Georgia, 370 U.S. 375, 390 (1962). The second function is to provide a defendant with notice of the charges against him, so that he may prepare a defense. Russell v. United States, 369 U.S. 749, 763-69 (1962); United States v. Debrow, 346 U.S. 374, 377-78 (1953); Hagner v. United States, 285 U.S. 427, 431 (1932). Similarly, the third function is to provide an account of the government's effort to prosecute and thereby protect the defendant from further jeopardy based on the same course of conduct. Hamling v. United States, 418 U.S. 87, 117 (1974); Cochran & Sayre v. United States, 157 U. S. 286, 290 (1895).

An indictment is not, however, a full-fledged presentation of the government's case. Under Ninth Circuit law, even "[t]he use of a 'bare bones' information--that is one employing the statutory language alone--is quite common and entirely permissible so long as the statute sets forth fully, directly and clearly all essential elements of the crime to be punished." United States v. Crow, 824 F.2d 761, 762 (9th Cir. 1987). Of course, if the statutory text does not provide sufficient notice of the acts that the government perceives as giving rise to criminal liability, the mere recitation of statutory language is not enough to sustain an indictment. See United States v. Cecil, 608 F.2d 1294, 1296-97 (9th Cir. 1979) (dismissing an indictment that made "only two specific allegations concerning the conspiracies" for importing illegal drugs, both of which were "open-ended" and failed "to facilitate the proper preparation of a defense"). Yet an indictment will generally pass muster "if it sets forth the elements of the charged offense so as to ensure the right of the defendant not to be placed in double jeopardy and to be informed of the offense charged." United States v. Woodruff, 50 F.3d 673, 676 (9th Cir. 1995). So long as it serves these basic functions, an indictment need not plead "evidentiary detail." Id. at 676; see also Carbo v. United States, 314 F.2d 718, 731-32 (9th Cir. 1963).

9

Here, the indictment more than adequately serves its intended functions. The essential elements of the crime of mail fraud are twofold: "the government must prove that the defendant (1) participated in a scheme with intent to defraud, and (2) the scheme used or caused the use of the mails or wire in furtherance of the scheme." United States v. Johnson, 297 F.3d 845, 870 (9th Cir. 2002). Here, the indictment alleges precisely what the statute requires--that Defendants intended "to defraud Brocade, its Board, its shareholders, [and] its auditors," Indictment ¶ 16; that they used "a private and commercial interstate carrier" to promote their fraudulent goals, id. ¶ 39; and that their purpose was "to obtain money and property for themselves" and "to deprive their employer Brocade of its intangible right to honest services," id. Further, the indictment identifies the specific acts giving rise to what the government has charged as a criminal scheme to defraud. See id. ¶¶ 17(a), 19-20 (describing "backdated Committee meeting minutes of the Board of Directors"); id. ¶¶ 17(b), 21-22 (describing "backdated employment offer letters and other personnel records"); id. ¶¶ 17(c), 22 (describing "cancelled or altered existing stock option grants"); id. ¶¶ 17(d)-(f), 23-28 (alleging that Defendants made "materially false and misleading statements" in Brocade's financial records). Taken together, the indictment's specific description of Defendants' alleged course of conduct and its recitation of the elements of the relevant crimes are sufficient to call for a trial upon the merits of the charges that Reyes and Jensen deprived Brocade of its right "to have its business conducted honestly." Williams, 441 F.3d at 723 (quoting Bohonus, 628 F.2d at 1172).

These allegations "furnish [Reyes and Jensen] with a sufficient description of the charges against [them] to enable [them] to prepare [their] defense, to ensure that the defendant[s] [are] prosecuted on the bases of facts presented to the grand jury, to enable [them] to plead jeopardy against a later prosecution, and to inform the court of the facts alleged so that it can determine the sufficiency of the charge." Cecil, 608 F.2d at 1296 (citing Russell v. United States, 369 U.S. 749, 763, 768 n.15, 771 (1962); United States v. Keith, 605 F.2d 462, 464 (9th Cir. 1979); and United States v. Phaester, 544 F.2d 353, 360 (9th Cir. 1976)). Indeed, the sufficiency of the indictment is evident from the fact that these

allegations have provided Reyes and Jensen with enough information to pursue a vehement attack on the government's charges of honest services fraud.

