IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>GREGORY L. REYES,<br><br>　　　　Defendant.　　　　　　　　／ | No. C 06-00556-1 CRB<br><br>**ORDER DENYING DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL** |

On August 7, 2007, a jury convicted Defendant Gregory Reyes of all ten counts charged against him in connection with a stock options backdating scheme. Now pending before the Court is Reyes' motion for a judgment of acquittal, pursuant to Rule 29. For the reasons set forth below, the motion is hereby DENIED.

Reyes stands convicted of engaging in a fraudulent scheme to understate the expenses of Brocade Communications Systems, the public company where he formerly held the position of Chief Executive Officer. Under the relevant accounting rules in effect at the time of his tenure, Brocade was required to report a "compensation charge" whenever it granted stock options with a strike price below fair market value. The theory of this prosecution is that, in order to avoid this compensation charge, Reyes and his co-conspirators "backdated" stock options. In other words, Brocade made it appear as though stock options had been granted on an earlier day when the fair market value was much lower. Through the systematic backdating of stock options, Reyes made the options look as though they had been

1 granted at fair market value, thereby allowing Brocade to avoid a compensation charge, when in fact they were being given at a price much lower than the fair market value on the date when the grants were approved.

That a backdating scheme existed is beyond dispute. That the scheme allowed the company to understate its compensation expenses is also undisputed. As Reyes himself acknowledges, "Brocade, as a company, . . . periodically used the benefit of hindsight to price stock options to its rank-and-file employees and . . . its accounting for those options had to be corrected in a financial restatement." Mot. for a New Trial at 1.

The criminal trial thus centered around two issues, both unrelated to the question of whether backdating occurred. The first issue was materiality. Do investors care about backdating? Is the understatement of non-cash compensation expenses important to shareholders? Or more precisely, did the government prove, beyond a reasonable doubt that there is a substantial likelihood that the undisclosed compensation expenses would have been important to a reasonable investor when buying or selling shares of Brocade stock? The second issue was intent. Did Reyes possess a criminal state of mind when he approved the backdated grants? That is, did Reyes intend to hide compensation expenses and deceive shareholders by participating in the scheme? Finally, in a similar vein, there is a corollary of the issue of intent, namely whether the relevant accounting rules were sufficiently clear in their commands. Did Reyes appreciate the significance of the accounting rules? Or instead are those rules so vague that it would be fundamentally unfair to hold Reyes criminally liable for their transgression? As to these issues--materiality, intent, and the clarity of accounting rules--Reyes claims that the case against him is insufficient to support the jury's verdict.

"In ruling on a Rule 29 motion, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" United States v. Alarcon-Simi, 300 F.3d 1172, 1176 (9th Cir. 2002) (quoting United States v. Bahena-Cardenas, 70 F.3d 1071, 1072-73 (9th Cir. 1995)). "The test applied is the same as the test for challenging the sufficiency of the evidence." United States v. Clayton, 108 F.3d

1114, 1116 (9th Cir. 1997) (citation omitted). "In ruling on a [motion for acquittal], a district court must bear in mind that 'it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts.'" United States v. Rojas, 554 F.2d 938, 943 (9th Cir. 1977) (quoting United States v. Nelson, 419 F.2d 1237, 1241 (9th Cir. 1969)).

## I. Materiality

The Court has already addressed the issue of materiality in two written orders. The first was issued in connection with the civil case and held that, at least on the evidence presented in that context, Reyes had presented insufficient evidence to compel the conclusion that backdating is immaterial as matter of law. See SEC v. Reyes, No. C-06-4435-CRB (May 17, 2007) (order denying defendant's motion for partial summary judgment). The second was issued in the context of this case, in response to Reyes' motion for a judgment of acquittal, and held that the government had presented sufficient evidence in its case-in-chief to send the issue of materiality to the jury. See United States v. Reyes, No. CR-06-0556-CRB, at 4-7 (N.D. Cal. Aug. 3, 2007).

