IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

        Plaintiff,

  v.

GREGORY L. REYES,

        Defendant.

_____/

No. C 06-00556-1 CRB

**ORDER DENYING
DEFENDANT'S MOTIONS
FOR A NEW TRIAL AND
TO DISMISS THE INDICTMENT**

On August 7, 2007, after deliberating for six days, a jury convicted Defendant Gregory Reyes of all ten counts charged against him in connection with a stock options backdating scheme. Now pending before the Court is Reyes' motion for a new trial. The motion is made pursuant to Rule 33, which provides that a district court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).

Reyes claims that justice requires a new trial for three reasons. First, the weight of the evidence weighs against conviction. Second, the Court prejudicially instructed the jury in response to the closing argument of defense counsel. Third, the prosecutor made improper remarks during closing arguments. For the reasons set forth below, the motion for a new trial is DENIED. For the same reasons, Reyes' motion to dismiss the indictment due to prosecutorial misconduct is also DENIED.

//

# I. Weight of the Evidence

"A district court's power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal." United States v. Alston, 974 F.2d 1206, 1211 (9th Cir. 1992). "The district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses." Id. (quoting United States v. Lincoln, 630 F.2d 1313, 1319 (8th Cir. 1980)). "If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." Id. at 1211-12 (quoting Lincoln, 630 F.2d at 1319).

The Court declines to exercise its discretion to grant a new trial based on the weight of the evidence. For the reasons set forth in a separate order filed on August 27, 2007, the Court considers the evidence sufficient to support the jury's finding of guilt beyond a reasonable doubt. United States v. Reyes, No. CR-06-0556-CRB (N.D. Cal. Aug. 27, 2007) (order denying motion for a judgment of acquittal). Nor does the Court believe that this is one of the "exceptional cases in which the evidence preponderates heavily against the verdict." United States v. Pimentel, 654 F.2d 538, 545 (9th Cir. 1981).

A juror in this case is confronted with a simple question: why backdate? It is beyond dispute that a backdating scheme existed at Brocade. It is also basically undisputed that Reyes knew about the backdating. And so the factfinder is left to wonder why the scheme existed at all. The most plausible answer is to hide expenses. The only explanation for backdating proffered by Reyes in this case--because Brocade wanted to obtain attract and retain talent, or, stated another way, because Brocade wanted to offer an advantageous strike prices to its employees--is no true explanation at all. This explains why Brocade might have wanted to grant options with low strike prices, that is, at less than fair market value. But a company can give away options without backdating them. The chief purpose served by the //

2

act of backdating itself is to make the grants look as though they were granted at fair market value, and thereby to avoid a compensation charge.

This explanation refutes the two central arguments Reyes advances in his post-trial motions: (1) that he had no criminal intent, and (2) that investors consider stock option expenses immaterial. The fact that he knowingly approved backdated options suggests he intended its chief consequence, namely the concealment of compensation charges. That same fact also suggests that investors cared about the unreported expenses, however hypothetical or inchoate those costs might be. If Brocade had believed that investors did not care about the compensation charges imposed by stock options, it is difficult to see why the company would have developed its backdating scheme, whose principal effect was to hide those very costs from shareholders. Because the nature of Brocade's backdating scheme rebuts the two arguments advanced by Reyes at trial, in addition to the reasons set forth in the Court's order denying Reyes' motion for acquittal, the Court finds that the jury's verdict constitutes no "miscarriage of justice." Alston, 974 F.2d at 1211.

## II. Closing Arguments by Defense Counsel

As the Court will discuss in greater detail below, certain potential evidence was never presented at trial. Most significantly, neither the prosecution nor the defense introduced certain available evidence about the role of Brocade's accounting and finance departments in the company's backdating scheme. Brocade's Chief Financial Officers, Michael Byrd and Antonio Canova, never testified. Significant figures in Brocade's accounting department, including Bob Bossi, Richard Deranleau, and Gary Blucher, also never testified. None of these witnesses ever appeared at trial, though all of them appeared in one or the other of the parties' witness lists.

Seizing on the absence of these witnesses, defense counsel properly argued to the jury that the prosecution's failure to call these significant players was indicative of weakness in its case. See, e.g., RT 3975 ("And what they really haven't done, which is a massive problem in their case, is they could have corrected it if it were true -- but it's not true -- by calling the witnesses who presented [the inaccuracy of the company's accounting records] to

3

Greg."); RT 3976 ("Same thing with Tony Canova. All they had to do was say 'Tony: When you presented this to Greg for his signature, did you talk about it? Did you tell him that you had misapplied APB 25?' Yes or no. Either way, we would have had evidence on this."). Likewise, defense counsel properly discussed the prosecution's failure to call certain witnesses regarding the materiality of the backdating scheme. RT 4010 ("And the government didn't call any analyst to the stand. The government didn't call one analyst to say non-cash expenses were important. They didn't call one investor to say that. But we introduced the analyst reports.").

But then defense counsel went further. Rather than merely pointing to gaps in the evidence, defense counsel began to fill the gaps. He stated:

> Now, I started this discussion by saying to you, Who are the real witnesses in this case and why hasn't the government sustained its burden?
>
> And one of the many reasons it hasn't is it hasn't brought to you, as you deserve before you make this monumental decision on my client's fate, it hasn't brought to you the witnesses that you deserve to [hear].
>
> Bob Bossi. I submit to you if it had, Bob Bossi would have said: "Yes, I advised HR that they could look-back within the quarter."
>
> And then the whole house of cards falls because I would have said to him: "Mr. Bossi, who is responsible for accounting for that, if there's any accounting consequences?" And he would have said: "Me."
>
> And I would have said: "Well, did Greg have any input into the accounting for stock options?" He would have said: "No."

RT 3908-09. This was not the only instance of gap-filling. Defense counsel repeatedly represented to the jury what absent witnesses would have said if they had been called. The representations included not only non-existent testimony from absent Brocade executives, but also from absent finance department employees, and absent expert witnesses. See, e.g., RT 3948 ("They didn't call the finance department. I believe if they had called the finance department, the finance department would have said, 'We innocently misapplied it.' And I would have asked them, 'Did you tell Greg?' And they would have said, 'No.'); RT 4018 ("Now, the government has awesome power. Do you think they could find the Fidelity manager who made the investment in Brocade and get him on a plane the next morning? Of course, they can. What do you think he would have said if they called him? He would have

4

1  said what [another witness] said. 'My model factors this stuff out.' So instead they bring the

2  proxy guy.").

3      The Court *sua sponte* raised concerns about these improper arguments. Defense

4  counsel initially defended them. Indeed, defense counsel suggested that it was proper to tell

5  the jury to draw adverse inferences based on the absence of witnesses because several of

6  them had been cooperating with and provided statements to the prosecutor. Cf. Graves v.

7  United States, 150 U.S. 118, 121 (1893) ("The rule, even in criminal cases, is that, *if a party*

8  *has it peculiarly within his power to produce witnesses whose testimony would elucidate the*

9  *transaction*, the fact that he does not do it creates the presumption that the testimony, if

10  produced, would be unfavorable." (emphasis added)); Hoffman, 964 F.2d at 24 (9th Cir.

11  1992) (stating that "negative inferences" may be argued "when a party fails to call an

12  important witness at trial, or fails to produce relevant documents or other evidence, *and it is*

13  *shown that the party has some special ability to produce such witness or other evidence*"

14  (emphasis added)). The Court rejected that argument, noting that the absent witnesses were

15  equally within the power of defense counsel to call. Indeed, notwithstanding the prior

16  cooperation of some of these witnesses with the prosecution, there was no showing at trial

17  that defense counsel was unable to summon any of the absent witnesses whose testimony he

18  described in closing argument.

19      The next day, upon resuming closing argument, defense counsel attempted to cure the

20  defects of his earlier comments. He stated:

21      And let me make a point about that. When I say something like, "This witness
      if he had been called would say," no one knows exactly what a witness would
22      say if and when they are called. My only point is, look at the people who
      weren't called, and you can look at who we didn't call and you can look at
23      who they didn't call.

24      We have no obligations, the Court will tell that [to] you, we didn't . .
      . have [any] burdens. So I didn't mean to suggest that a witness who would
25      have been called would have said X, Y and Z. We have no way of knowing.