Defendants vigorously assert that they "in no way profited from the conduct at issue," Motion at 2; that they "at no time acted to the economic detriment of [their] corporate employer," id.; that the stock options program "at all times operated in conformity with [Brocade's] corporate mission," id. 8; and that they "displayed undivided loyalty to [their] corporate employer and personally profited by not one nickel," id. at 11. These assertions may be true. But they are unsupported by the indictment, which alleges otherwise.

An indictment must be tested on its face, and Defendants here rely improperly on their own perception of the alleged backdating scheme. See Costello v. United States, 350 U.S. 359, 363 (1956). ("An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, *if valid on its face*, is enough to call for trial of the charge on the merits." (emphasis added)). Defendants' view of the alleged scheme may be justified, but it necessarily rests upon a particular view of the evidence. Such evidentiary contentions are not proper ammunition for an attack on the indictment. United States v. Williams, 504 U.S. 36, 51 (1992) ("It is axiomatic that the grand jury sits not to determine guilt or innocence, but to assess whether there is adequate basis for bringing a criminal charge."); see also id. at 52 (noting that a grand jury need not consider exculpatory evidence or possible defenses, and remarking that purpose of the institution is not to provide a "balanced assessment of the entire matter"); United States v. Calandra, 414 U.S. 338, 349-51 (1974) (noting that the grand jury "has traditionally been allowed to pursue its investigative and accusatorial functions unimpeded by the evidentiary and procedural restrictions applicable to a criminal trial," and that allowing such challenges to the sufficiency or validity of the evidence against a suspect "would halt the orderly progress of an investigation and might necessitate extended litigation of issues only tangentially related to the grand jury's primary objective"). Thus, to the extent that Defendants' motion attacks the strength of the government's case for honest services fraud, it is premature. While Defendants' arguments about the actual nature of the alleged backdating scheme may constitute a valid theory of

defense at trial--an issue that the Court declines to address here--these arguments do not require the dismissal of any of the criminal counts contained in the indictment.[1]

## CONCLUSION

The Court holds that the indictment against Defendants sets forth allegations sufficient to sustain charges of honest services fraud. The Court has no occasion at this juncture to consider the precise contours of criminal liability under 18 U.S.C. § 1346 because, even accepting Defendants' preferred interpretation of the mail fraud statute, the indictment alleges a scheme of conduct that falls within it. Whether Defendants' actual conduct gives rise to criminal liability, and whether their subjective understanding of the alleged scheme gives rise to a valid defense against the charges of honest services fraud, depends upon the proof offered at trial. Here, the Court concludes that the charges of honest services fraud are sufficient, since "the crime and the elements of the offense that sustain the [fraud-related charges] are fully and clearly set out in the indictment." United States v. Miller, 471 U.S. 130, 136 (1985). Defendants' motion to dismiss the fraud-related counts in the indictment is therefore DENIED.

**IT IS SO ORDERED.**

Dated: March 16, 2007

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE

---

[1] Defendants also argue that, as applied in this case, § 1346 is unconstitutionally vague because it fails to provide them with notice that the statutory prohibition against honest services fraud encompasses conduct such as the backdating of stock options. The Court holds that § 1346 provided constitutionally adequate notice that the scheme described in the indictment falls within the scope of the statute's prohibition on honest services fraud. Without reference to any proof of what Defendants' conduct actually was, however, it is impossible to determine whether the statute provided sufficient notice that it prohibited the scheme of conduct in which they actually engaged. For this reason, the Court finds that Defendants' as-applied constitutional challenge to § 1346 is also premature, and denies the motion to dismiss for vagueness without prejudice. Defendants may, of course, renew their arguments following the presentation of evidence at trial.