In this motion, Reyes renews his argument that evidence as to the materiality of Brocade's backdating scheme was insufficient, especially in light of the evidence presented in his defense. The Court considers the defense case not nearly so persuasive as to compel reasonable doubt regarding the materiality of backdating. It is true, as Reyes has repeatedly argued, and as several witnesses testified, that investors frequently disregard non-cash compensation expenses, such as stock options, when trying to discern the value of a company. See, e.g., RT 1847-48 (testimony of Steven Catricks); RT 3143 (testimony of Jason Gold). It is also true, as many analysts noted, that Brocade's restatement of compensation expenses was irrelevant to the company's fundamentals, such as its revenues or sales growth. See, e.g., Exs. 6006, 6007, 6010, 6014, 6015 (analyst reports). It is also true that many investors continued to hold stock in companies that had disclosed "irregularities" in their stock option programs. See, e.g., RT 1905-08, 1911-15 (testimony of Steven Catricks); RT 3153-54 (testimony of Jason Gold). All of this evidence underscores a very

3

important point: stock option expenses do not say very much about the potential for a company to make money, which is what investors care about most.

It does not follow from this evidence, however, that investors necessarily consider stock option expenses immaterial. A wildly profitable company might give away no stock options. It might give away stock options at fair market value (as Brocade told investors it did). It might backdate stock options at less than fair market value by backdating them (as Brocade actually did). It might even give away all of the company's treasury stock to its employees for free. Regardless of whether or how a company granted options, it is likely that many investors still would be interested in buying shares of that company for the simple reason that it is wildly profitable. This does not mean that investors necessarily consider the stock options program immaterial. In other words, although investors consider some information *more important* than non-cash compensation expenses, it does not follow that they consider stock options expenses *unimportant*.

None of the witnesses for the defense testified that non-cash compensation expenses are irrelevant to investors. To the contrary, Shirley Stacy, the director of "investor relations" at Brocade, testified that she fielded questions from investors who specifically asked about the company's stock options program. RT 3534-49. For example, she stated that investors raised questions about Brocade's decision to regrant (as opposed to reprice) "underwater" stock options. RT 3545-3548. She further indicated that she handled calls from investors who were concerned about the incentives created by Brocade's stock options program. RT 3546. From this testimony, it is easy to infer that investors would have cared that Brocade was concealing in-the-money grants, which were perceived by investment professionals as a "a giveaway of shares" that failed to align the interests of shareholders and employees. RT 1681 (testimony of Robert McCormick).

Dr. David Gulley, an expert witness for the defense, recognized that there was a "statistically significant drop" in Brocade's share price attributable to the company's announcement that it was conducting an ongoing investigation into stock options and would restate compensation expenses. RT 3386-89. This testimony also permits an inference that

4

investors bought and sold shares of Brocade based on the company's non-cash compensation expenses. (Dr. Gulley's "scientific" opinion that this "statistically significant drop" was attributable to "concern" about an "internal review," as opposed to concern about the compensation expenses that were being internally reviewed, is not, in this Court's view, sufficient to compel reasonable doubt in the minds of jurors. RT 3382-85.)

"The determination [of materiality] requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him," and in the civil and criminal contexts alike, "these assessments are peculiarly ones for the trier of fact." TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 450 (1976). The Court finds nothing in the evidence presented by the defense to justify withholding the issue of materiality from the jury in this case.

## II. Intent

In its previous order, the Court explained why the prosecution's case-in-chief contained sufficient evidence for a jury to conclude, beyond a reasonable doubt, that Reyes acted with criminal intent. Relevant evidence included: (1) Reyes' approval of backdated grants, which included his review of paperwork showing the selection of a favorable historical price; (2) Reyes' statement that, at some point during his tenure as CEO, he became aware that the granting of stock options carried "accounting implications," RT 2201-03; (3) Reyes' receipt of an e-mail attachment containing summaries of the relevant accounting rules related to stock options, Ex. 187; (4) indications that Reyes was "very, very interested" in possible changes to the stock options program, RT 548; (5) Reyes' acknowledgment via e-mail, albeit in a distinguishable context, that it was "illegal" to backdate stock options, Ex. 648; RT 2080-84; (6) Reyes' statement, recounted by a human resources employee whose only interaction with Reyes concerned stock option grants, that "[i]t's not illegal if you don't get caught," RT 567; and (7) Reyes' acknowledgment in Brocade's financial statements and representation letters that the company had recorded a compensation charge for "the difference between the exercise price and the fair market value at the date of grant," see e.g., Ex. 27 at 54.