26      But, for example, if a witness wasn't called -- if his document is in
      evidence and he says, for example, it's okay to look-back within the quarter,
27      that's what the document says. That's a clear statement of what the witness
      believed was okay at the time. And you know I'm talking about Bob Bossi in
28      that situation.

5

> So I wanted to clarify what I meant by that so that there is no confusion here. Obviously, none of us could predict what a witness would say.

TR 4077-78. After concluding his remarks, defense counsel argued to the Court that his subsequent comments remedied any ill effect of his earlier prognostications about the testimony of absent witnesses. The Court disagreed and, over the objection of defense counsel, instructed the jury as follows:

> [Y]ou have heard argument from the government and from defense counsel about certain witnesses that were not called to testify in this case. I am now going to give you a set of instructions about what you may and may not consider with respect to these arguments.

> You are not to draw any inference, one way or the other, for the defense or for the prosecution, about the testimony that these absent witnesses would have provided. Both parties in this case have authority to bring witnesses before the Court. It is not for you to speculate about why a witness did not appear. You are to limit your deliberations to the evidence that has been adduced at trial. And I instruct you to disregard any statements from counsel from either side about what those witnesses would have said.

> In telling you to disregard the statements of counsel about what absent witnesses would have said, I want to emphasize to you that I am not telling you to disregard the role that any of these witnesses played at Brocade. That is, you are entitled to draw inferences about these absent witnesses based on the evidence in the record that has been presented about them. My instruction to you is limited; it is that you are not entitled to draw such inferences based on evidence that is not in the record, or on arguments of counsel, which, again, are not evidence.

> Finally, in telling you that witnesses are available to both sides, I want to reiterate to you that nothing I have said alleviates the government's burden of proof in any way. The burden of proof always remains with the government to prove beyond a reasonable doubt each element of the crimes charged.

RT 4241-42. The Court submitted a copy of this instruction, entitled "Arguments of Counsel," for the jury to review during deliberations. It also inadvertently submitted a copy of a nearly identically worded instruction, entitled "Absent Witnesses." Two days later, during deliberations, and at the request of defense counsel, the Court removed the duplicative second instruction from the jurors' instruction booklets.

Reyes objects to the Court's instruction as unduly prejudicial. He contends that it effectively denied him the right to make a perfectly proper argument about the government's failure of proof. See United States v. Thompson, 37 F.3d 450, 454 (9th Cir. 1994) ("Because evidence comes in various forms, some stronger and some weaker, a defendant is entitled to

6

argue to the jury that the government's failure to present a particular type of strong evidence against her . . . weakens its case.").  The Court disagrees.

Here, defense counsel crossed over the line from commenting about gaps in the evidence to filling them.  Accordingly, an instruction was proper.  This case is entirely unlike the case on which Reyes principally relies, a case in which the defense attorney "did not even ask the jury to infer, either directly or in a meaningful indirect manner, that [the absent witness] would have testified against the government's case."  United States v. Lawson, __ F.3d __, 2007 WL 2066863, at *4 (D.C. Cir. 2007) (finding that a district court committed error, but not plain error, in instructing the jury to disregard an attorney's argument because the district court incorrectly believed that the attorney was making "a missing-witness argument").  Here, defense counsel *was* making a missing-witness argument.  What is more, he not only asked the jury to infer that the absent witness's testimony would have been unfavorable to the prosecution, but told the jury exactly what that unfavorable testimony would have been.

Moreover, unlike the district court's admonishment in Lawson, this Court's instruction did not preclude or negate the entirely proper arguments of defense counsel regarding the prosecution's purported failure of proof.  To the contrary, the Court's instruction told the jury "to disregard any statements from counsel from either side about *what those witnesses would have said*."  RT 4242 (emphasis added).  Conscious of the potential effect of such an instruction, the Court explicitly emphasized that the jury was "entitled to draw inferences about these witnesses based on the evidence in the record that [had] been presented about them."  RT 4242.  The Court stressed that its admonition was "limited" in nature, in that the jury could draw valid inferences about absent witnesses, just not based on the "arguments of counsel" or "evidence that [was] not in the record."  RT 4242.  To underscore the point, the Court noted that its instruction did not "alleviate[] the government's burden of proof in any way," and it emphasized that "[t]he burden of proof always remains with the government to prove beyond a reasonable doubt each element of the crimes charged."  RT 4242.

It is one thing for a lawyer to tell the jury that evidence is absent. It is quite another to tell the jury about absent evidence. The law permits the former, not the latter. United States v. Hoffman 964 F.2d 21, 26 (9th Cir. 1992) ("It is permissible for a defense attorney to point out to the jury that no fingerprint evidence has been introduced and to argue that the absence of such evidence weakens the Government's case; however, that attorney may not use the absence of fingerprint evidence as a springboard for arguing facts not in evidence."). The Court's instruction drew a careful distinction between defense counsel's permissible arguments about the inferences to be drawn from a failure of the proof presented, and his impermissible arguments about the substance of proof never presented. The Court therefore concludes that its instruction was an appropriate exercise of judicial discretion. See United States v. Jackson, 845 F.2d 880, 883 (9th Cir. 1988) ("The trial court is given substantial latitude in tailoring the instructions, and a challenge to the district court's language or formulation is reviewed only for an abuse of discretion.").

### III. Closing Arguments by Prosecutor

Government attorneys must abide by high standards in their prosecution of a criminal case. "While lawyers representing private parties may--indeed, must--do everything ethically permissible to advance their clients' interests, lawyers representing the government in criminal cases serve truth and justice first. The prosecutor's job isn't just to win, but to win fairly, staying well within the rules." United States v. Kojayan, 8 F.3d 1315, 1323 (9th Cir. 1993). As Justice Douglas put it: "The function of the prosecutor under the Federal Constitution is not to tack as many skins of victims as possible to the wall. His function is to vindicate the right of people as expressed in the laws and give those accused of crime a fair trial." Donnelly v. DeChristoforo, 416 U.S. 637, 648-49 (1974) (Douglas, J., dissenting); see also Berger v. United States, 295 U.S. 78, 88 (1935) (stating that a prosecutor "may strike hard blows," but "is not at liberty to strike foul ones").

Yet the unique position of a government attorney does not require a prosecutor to refrain from aggressively arguing plausible inferences from available evidence. "In closing arguments, both defense attorneys and prosecution attorneys are allowed reasonably wide

latitude.  They may strike 'hard blows,' based upon the testimony and its inferences, although they may not, of course, employ argument which could fairly be characterized as foul or unfair."  United States v. Gorostiza, 468 F.2d 915, 916 (9th Cir. 1972) (quoting Berger, 295 U.S. at 88).  Furthermore, improper comments do not warrant setting aside a verdict unless, "in the context of the entire trial, [they] were sufficiently prejudicial." DeChristoforo, 416 U.S. at 639. "Improprieties in counsel's arguments to the jury do not constitute reversible error 'unless they are so gross as probably to prejudice the defendant, and the prejudice has not been neutralized by the trial judge.'"  United States v. Birges, 723 F.2d 666, 672 (9th Cir. 1984) (quoting United States v. Parker, 549 F.2d 1217, 1222 (9th Cir. 1977)).

In his motion for a new trial, and in a previously filed motion to dismiss the indictment, Reyes argues that the prosecution repeatedly engaged in misconduct during closing arguments.  He contends that the prosecution deliberately misrepresented both the law and the evidence, and improperly impugned the integrity of defense counsel.  The Court now examines each of these claims of misconduct.

*A.  Statements of Law*

"A prosecutor should not misstate the law in closing argument . . . ."  United States v. Artus, 591 F.2d 526, 529 (9th Cir. 1979).  Nor, for that matter, should defense counsel or the Court.  See, e.g., United States v. Vallejo, 237 F.3d 1008, 1025-26 (9th Cir. 2001) (reversing a drug conviction where the district court insisted on giving erroneous instructions).  Even if the law is properly stated to the jury, a forceful misstatement of the law requires reversal of a conviction whenever it is "highly probable that the prosecutor's [improper] argument materially affected the verdict."  United States v. Segna, 555 F.2d 226, 231 (9th Cir. 1977). In Segna, for example, the Ninth Circuit reversed of a conviction for first-degree murder where the prosecutor had improperly described the law regarding an insanity defense, even though the trial court and defense counsel had properly stated the law).  Here, Reyes argues that the prosecution misrepresented the applicable law in its closing argument, both by suggesting that "backdating" was itself criminal, and by suggesting that a mere lapse in the

integrity of corporate management would be enough to prove the "materiality" of Brocade's statements or omissions.