5

The Court finds the evidence presented by the defense insufficient to establish reasonable doubt as a matter of law. It is true that the defense presented significant evidence that Reyes relied on Brocade's accounting and finance departments to handle the company's books. It also demonstrated that Reyes, as CEO, was primarily occupied with concepts other than accounting and spent little time scouring financial statements. RT 2631-32 (testimony of Yin Cantor). But the defense case also provided additional fodder for the jury's conclusion that Reyes understood the relevant accounting rules, and therefore that he acted with an intent to deceive when he approved backdated options. For example, Shirley Stacy testified that she participated in meetings with top Brocade executives about proposed changes to the accounting rules for stock options. Stacy testified that Reyes was in attendance at the meeting, where company officers received a briefing on the impact of the new accounting rules, which would have required Brocade to record a compensation charge based on the "fair value," as opposed to merely the "intrinsic value," of the stock options it granted. RT 3588-3599, 3614-3618, 3637.

In addition, in cross-examination of an expert witness for the defense, the prosecution introduced evidence that Reyes himself was very concerned about the proposed changes. In one e-mail, for example, Reyes asks:

> In your opinion, how real is the threat that this McCain/Levin bill which calls for companies to report the cost of stock options as an expense will be passed?
>
> Is there anything that Brocade can be doing from a lobbying standpoint to help stop this over reaction to [Enron]?

Ex. 1035. In subsequent communications to colleagues at Brocade, Reyes asks for assistance in drafting "letters . . . to our Senator and Congressman to go out under my signature" in order to "help to stop Congress from harming or eliminating [the] company's stock options program." Ex. 1052. These communications suggest quite a bit about Reyes' state of mind. They indicate his understanding that the accounting rules then applicable permitted Brocade to grant options at fair market value without a compensation charge. They indicate that he was opposed to a proposal that would have required compensation charges for all grants. They indicate his perception of the proposal as a "threat." Ex. 1035. And they imply his

6

belief that additional compensation charges would have "harm[ed] or eliminat[ed]" Brocade's stock options program. Ex. 1052.

In his motion, Reyes cites numerous cases for the proposition that acquittal is warranted where "the evidence viewed in the light most favorable to the prosecution gives 'equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence.'" United States v. Glenn, 312 F.3d 58, 70 (2d Cir. 2002) (quoting United States v. Lopez, 74 F.3d 575, 577 (5th Cir. 1996)); see also United States v. Bishop, 959 F.2d 821, 831 (9th Cir. 1992). His recitation of the law is correct. But the law does not require the prosecution "exclude every reasonable hypothesis consistent with innocence." Bishop, 959 F.2d at 831 (quoting United States v. Miller, 688 F.2d 652, 663 (9th Cir. 1982)). Though it may be possible to "conjure hypothetically plausible explanations of [a defendant's] behavior that are consistent with innocence," United States v. Mares, 940 F.2d 455, 460 (9th Cir.1991), a hypothetical explanation "does not justify disturbing a jury verdict to the contrary," Bishop, 959 F.2d at 832. Here, in the Court's view, the evidence at trial was sufficient to support the jury's finding of criminal intent.

### III. "Ambiguity" of APB 25

Reyes has argued throughout these proceedings that APB 25--the Accounting Board Principles opinion requiring companies to record a compensation charge for the "intrinsic value" of the stock options it grants--is vague and ambiguous. He observes that there was a "diversity of practice" among accounting experts about how to apply the rule. RT 2872-73; Ex. 4012. He notes that certain accounting authorities, including the SEC itself, issued additional guidance to clarify some types of confusion about what he perceives as an unclear and obscure accounting provision. RT 2867-69, 2879-82; Exs. 3805, 3185. And he notes that numerous public companies have recently restated their stock option expenses due to "misapplication" of the rule. RT 2882-87. Reyes attributes these restatements to the complexity and lack of clarity of APB 25. He argues that criminal liability cannot be based upon the violation of so vague a rule, noting that the law must "give[] a person of ordinary

//

7

intelligence fair notice that his contemplated conduct is forbidden by the statute." Mot. for J. of Acquittal at 19 (quoting United States v. Harriss, 347 U.S. 612, 617 (1954)).