**1. "Backdating."** Reyes first argues that the prosecutor improperly suggested to the jury that backdating, in and of itself, was illegal. Reyes notes that the prosecutor referred repeatedly to an e-mail in which Reyes himself had described the act of backdating as illegal. See, e.g., RT 3813 ("And in that e-mail [Reyes] tells [his colleague] in very plain terms, quote, 'It is illegal to backdate option grants.' Well, ladies and gentlemen, Greg Reyes was right. It is illegal to backdate option grants. And when you have weighed all the relevant evidence and you have discarded the excuses and the dodges and the irrelevancies that have been piled into this case, we are confident that you will have not much trouble concluding that Greg Reyes is guilty of doing exactly that, illegally backdating stock option grants."); RT 4148 ("The evidence shows that Mr. Reyes was not mistaken. It is illegal to backdate options. No mistake."); RT 4170 ("And it is a big issue because, as he knows, it's illegal."). Reyes also notes that the prosecutor ended his rebuttal with this statement:

> Now, one of the instructions you're going to get refers to backdating. It says, [b]ackdating is not -- not illegal, despite what Mr. Reyes said in the e-mail and thought.
>
> Call it whatever you want. Retroactive pricing, backdating, hindsight, look-backs, cheating, cutting corners, call it whatever you want. It's a crime. It's deception. It's manipulation and it's fraud.
>
> The crime is not in the word. It's in the deed. The evidence tells you that. So keep your eye on the ball.

RT 4205. Reyes argues that the prosecutor's comments invited the jury to convict based on the fact of backdating alone, rather than on the other elements of the crimes charged, in contravention of the applicable law. He claims that this mischaracterization of the crime warrants reversal of his convictions.

The Court finds this argument unpersuasive. Notwithstanding Reyes' arguments to the contrary, this *is* a case about backdating. It is about changing the date on a document to make it look like something happened much earlier than it really did. There are benign explanations for backdating: "The paperwork was catching up with actual events." And there are nefarious explanations for backdating: "The paperwork was to hide expenses." The

10

United States District Court
For the Northern District of California

jury's task in this case was to decide whether the backdating scheme was benign or nefarious. The jurors decided it was the latter.

The Court concludes that the prosecution's arguments were not contrary to the law. By invoking Reyes' e-mail, which purported to acknowledge the illegality of backdating options, see Ex. 648, the prosecution was properly arguing that Reyes' own acknowledgment of impropriety is what made his involvement in the scheme a crime. The government's point was that the e-mail showed why backdating was a crime in this case: because Reyes understood its nefarious purpose.

Further, even if the Court were to construe the prosecutor's comments as an invitation to convict based on backdating alone (which it does not), it is inconceivable that the comments could have had a prejudicial effect on the jury. Repeatedly, and at Reyes' behest, the Court instructed the jury that the placement of a certain date on a document was not enough for it to convict Reyes. It admonished the jurors at *voir dire*:

> Backdating in and of itself may not be a crime. That simple. There may be a legal justification for putting a particular date on a document. And there may not be. You will have to make that determination if you sit as a juror.

RT 67. Similarly, the Court agreed to give the jury an instruction regarding the need to look past the mere fact of "backdating" and examine the elements of each of the crimes charged:

> Retroactively dating or pricing, or alternatively "backdating," stock-option grants or related paperwork is not in and of itself a violation of the criminal law. The fact that options, grant lists, committee minutes or other paperwork may have been retroactively dated, or that stock options may have been retroactively priced does not by itself establish a criminal violation of federal securities laws. However, evidence of such practices may be considered by you, along with other evidence, in connection with the crimes charged in the indictment.

RT 4258. The Court thus clearly, and repeatedly, informed the jury that it was required to consider more than the date on a document. Rather, it was required to determine the reasons why backdating was done, and whether the backdaters understood and intended the consequences of their scheme. The Court's instructions made the law abundantly clear.

The harmlessness of the prosecution's purportedly improper argument is also evident in the jury's behavior. After all, the existence of a scheme to backdate options was all but conceded in this case. See, e.g., Mot. for New Trial at 1 ("After more than five weeks of

11

1   trial, the only thing the prosecution had managed to prove beyond a reasonable doubt was the

2   one fact uncontested by the defense -- that Brocade, as a company, had periodically used the

3   benefit of hindsight to price stock options to its rank-and-file employees and that its

4   accounting for those options had to be corrected in a financial restatement.").  If, after sitting

5   through a trial of roughly six weeks, during which time there was no serious challenge to the

6   fact that hindsight was used at Brocade to price options, the jury had believed that it was

7   permitted to convict based solely on the fact that documents had been backdated, it would

8   not have deliberated for a week.  In short, the prosecutor's comments did not improperly

9   suggest that backdating alone was sufficient for conviction, nor could a reasonable juror have

10  understood the law that way, especially given the focus of both sides during the entire

11  criminal trial and the Court's repeated instructions on the subject.

12      **2.  Materiality.**  To obtain a conviction for securities fraud, the government must

13  persuade a jury that the information withheld from investors is "material."  As this Court has

14  noted, investors must care about the information misrepresented, not merely *that* it was

15  misrepresented.  "If a misrepresentation is deemed material simply because it is a

16  misrepresentation, then the law's materiality requirement is altogether meaningless."  SEC v.

17  Reyes, No. C-06-4435-CRB, at 9 n.6 (N.D. Cal. May 17, 2007) (order denying defendant's

18  motion for partial summary judgment).

19      Reyes contends that the prosecution invited the jury to draw an impermissible

20  inference that Brocade's backdating scheme was "material" simply because it was dishonest.

21  Specifically, he points to the redirect examination of a portfolio analyst called by the

22  prosecution.  To rebut questions and testimony suggesting that many investors do not look at

23  non-cash compensation expenses when buying or selling stock, see RT 1885-94, the

24  prosecutor asked whether investors wouldn't care about issues such as transparency and

25  integrity.  RT 1940-41 ("Q.  How about management integrity, is that something you

26  consider?  A.  Yes.  Q.  Is that something that's important to you?  A.  Yes, it is.  Q.  Is that a

27  fundamental that you consider in deciding whether to invest millions of dollars of your

28  clients' money in the companies that you invest in?  A.  Yes.  Q.  Would you want to know

before you invested that money whether the CEO of the company was creating misleading documents? . . . . [A.] Yes, I would."). In addition, the prosecutor argued to the jury in summation that the integrity of management is important to investors:

> You heard a lot of evidence about the issue of whether anybody cares about this. Nobody cares about lying and cheating. Investors do. Steve Catricks told you that in case you needed a witness to tell you that management integrity matters. When shareholders give people their money that they hope to have when they retire, they are asking themselves, can I trust this person with my money? Will he follow the rules? Will he tell me the truth about my company?

RT 4186. Reyes asserts that this line of questioning and argument was improper. He claims that "management integrity" has "no place" in a discussion about the "materiality" of misrepresentations. Mot. for New Trial at 13.

The Court finds that the prosecutor's statements were not unduly misleading or improper. A prosecutor is entitled in a securities fraud case to point out to the jury that honesty is important and that our system of public finance depends on accurate information and transparency. See, e.g., RT 3880 ("And when a corporate leader like the defendant thinks the rules don't apply to him, not only does he break the law, but he threatens the integrity of the financial markets the laws were designed to protect."). It was not error for the prosecutor to suggest that investors "care about" deception, though the point could probably have been more carefully constructed.

To the extent that the prosecutor's argument might have been construed as arguing that misrepresentations are material by their very nature, that inference was thoroughly dispelled by defense counsel, the Court's instructions, and the prosecutor himself. Only seconds later, the prosecutor stated:

> Now, we don't need to prove that everybody cared. We don't need to prove that it was the most important thing to shareholders. And you heard lots of testimony. Shareholders think [about] and consider lots of different things; products, growth, competition, revenues.
>
> They also think -- there are reasonable shareholders out there who also think about net income and earnings per share and whether stock options are being granted in the money. People do, reasonable shareholders do and you heard evidence of that. Does it mean that has to be the decisive reason for buying or selling a stock? They would have done something different? No. But would a reasonable shareholder consider that information important among all the other bits of information? And they do.

RT 4187-88.  This argument made clear to the jury that its duty was to find that the information concealed, *i.e.*, the compensation expenses that should have been recorded for what were essentially in-the-money options granted by Brocade, was important to investors. Indeed, at other times in its hours-long argument, the prosecutor discussed the precise issue of materiality at great length, and in doing so, correctly identified the governing legal standard and properly directed the jury's attention to evidence from which it could have concluded that a reasonable investor "cared about in-the-money options" when "making . . . investment decisions regarding Brocade."  RT 3871-75.

The point was made clear by defense counsel as well, who repeatedly focused the juror's attention on the insignificance of the understated expenses.  See, e.g., RT 4007 ("[I]t is undisputed that actual Brocade investors were not concerned about hypothetical non-cash expenses because they don't impact operating results, cash flow or cash in the bank."); RT 4008-09 (reciting testimony from an investor who disregarded stock option expenses entirely); RT 4010 ("The government didn't call one analyst to say non-cash expenses were important."); RT 4018-19 ("The allegation is that the financial statements were falsified to commit securities fraud, to defraud investors in connection with the purchase or sale of securities, and they didn't bring any investor to tell you about their investment decisions."); RT 4020 ("So the government has the burden to prove beyond a reasonable doubt that the disclosure of the non-cash expenses would have been material to a reasonable investor.  A real person, not some hypothetical investor.").

Finally, the Court's instructions accurately instructed the jury about the standard for materiality, and Reyes does not claim otherwise.  The Court stated:

> [I]nformation is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision.  For instance, if a reasonable investor would find it significant in deciding whether to buy, sell or hold a security.  In other words, to find that a particular misrepresentation or omission is material . . . you must find that reasonable investors would have viewed the misrepresentation or omission as having significantly altered the total mix of information available to them.

RT 4242.  Accord Livid Holdings v. Salomon Smith Barney, 416 F.3d 940, 946 (9th Cir. 2005) (citing Basic Inc. v. Levinson, 485 U.S. 224 (1988)).  The record indicates not only

14

that the jury was instructed correctly, but also that the jurors paid close attention to this correct instruction. <u>See</u> Jury Notes, Docket No. 561, at 4 (asking whether there was a difference between the jury instructions' reference to "a reasonable investor," as opposed to "reasonable investors").

The Court concludes that the prosecutor's comment about the significance of "management integrity" was not an invitation for the jury to apply the incorrect legal standard, and further, that such an invitation would have been harmless given the pervasive evidence and argument, as well as the Court's unchallenged instructions, directing the jurors to focus on whether the misstated or omitted compensation expenses would have been important to Brocade investors when deciding whether to buy or sell shares of the company.

*B. Statements on Evidence*

Reyes also claims that the government argued a theory of the case that was in contradiction of both the evidence presented at trial and other facts known to the prosecution. He relies on decisions such as <u>United States v. Kojayan</u> for the proposition that the prosecution cannot argue facts or theories it knows to be untrue. <u>See</u> 8 F.3d at 1323 (reversing conviction where the prosecutor had "made a strategic decision to present [a cooperating witness's] evidence by way of hearsay, and then did everything he could to keep the defense from learning [of the witness's] whereabouts"). In reviewing such claims of misconduct, however, the Court is mindful that, as Judge Kozinski instructed in <u>Kojayan</u>, it "must ask the broader question: How did all this come about?" 8 F.3d at 1323.

One of the critical issues in this case was intent. The defense argued that there was insufficient evidence to prove that Reyes knew about, much less understood, the consequences of his approval of backdated grants. The prosecution argued that he understood full well. In support of their respective theories, each side pointed to Reyes' interaction with Brocade's accounting and finance departments. (Of course, notwithstanding the parties' emphasis on this subject, what the finance and accounting departments did or did not know about the scheme is certainly not determinative of Reyes' criminal liability.)

//

On the one hand, defense counsel argued that important employees, including finance folks versed in the minutiae of accounting regulations, knew about the backdating scheme. And yet, defense counsel observed, there was no evidence that any of these individuals had taken any steps to inform Reyes about the impropriety of the scheme or the need to report expenses that were going unrecognized, in violation of APB 25. How could Reyes be held criminally responsible for knowing that backdating ran afoul of the accounting rules when the number-crunchers knew, or should have known, and did not tell him? On the other hand, the government told the jury that the finance and accounting departments were kept in the dark. The prosecution argued that Reyes concealed his scheme from the very people who would have been able to tell him it was improper, thereby perpetrating his fraud not only upon accountants and investors, but also upon his colleagues at Brocade.

**1. Evidence Within the Record.** There was some evidence at trial presented on the subject, and the evidence actually presented was capable of being construed to support the government's story. For instance, the only finance employee who testified in the case, Elizabeth Moore, testified that *she* did not know about backdating. Moore was a relatively low-level employee; her duty was to receive the paperwork from human resources after stock options grants had been approved by Reyes, and then to record those grants in the company's financial database. RT 892 ("Q. Do you recall that the minutes that you would receive, the signed minutes, had a date on them? A. Yes. Q. And when would you receive the signed minutes relative to the date that was on the signed minutes? A. It could have been anywhere from days to weeks to even a month after that date. Q. Could you tell from reviewing the minutes when the minutes had either been signed or approved? A. No."). The government relied on Moore's testimony to argue that Brocade's finance department was unaware of the backdating scheme. RT 3854 ("But Elizabeth Moore, Gary Blucher, Bob Bossi, they would have no idea that those meetings hadn't happened on the days that are reflected in the grants.); RT 4155 ("Elizabeth Moore says finance didn't know. Did you need everybody in the finance department to come and tell you that they didn't know?").

*//*

16

Evidence pertaining to the senior employees in Brocade's finance and accounting departments, however, was scarce. As the Court has noted, Brocade's Chief Financial Officers, Michael Byrd and Antonio Canova, did not testify. Nor did employees in the accounting department like Bob Bossi, Richard Deranleau, or Gary Blucher. The limited evidence actually presented about these witnesses became the subject of debate. One such disputed item was Exhibit 187, an e-mail string circulated among employees in the human resources and accounting departments. In this correspondence, dated April 22, 2003, Brocade's controller, Bob Bossi, discusses stock options pricing. He states:

> New hire grants can happen whenever you want. Just bear in mind that after this week you can't go back and use a date pre [April 25].

Read in isolation, Bossi's e-mail is susceptible to different interpretations. On the one hand, it is susceptible to a sinister reading, which is that Bossi was warning the human resources department that it would not be able to backdate after the end of the quarter, three days later. On the other hand, it is susceptible to an innocent reading as well, which is that Bossi was telling the human resources department that it could not backdate at all. The prosecution offered the latter interpretation to the jury. RT 4163 ("The better reading, I would submit to you, is that he's saying . . . if you want to do it before the end of the quarter . . . you better do it by 4/25 at the latest because after that you can't use a date from the prior quarter. . . . In fact, he's saying you can't backdate.").

Other evidence was similarly susceptible to competing interpretations, and much of it was introduced to the jury without any context at all. In particular, the defense introduced numerous exhibits *en masse* at the conclusion of the case. See RT 3801-02 (admission of 58 exhibits without context or explanation). In closing arguments, both sides claimed these documents in support of their respective stories. Defense counsel pointed to a slew of exhibits as "examples of documents which showed that finance knew." RT 4099 (citing Exhibits 135, 168, 2083, 2099, 2431, 2468, 1590). In particular, defense counsel focused on Exhibit 2539 in support of the theory that Brocade's Chief Financial Officer, Mike Byrd, really was aware of backdated grants. Claiming that the exhibit "puts everything in context," even though no testimony about it had been given by any witness, he argued that the

17

document proved that Byrd was the mastermind of a backdated grant given to the employee discussed in the e-mail.  RT 4240-41.

The prosecutor responded that the documents showed no such thing. The government argued that Exhibit 2539 was entirely consistent with the prosecution's theory and that it gave no indication to Byrd at all that the employee's options had been backdated or priced below fair market value.  In addition, the prosecutor pointed to two additional items, Exhibit 2526 and Exhibit 2536, to suggest that Byrd and other people in finance and accounting had been misled.  RT 4157-59.  He argued that these other two documents, which both contain ostensibly innocent discussion about the starting dates of two employees who received backdated grants, showed that Byrd had been duped about the nature of their options.

Introduced without any explanation as they were, Exhibits 2526, 2536, and 2539 are practically inscrutable.  They are Rorschach blots, amenable to whatever inferences a beholder, or attorney, wishes to draw from them.  For instance, Exhibit 2526 contains only discussion about the need to pay an employee for his previous "part time work," but contemporaneous correspondence indicates that the employee had not yet signed with Brocade.  Exhibit 2536 similarly contains discussion about "part time pay" for two employees who were about to join the company on a full-time basis, but it says nothing specifically about stock options.  And Exhibit 2539, the focus of Defendant's argument about the complicity of Brocade's Chief Financial Officer, indicates only that Byrd knew another employee's "part-time start" was much earlier than his actual full-time start date.  Similarly, Exhibit 2431, which was never closely examined by either party in closing arguments but has become the subject of debate in post-trial motions, is amenable to different interpretations.  Viewed through a "tainted glass," it suggests that the top finance and accounting personnel had approved backdating stock options to "the low of the quarter."  Viewed through a "clean glass," it suggests only that these same people were interested in the possible "stock options valuations" based on different prices within the quarter.

In short, the evidence adduced at trial was amenable to any number of interpretations. Defense counsel insisted, however, that the prosecutor had "misstated the record."  RT 4208.

After briefing on the issue, the Court decided to give an instruction specifically calling the jury's attention to some of the disputed exhibits, including the one emphasized most by the defense (Exhibit 2539) and the one emphasized most by the prosecution (Exhibit 2536). The Court instructed the jury thus:

> First, you may recall that several documents, and in particular Exhibits 2536 and 2539, were introduced into evidence at the conclusion of the defense case. During closing arguments, the attorneys commented on these documents. Their comments may have been in error.
>
> During closing arguments the attorneys -- pardon me. As with all evidence, you should not simply accept attorneys' characterization of these documents, but should review them on your own to determine the significance and meaning that should be given to these documents, and the weight that should be given to them.
>
> We had a very long closing argument on both sides. And I want you to understand that the attorneys' characterization of a document is not to be accepted by you as a correct characterization of the document unless you look at the documents and you come to whatever conclusions you come to.

Nobody liked this instruction. The prosecution worried that the instruction had not accurately identified the two exhibits discussed in its rebuttal (Exhibits 2526 and 2536). Meanwhile, defense counsel vehemently argued that the instruction had not only failed to condemn the prosecutor's misconduct, but had unwittingly suggested that defense counsel was to blame for any misrepresentations, because the instruction stated that the documents had all been introduced at the close of the "defense case." The defense demanded an additional jury instruction calling attention to the prosecutor's errors, and the prosecution, conceding that it had been mistaken in its explanation of Exhibit 2539, did not object. Though the Court expressed its reluctance to give a jury instruction calling attention specifically to an error by one side, especially after deliberations had already begun, it issued an amended supplemental instruction. The amended portion stated:

> You may recall that several documents, and in particular Exhibits 2526, 2536, and 2539, were introduced into evidence at the end of the case, and without testimony. During the government's rebuttal argument, comments were made about these documents. As with all evidence, you should not simply accept an attorney's characterization of these documents, but should review them on your own to determine the significance and meaning that should be given to these documents, and the weight that should be given to them.

//

19

Docket No. 545 at 2. The Court's instructions thus made clear to the jurors that they should review the relevant exhibits to make sure that they had not been unduly influenced by an inaccurate characterization *by the prosecutor*. In fact, the Court specifically called the jury's attention to this paragraph, noting that it was the only one amended. No other direction could have been reasonably understood from the instruction except that the jury was to exercise caution as to what the prosecutor said about these documents.

Considering only the evidence presented at trial, the Court can discern no reason for disturbing the jury's verdicts based on the comments of the prosecutor. The government made no argument without a basis in the record. The controversial exhibits identified as the basis for the government's misconduct are all amenable to competing interpretations, at least as they were introduced at trial. United States v. Molina, 934 F.2d 1440, 1445 (9th Cir. 1991) ("[T]he prosecution must have reasonable latitude to fashion closing arguments. Inherent in this latitude is the freedom to argue reasonable inferences based on the evidence." (citations omitted)). Further, the Court believes that it neutralized any possible misstep on the prosecution's part by telling the jury, in so many words, to be skeptical of anything the prosecutor said about these items and to take a good, independent look at them. United States v. Endicott, 803 F.2d 506, 513 (9th Cir. 1986) ("A trial judge may cure the effect of improper prosecutorial comments 'by admonishing counsel to refrain from such remarks or by giving appropriate curative instructions to the jury.'" (quoting United States v. McKoy, 771 F.2d 1207, 1212 (9th Cir.1985))).

Given the plausible inferences supported by the record and curative effect of the Court's supplemental instruction, the Court declines to set aside the jury's verdict based on the government's closing arguments. The Court has considered Reyes' other grievances with the prosecution's portrayal of the evidence as well, and it finds the remainder of his objections without merit.[1]

---

[1] First, Reyes argues that the prosecution misled the jury into thinking that Reyes had attended a meeting at which a certain presentation had been given. The presentation related to the accounting rules governing stock options. In truth, the evidence showed that Reyes had received that particular presentation as an e-mail attachment. The evidence further showed that

**2. Evidence Beyond the Record.** Reyes also argues that the prosecution's

arguments at trial were impermissible because they were contrary to evidence obtained by

the government during its investigation of Brocade's backdating scheme. The defense notes

he had attended a meeting where substantially similar subjects had been discussed. <u>See</u> RT
3595-99. The Court sustained one defense objection to the prosecution's failure to distinguish
clearly between the e-mail presentation and the information presented at the meeting, and it told
defense counsel to clarify the matter on redirect if necessary. RT 3599-3614. Regardless of
what impression was left to the jury, the Court sees no significant prejudice from the
prosecution's conduct. The evidence indicates that both the e-mail Reyes received and the
presentation he attended covered the same substance, namely the proposed revisions to the
accounting rules for stock options. <u>Compare</u> Ex. 187, <u>with</u> RT 3591-3595. It was not error for
the prosecution to suggest they were the same. Indeed, no subsequent testimony was introduced
to suggest that the e-mail attachment and the presentation at the meeting, both of which involved
the same set of outside consultants, were any different at all.

Second, Reyes objects to the prosecution's description of Exhibit 87, a cover note in
which a human resources employee specifically explained to Reyes how the department had
selected a favorable historical price. At closing argument, the prosecutors stated: "We're
fortunate, you're fortunate to have that one piece of evidence because June Weaver happened
to save that, she happened to tuck it in her drawer. That note shows the defendant was trying to
conceal the process, not reveal it." RT 4154. The prosecutor's argument was entirely proper.
There was nothing wrong in remarking that the jury was "lucky" to have such incriminating
evidence of backdating, or in suggesting that it demonstrated Reyes' complicity in concealing
the backdating scheme, especially given that the human resources department did not pass along
information about the scheme to people in the finance department like Elizabeth Moore.

Third, Reyes objects to the prosecution's description of Seth Nieman's testimony.
Nieman, a member of Brocade's compensation and audit committees, testified about his
knowledge of various accounting regulations for stock options. <u>See, e.g.</u>, RT 2487-88. In
closing, the prosecutor stated that Nieman believed the crucial accounting opinion, known as
APB 25, was "straightforward." RT 4142. It is true that Nieman also stated he was "not an
accountant" and would not be surprised if the rule was "a relatively complicated piece of
regulation." RT 2488. Yet the prosecutor did not distort the testimony, for Nieman also
recognized the "shorthand" for a simple calculation involving the subtraction of the strike price
from the fair market value. Nothing about the government's argument involved an unfair
inference from the record, especially given Nieman's agreement that he was "careful" not to
"look back into the past and select a date to pretend that something had happened on that date").
<u>See</u> RT 2478.

Finally, Reyes objects to the prosecution's characterization of Shirley Stacy's testimony.
Stacey, who was the director of "investor relations" at Brocade, testified that she fielded
questions from investors who specifically asked about the company's stock options program. RT
3534-49. In closing arguments, the prosecutor stated that the questions Stacy had fielded were
evidence that investors cared about the restatement of stock options expenses. <u>See</u> RT 4194 ("In
January of 2005 when they announced the investigation . . . in connection with the stock option
granting process, she got a lot of calls."). Reyes objects to this comment because Stacy also
testified investors who called after the announcement were concerned with Brocade's ongoing
review, not necessarily with the subject of options expenses. RT 3506. In the Court's view, the
prosecution argued an entirely reasoanble inference from Stacy's testimony that (1) investors
in the past had called with concerns about stock option expenses, and (2) investors made many
calls in response to the company's internal investigation into stock options expenses.

21

that the government's investigation extended to all of Brocade's executives, and in fact, that the SEC has pursued a civil enforcement action against two of the company's former Chief Financial Officers, Antonio Canova and Michael Byrd.  See SEC v. Canova, No. C-06-4435-CRB (N.D. Cal. filed July 20, 2006); SEC v. Byrd, No. C-07-4223-CRB (N.D. Cal. filed Aug. 23, 2007).  He argues that the SEC's pursuit of these two financial officers is inconsistent with the government's theory at trial that the finance department was kept in the dark about Brocade's backdating scheme.

Reyes also points to several Brocade insiders who, according to witness statements recorded by the FBI in interviews with government attorneys, admitted that they came to suspect, if not know, that backdating was going on at Brocade.  In particular, Reyes points to the statements of Bob Bossi, the company's controller between 1999 and 2003; Michael Byrd, who was hired as the company's CFO in 1999 and worked at Brocade until 2003; and Tony Canova, who was the company's CFO between roughly 2001 and 2005.

Reyes had access to all of these witness statements for months prior to his trial.  These witnesses were available for him to call.  In this sense, his case is fundamentally different form Kojayan, the case on which Reyes relies most heavily.  In that case, the prosecutor "made a strategic decision to present [his star witness's] evidence by way of hearsay, and then did everything he could to keep the defense from learning [of the witness's] whereabouts and the existence and nature of [his] cooperation agreement."  Kojayan, 8 F.3d at 1323.  See also United States v. Udechukwu, 11 F.3d 1101, 1106 (1st Cir. 1993) (reversing a conviction due to the prosecutor's "failure to communicate salient information," as well as its "deliberate insinuation [contrary to] the truth"); United States v. Cruz-Garcia, 344 F.3d 951, 957 (9th Cir. 2003) (reversing a conviction where prosecutor had misrepresented facts that were contradicted by *excluded* evidence).  Here, by contrast, the prosecutor *disclosed* all of the witness statements recorded by the FBI, and all of the witnesses were available for Reyes to summon.  Of course, Reyes was under no obligation to call any witnesses at all.  But having foregone the opportunity to rebut many of the inferences raised by the prosecution's case-in-chief, assuming he could have done so with these witnesses, the Court

finds no reason to grant a new trial based on the prosecution's decision to argue those inferences.

Furthermore, and most significantly, the Court does not share Reyes' view of the significance of these witness statements.  Reyes portrays the statements as unambiguously establishing the knowledge and complicity of higher-ups in the finance and accounting departments about Brocade's backdating practices.  The Court sees them differently.  It is plausible to argue, as Reyes does, that some of the cooperating witnesses had a strong suspicion about, or even an actual knowledge of, the stock options scheme.  But it is also possible to argue from these statements, as the prosecution did at trial, that when they were presented with "the actual minutes, . . . what they assumed is that something really did happen on that day."  RT 3854.  Exactly what these individuals knew, when they knew it, and what conclusions they reached about the propriety of Brocade's stock options program was left largely unexplored in this trial as an evidentiary matter.  And unlike other cases in which courts have reversed convictions due to prosecutorial misconduct, the extrinsic evidence cited by Reyes does not persuasively "put the lie" to the prosecutor's arguments.  See, e.g., Kojayan, 8 F.3d at 1332 (reversing where prosecutor insinuated that missing witness had not cooperated, when in fact a cooperation agreement had been signed and concealed from defense counsel).  What these individuals knew, and how they reacted to that knowledge or suspicion, is anything but clear.  Both sides elected to give the jury a partial view of this subject and to withhold other information.  This Court is in no position to command a new trial based on the evidence that has been presented to it about these individuals, whose participation in some instances is the subject of other civil proceedings.

The parties had their reasons for presenting the case as they did, whatever those reasons may have been.  It is not for the Court to second-guess their motives.  Yet it is also not an appropriate role for the Court to inquire into the matter at an evidentiary hearing, when the only endgame of that proceeding would essentially be an adjudication of what certain individuals knew or believed; what they communicated to the government about their knowledge or beliefs; and what other evidence the government had to corroborate what these

23

individuals knew or believed. Those issues are at stake in other actions currently pending before this Court. They are incapable of ready determination, they are likely to be contested, and the individuals themselves may refuse to shed any light on the subject. See U.S. CONST. amend V. The Court declines to delve into that evidence when neither party considered it worthy of being presented to the jury in the first place. Accordingly, the Court rejects Reyes' attack on the verdict based on the alleged misconduct of prosecutors in describing the case to the jury.

*C. Attacks on Defense Counsel*

Reyes raises three discrete objections to what he perceives as the prosecutor's improper attacks on his attorney. He argues that, in three separate contexts, the prosecutor crossed the line from fair advocacy to improper disparagement.

**1. Role of Defense Counsel.** Throughout Brocade's internal investigation into its stock options program, as well as the federal government's civil and criminal inquiries, Reyes was represented by the same defense attorney. Indeed, it was defense counsel himself who introduced the fact of his presence at certain proceedings in the Brocade investigation. RT 2184 ("And I attended that meeting, right? Yes."). At the end of its closing argument, the prosecution invited the jury to examine that attorney's role in these proceedings. Specifically, the prosecution called attention to the fact that defense counsel had been present during an interview at which Reyes had denied using historical prices to grant options. See RT 2213 ("Q. Sitting here today, roughly two years after the fact, do you have any doubt in your mind, Mr. Martin, that Greg Reyes repeatedly denied in whatever way you could ask him that he used historical pricing information to price employee stock option grants at Brocade? A. No."). In closing, the prosecutor stated:

> Why did Greg Reyes cheat when no one was looking? Because he could. What does Greg Reyes do when he gets caught? He does what most guilty people do. He lied. He looked right into Craig Martin's eye and said multiple times, "There were no look-backs. I really did meet with myself."
>
> And who was sitting right next to him when he did that? His lawyer. That's who. And soon enough that lawyer will stand up and look you in the eye and tell you the exact opposite thing; that the defendant did look -- do look-backs and everybody knew it. You are entitled to consider that as you listen to his arguments.

24

RT 3879. When the prosecutor concluded his comments shortly thereafter, defense counsel objected that the comment was improper. The Court agreed that it was. So it immediately gave the following admonishment:

> Ladies and gentlemen of the jury, during the course of the -- of the argument or summation by the government, there was a reference to the fact that [defense counsel], who you are about to hear from, was present during the -- during an incident or during some incident that was testified to during the course of the trial. And, indeed, the evidence did -- my recollection of the evidence reflected he was present at that time.
>
> But then Counsel invited you to consider the fact that he's about to address you, and you should see -- you should view his address in light of the fact that he was present at that episode. And I'm instructing you not to do so.
>
> Because the fact is that lawyers -- happens all the time. I mean, lawyers, especially in an investigation, are representing a client. They have a duty to be present in the representation of their client. They don't necessarily become witnesses.
>
> And if you remember what I said at the outset of the government's presentation, it was that you're about to hear from counsel. Remember, counsel aren't witnesses. They are advocates for their clients' position, on both sides. On both sides.
>
> And, therefore, you should consider what they are about to say as -- as being useful to you to the extent you accept it and find it use -- and find it instructive as to how you ought to view the evidence.
>
> But we start on an even playing field. That is, you should not give any more credibility to one side or the other. You should not give any less credibility to one side or the other. And the fact is that [defense counsel] was present at a -- at something that was testified to. Indeed, the government counsel was present during some of the things that were testified to, if I recall the testimony correctly. And who knows whether I do.
>
> But -- so we just -- take that out of your mind in arriving at a verdict in this case. Okay. Thank you very much.

RT 3885-86. Reyes contends that the prosecutor's remarks on his attorney's presence at the interview was "an impermissible strike at the very fundamental due process protections that . . . [ensure] fairness in our adversarial system of criminal justice." Bruno v. Rushen, 721 F.2d 1193, 1195 (9th Cir. 1983). Too, he argues that the Court's instruction was insufficient "to cure the confusion and eliminate the poison injected by the government's attack." United States v. Rodrigues, 159 F.3d 439, 450-51 (9th Cir. 1988).

The Court agrees that the prosecutor's comments went too far. While the prosecutor was free to direct the jury's attention to Reyes' denial of backdating, and even to note that

25

Reyes made the denial with the benefit of legal representation, it was too much to suggest that defense counsel could not be believed due to his presence at the interview, when he was fulfilling his role as an advocate for the defendant. This the prosecution is not permitted to do. <u>Bruno</u>, 721 F.2d at 1195 (observing that the disparagement of the role of a defense attorney "severely damage[s] an accused's opportunity to present his case before the jury").

The Court disagrees, however, that its instruction was insufficient to cure the harm that might have been caused by the prosecutor's conduct. The two cases cited by Reyes do not support a finding of incurable prejudice. In <u>Bruno</u>, the Ninth Circuit overturned a conviction where the prosecutor had described the actions of defense counsel "as unethical and perhaps even illegal," and the trial judge had both overruled an objection and given only "a generalized admonition to the jury to only consider what was in evidence." 721 F.2d at 1194. In <u>Rodrigues</u>, after the prosecutor accused defense counsel of lying to the jury, the trial court denied defense counsel's request for "the opportunity to address the jury" and refused to give "a curative instruction." 159 F.3d at 450. By contrast, in this case the Court quickly and forcefully communicated to the jury that it was to put the prosecutor's improper comments "out of [its] mind in arriving at a verdict." RT 3886. Further, the Court explained to the jury the duty of attorneys "to be present in the representation of their clients" and to be "advocates for their clients' position[s], on both sides." RT 3885. Given the immediate admonition by the Court that the prosecutor's remarks were improper, the Court believes that its instruction cured any prejudice caused by the remarks. <u>United States v. Alvarado</u>, 838 F.2d 311, 317 (9th Cir. 1988) ("The trial judge acted quickly, emphatically, and appropriately to neutralize whatever prejudicial effect the misstatements may have caused by issuing the curative instructions.").

**2. "Lawyer Defenses."** Reyes also points to additional statements that, in his view, impugned the integrity of his attorney. For instance, he notes that the prosecutor's rebuttal maligned the closing arguments of defense counsel by calling them "lawyer defenses" or "lawyer arguments." The prosecutor stated:

//

26

Let me talk a little bit about the argument. Okay. Arguments that you heard. You heard a lot of them. And that's what lawyers do. Lawyers argue on behalf of their clients. Mr. Reeves and I have done that. The team of lawyers representing Mr. Reyes has done that. And that's their job. That's what they should be doing.

But here are the lawyer arguments, the lawyer defenses: "I was confused. It was all a big mistake. Somebody else told me that it was OK. I didn't know. I'm a great guy." And, "Nobody cared." Okay. Those are the lawyer defenses, the lawyer arguments.

RT 4128-29. The prosecutor then repeatedly used the same phrases, "lawyer defenses" and "lawyer arguments," when giving the prosecution's rebuttal to each of the contentions set forth in defense counsel's closing statement. RT 4130, 4149, 4169, 4180, 4186, 4200.

The Court concludes that these comments were within the "reasonably wide latitude" given to "both defense attorneys and prosecution attorneys" in making closing arguments. Gorostiza, 468 F.2d at 916. The Ninth Circuit has directly held that it is not improper for a prosecutor to comment upon "defense tactics." United States v. Santiago, 46 F.3d 885, 892 (9th Cir. 1995). Under the law, a direct rebuttal of the arguments interposed by defense counsel is not an impermissible comment on the lawyer's integrity, but rather a permissible parry in response to an attack on the merits of the case. See id. (condoning the prosecutor's jibe about "two tactics which appear to pass for a defense"); see also United States v. Tam, 240 F.3d 797, 805 (9th Cir. 2001) (stating that a prosecutor commits no misconduct by "addressing the arguments made by defense counsel"). Although it is always best for attorneys to stick to facts, rather than sling mud, the Court finds no impropriety in suggesting that the other side's arguments are only that, arguments, and not rooted in evidence.

**3. Expert Testimony.** Reyes contends that the prosecutor cast aspersions on defense counsel in connection with Dr. David Gulley, one of the defense's expert witnesses. As the evidence showed at trial, defense counsel had asked Dr. Gulley to explore, as a statistical matter, whether stock options at Brocade could have been picked randomly. RT 3282. In other words, Dr. Gulley examined whether the pattern of Brocade's options could be explained without the use of hindsight. His research had concluded that they could not. He stated: "What our work does is basically establish that . . . certain grant dates appeared to be very, very lucky or unusual, and that . . . the granting process, the way in which grants were

27

United States District Court
For the Northern District of California

processed over time by the company, [was] not a pure random process." RT 3282. In other words, Dr. Gulley confirmed, merely by looking at the grant dates, that Brocade had backdated its stock options.

In his closing argument, the prosecutor pounced on this testimony, not only to confirm for the jury that stock options had been backdated, a fact that was essentially conceded by the defense, but to call into question the credibility of the defense's other arguments:

> Now, I want to talk very briefly about Professor Gulley's randomness examination. You remember we spent a little bit of time talking to him about that. A chunk of his 7,000 hours and $2 million-plus that he racked up was part of the project he worked on for several months about examining the randomness of the stock option grants.

> He says he used statistical models to look at whether or not the selection of the grant dates appeared to be random. Whether the evidence showed beyond a reasonable doubt that backdating had occurred. And his conclusion was that certain grant dates appeared to be very, very lucky or unusual. It was not a purely random process that the company used.

> Why do I bring this up? We didn't need to pay Professor Gulley $625 an hour to tell us that. Colleen Devine told us that. Stephen Beyer told us that. Patricia Kada told us that. That's what the company did.

> And now the defendant acknowledges that that's what the process was, unlike back in January of 2005 when he lied to Morrison and Foerster about it. Apparently, now that issue is conceded.

> And the question is not why I bring this up now. The question is why Dr. Gulley was asked about it at all in the first place. Why on earth would you pay Dr. Gulley a lot of money to prove something that you now agree with the government, that there were look-backs? And the only reason you do that is if you were trying to carry out the lie, to see if there was evidence to support the lie, including to pay Dr. Gulley to support it. That's a lawyer argument we didn't hear.

RT 4190-92. This argument was a "hard blow," to be sure, but the Court concludes that it was not a "foul one." Berger, 295 U.S. at 88. As the Ninth Circuit stated in Bruno, "absent specific evidence in the record, no particular defense counsel can be maligned." 721 F.2d at 1195. Here, evidence in the record indicated that the defense had explored the possibility of presenting expert testimony in order to suggest a fact to the jury that it conceded at trial to be untrue. It was not unjustified for the prosecution to call that effort to the jury's attention, whether to call into question the credibility of the expert witness, or more broadly, the credibility of the arguments presented by the defense.

28

All cases require, to one degree or another, the prosecution to argue that views of the defense should not be credited, and vice versa. And the difference between attacking an argument and attacking the arguer is often difficult to define. This is not a case, however, where the prosecutor baldly disparaged opposing counsel as a "liar," or flatly stated that the defense attorney had "tried to deceive" the jury by presenting "false issues." <u>Rodrigues</u>, 159 F.3d at 449. Nor is it a case where the prosecutor suggested that the jury should disbelieve defense counsel simply by virtue of the fact that he was trying to obtain an acquittal for his client. <u>See, e.g.</u>, <u>United States v. Friedman</u>, 909 F.2d 705, 709 (2d Cir. 1990) (overturning conviction where the prosecutor had argued that a defense attorney "will make any argument he can to get that guy off" and had insinuated that, in contrast to "some people" who try to catch criminals, "there are others who defend them, try to get them off, perhaps even for high fees"). What the law abhors are arguments that denigrate the very nature of the adversarial system. What it permits are arguments that dissect, even if harshly, the arguments of an adversary. The Court concludes that the prosecution's comments about Dr. Gulley are of the permissible first kind, and not the impermissible second. For this reason, it concludes that the prosecutor's comments do not warrant a new trial.

**4. Context.** In connection with the alleged sins of the prosecutor, it is worth pausing to consider the context of the closing arguments. This case involved a trial of nearly six weeks. It was by any account a complex case; it focused on the violation of accounting rules, and it involved the introduction of thousands of pages of evidence, in addition to the testimony of more than twenty witnesses. Closing arguments alone took two days. Defense counsel spoke for more than four hours. <u>See</u> RT 4022, 4076, 4124. So did the prosecution. <u>See</u> RT 4022, 4124, 4165, 4168, 4206. The transcript of the closing arguments spans nearly two hundred pages. RT 3807-4205. Further, neither of the attorneys interposed any objections during the four hours while the other was speaking.

There is a real danger in reviewing all of the alleged misdeeds of the prosecutor at once. Namely, it creates an impression that the prosecutor's argument consisted of nothing but slanted descriptions of the evidence and jabs at defense counsel. To be sure, there is a

cumulative effect to misstatements during a closing argument, and the Court must consider the prejudice of any untoward comments in the aggregate. <u>See, e.g.</u>, <u>United States v. Frederick</u>, 78 F.3d 1370, 1381 (9th Cir.1996) ("In some cases, although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant."). But it is equally true that the Court must consider these comments in the context of the trial as a whole.

"When prosecutorial misconduct is alleged, 'the issue is whether, considered in the context of the entire trial, that conduct appears likely to have affected the jury's discharge of its duty to judge the evidence fairly.'" <u>United States v. Henderson</u>, 241 F.3d 638, 652 (9th Cir. 2000) (quoting <u>United States v. Frederick</u>, 78 F.3d 1370, 1379 (9th Cir.1996)). Repeatedly, the Ninth Circuit has found that even improper or inflammatory comments do not warrant throwing out a conviction when placed in the context of lengthy and otherwise proper proceedings. <u>United States v. Ray</u>, 731 F.2d 1361, 1368 (9th Cir. 1984) ("In the context of a three-week trial, a fourteen volume record, and two hundred pages of closing argument transcript, the remarks at issue are not of great significance."); <u>United States v. Rude</u>, 88 F.3d 1538, 1548 (9th Cir. 1996) (holding that "the government's use of inflammatory words" did not deny the defendant an unfair trial when viewed "in their entirety and in the context of the month-long trial").

Further, the Ninth Circuit has held that a trial judge may "neutralize" the prejudicial impact of an improper closing argument with appropriate instructions. The Court endeavored to do so here, and did so repeatedly, by cautioning they jury about the value of arguments. It began the trial by admonishing the jury that arguments of counsel are not evidence. RT 6 ("The following things are not evidence and you must not consider them as evidence in deciding the facts of this case: Statements and arguments of the attorneys, questions and objections of the attorneys . . . ."). The Court prefaced closing arguments with a similar warning. RT 3807 ("And as I told you at the outset and as I will tell you again tomorrow, argument is not evidence. The attorneys are not witnesses. And what they say to you can be considered by you only insofar as it will assist you in forming your opinion with

1   respect to what you have to decide."); see also RT 3885 ("And if you remember what I said

2   at the outset of the government's presentation, it was that you're about to hear from counsel.

3   Remember, counsel aren't witnesses. They are advocates for their clients' position, on both

4   sides. On both sides."). Notably, the lawyers often policed themselves, reminding the jury

5   that their own, and each other's, words were for limited use by the jury.[2]

6       Finally, and most significantly, the Court instructed the jury extensively about the fact

7   that arguments of counsel are not evidence. The Court stated:

8           Arguments and statements by lawyers are not evidence. The lawyers
            are not witnesses. What they have said in their opening statements, their
9           closing arguments, and at other times, is intended to help you interpret the
            evidence, but it is not evidence. If the facts as you remember them differ from
10          the way the lawyers state them, your memory of them controls.

11          . . . .

12          As with all evidence, you should not simply accept attorneys'
            characterization[s] of these documents, but should review them on your own
13          to determine the significance and meaning that should be given to these
            documents, and the weight that should be given to them.

14

15          We had a very long closing argument on both sides. And I want you to
            understand that the attorneys' characterization of a document is not to be
            accepted by you as a correct characterization of the document unless you look
16          at the documents and you come to whatever conclusions you come to.

17          You are the people who review the evidence in this case. And,
            therefore, while attorneys' arguments may be helpful as to all of the evidence,
18          you should look at the particular parts of . . . the evidence in question, and
            make a determination as to whether or not you accept that evidence, the
19          interpretation of that evidence, and fold it into all of the evidence that has been
            presented to you.

20

21      [2] The attorneys repeatedly underscored that their own -- and each other's -- arguments
    were not evidence. See, e.g., RT 3894 ("They use all these kind of words. I ask you to ignore
22   those words, because what we say is argument. All I ask you to do is look at the evidence.");
    RT 3903 ("And I'm going to prove it to you with documents, not by what I say. Because what
23   I say, like what Mr. Reeves says, is argument. I'm going to prove it to you by the documents
    when we get into the evidentiary portion."); RT 4109 ("But all I ask you to do when you listen
24   to the arguments of counsel, is to treat them as arguments of counsel and to remember that the
    evidence, just as with my arguments, comes from the trial transcript and from the documents.");
25   RT 4124-25 ("And when the lawyers are done with the argument, that is what you're going to
    think about: The evidence. That is what is going to determine the outcome that you will
26   eventually reach in this case."); RT 4128 ("Let me talk a little bit about the argument. Okay.
    Arguments that you heard. You heard a lot of them. And that's what lawyers do. Lawyers
27   argue on behalf of their clients. Mr. Reeves and I have done that. The team of lawyers
    representing Mr. Reyes has done that. And that's their job. That's what they should be doing.");
28   RT 4202 ("And keep in mind what is relevant and what is not, and what is evidence and what
    is only argument.").

1   RT 4240-41.  Given the length of the trial, the length of the closing arguments, the repeated

2   admonitions about the limited value of arguments of counsel, the Court's specific curative

3   instructions, and the jury's week-long deliberation, during which significant portions of the

4   transcript were recited at the jurors' request, see Docket No. 558 (jury notes), the Court

5   concludes that the various arguments of the prosecution, some of which were admittedly

6   improper, were not "likely to have affected the jury's discharge of its duty to judge the

7   evidence fairly.'"  Henderson, 241 F.3d at 652 (quoting Frederick, 78 F.3d at 1379).

8                                      **CONCLUSION**

9          The Court holds that none of the events of the trial--the evidence presented, the

10  Court's curative jury instructions, or the prosecution's closing arguments--constitute a

11  "miscarriage of justice."  Alston, 974 F.2d at 1211 (9th Cir. 1992) (quoting Lincoln, 630 F.2d

12  at 1319).  Accordingly, Reyes' motion for a new trial pursuant to Rule 33 is DENIED.  Also

13  for the reasons set forth above, Reyes' pending motion for dismissal of the indictment due to

14  prosecutorial misconduct is DENIED.

15         **IT IS SO ORDERED.**

16

17

18  Dated:  August 29, 2007                          _____
                                                     CHARLES  R. BREYER
19                                                   UNITED STATES DISTRICT JUDGE

20

21

22

23

24

25

26

27

28