The Court previously addressed this contention in the context of a motion to dismiss. In a written order, the Court disagreed with Reyes' description of APB 25 as vague and ambiguous. It stated: "The goal of APB 25 is straightforward: it requires companies to record the "intrinsic value" of an option at the time it is granted. In other words, if an in-the-money option is granted, then APB 25 requires a company to record as compensation the amount by which the market price exceeds the strike price." United States v. Reyes, No. CR-06-0556-CRB, at 5 (N.D. Cal. May 30, 3007) (unpublished order denying motion to dismiss indictment). The Court noted that certain aspects of the opinion might have been unclear at the time of Reyes' tenure at Brocade--for instance, "whether the value of [a] stock option should be calculated based on the date of the interview, or the offer, or the acceptance, or another event." Id. But the Court rejected the notion that APB 25 could be reasonably construed so as to permit the deliberate selection of an historical date in order to make stock options appear to have been given at a lower fair market value.

The Court reserved making any judgment, however, about how the alleged backdating scheme at Brocade had run afoul of APB 25, whether due to the rule's ambiguity or for some other, less innocent reason. The Court concluded that such a determination was not possible "without a trial of the general issue." Id. at 7. The Court noted, however, that Reyes would be free to "renew his attack upon the government's case . . . if the evidence presented at trial would not allow a jury to find beyond a reasonable doubt . . . that [he] received adequate guidance from APB 25." Id. Defendant here renews his attack. The Court now rejects it.

None of the evidence introduced in the defense case suggests that APB 25 is so fuzzy as to permit the retrospective selection of a favorable historical stock price. The "diversity of practice" that may have existed, and still may exist, in the application of APB 25 relates to different complexities, such as whether a grant recipient is or when he becomes an eligible "employee," whether a stock option plan qualifies as "noncompensatory," how to account for "modifications" to previous grants, and how to account for awards in the context of "business

8

1 combinations," such as subsidiaries. See Ex. 3082. Similarly, the supplemental guidance
2 issued by the Financial Accounting Standards Board had nothing to do with clarifying
3 whether backdating was permissible. See Ex. 3802. Likewise, the revised rules set forth in
4 FAS 123 had little to do with "confusion" about the application of APB 25, and more to do
5 with the criticism that a stock option's "intrinsic value" does not "faithfully represent the
6 economic transactions affecting the issuer." Ex. 3805. Finally, the recent letter expressing
7 "only the views of the Office of the Chief Accountant" give no indication that APB 25 was
8 unclear on the question of backdating. The letter dedicates only one paragraph on the
9 question of backdating and indicates that the practice is impermissible. By contrast, it
10 dedicates ten pages to other issues, including lags in options paperwork and how to account
11 for previous accounting errors. Ex. 3185.

As the Court previously stated: "Whatever ambiguity may exist in APB 25, it is not possible to construe the rule's language as permitting the deliberate retroactive selection of a particular grant date and the intentional concealment of the date on which that retroactive selection was made. If APB 25 precludes *anything*, it prohibits companies from deliberately choosing a strike price based on a favorable historical date and then, even under circumstances where the intrinsic value of the grant is clear, pretending that the option was granted earlier than it actually was." Id. at 6. That is precisely the scheme proven by the government at trial. The nature of the scheme at Brocade was clear from evidence such as the so-called "beer truck" memo, in which human resources personnel explained the process by which the most favorable historical prices were selected, and the option paperwork then prepared to reflect that earlier date. See Ex. 196. Indeed, it is nearly beyond dispute that Brocade's human resources department systematically looked back at the performance of the company's stock and chose a grant date, then approved by Reyes, solely for the reason that it provided the recipient with a favorable strike price. The only reasonable construction of APB 25 is that it prohibits such a practice. To read the rule otherwise would render it utterly meaningless; there would be no purpose to requiring a compensation charge for in-the-money
//

9

options if companies could avoid the charge, and thereby confer in-the-money options, simply by backdating a document.

## CONCLUSION

As to Reyes' conviction on all of the ten counts charged, the Court concludes that, "viewing the evidence in the light most favorable to the prosecution," the jury "'could have found the essential elements of the crime[s] beyond a reasonable doubt.'" Alarcon-Simi, 300 F.3d at 1176 (quoting Bahena-Cardenas, 70 F.3d at 1072-73). Accordingly, Reyes' motion for a judgment of acquittal pursuant to Rule 29 is DENIED.

**IT IS SO ORDERED.**

Dated: August 27, 2007

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE