1    COOLEY GODWARD KRONISH LLP
     STEPHEN C. NEAL (170085)
2    (nealsc@cooley.com)
     NEAL J. STEPHENS (152071)
3    (nstephens@cooley.com)
     SCOTT D. DEVEREAUX (146050)
4    (devereauxsd@cooley.com)
     KATHLEEN H. GOODHART (165659)
5    (kgoodhart@cooley.com)
     Five Palo Alto Square
6    3000 El Camino Real
     Palo Alto, CA  94306-2155
7    Telephone:  (650) 843-5000
     Facsimile:   (650) 857-0663
8

9    Attorneys for Defendant
     GREGORY L. REYES
10

                    UNITED STATES DISTRICT COURT
11
                  NORTHERN DISTRICT OF CALIFORNIA
12
                     SAN FRANCISCO DIVISION
13

14

15   UNITED STATES OF AMERICA,             Case No. CR06-00556 CRB

16                    Plaintiff,           **DEFENDANT GREGORY L. REYES'S
                                           NOTICE OF MOTION AND MOTION FOR
                                           NEW TRIAL PURSUANT TO RULE 33**
17             v.

18   GREGORY L. REYES,                     Date:      April 28, 2010
                                           Time:      2:00 p.m.
19                    Defendant.           Dept.:     Courtroom 8, 19th Floor
                                           Judge:     Hon. Charles R. Breyer
20
                                           Trial Date:  February 22, 2010
21

22

23

24

25

26

27

28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

**DEF.'S MOTION FOR NEW TRIAL
CR06-00556 CRB**

1

## NOTICE OF MOTION AND MOTION

2          PLEASE TAKE NOTICE THAT on April 28, 2010, or as soon thereafter as the matter

3   may be heard, in the courtroom of the Honorable Charles R. Breyer, located at 450 Golden Gate

4   Ave., San Francisco, California 94102, Defendant Gregory L. Reyes will, and hereby does,

5   respectfully move for a new trial pursuant to Federal Rule of Criminal Procedure 33.

6          Mr. Reyes's motion is based on this notice, the attached memorandum of points and

7   authorities, the pleadings and papers previously filed, the evidence presented in this case, the

8   arguments of counsel, and such other matters as the Court may deem it proper to consider.

9   Dated:     April 9, 2010                    COOLEY GODWARD KRONISH LLP

10

11                                                _____/s/ Stephen C. Neal_____
                                                    STEPHEN C. NEAL
12

13                                             Attorneys For Defendant
                                               GREGORY L. REYES

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

1.

DEF.'S MOTION FOR NEW TRIAL
CR06-00556 CRB

## TABLE OF CONTENTS

**PAGE**

I.    INTRODUCTION ......................................................................................... 1

II.   SUMMARY OF ARGUMENT ..................................................................... 1

III.  ARGUMENT ................................................................................................. 2

     A.    Applicable Standards for Motion for New Trial Under Rule 33 ........... 2

     B.    The Government's Misportrayal of the Options Practices at KLA-Tencor Through Stephen Beyer's Testimony Improperly Encouraged the Jury To Infer that Brocade's Options Practices Were Unique Among Companies that Restated Options Expenses. .............................................................. 3

          1.    The government elicited Beyer's testimony regarding his "concerns" about Brocade's options practices despite KLA-Tencor's similar use of look-back pricing of stock options. ..................... 4

          2.    KLA-Tencor's options practices were substantially similar to Brocade's, and the government's inferences to the contrary misled the jury. .................................................................................................. 6

          3.    The government's obligation to correct the misimpression left by Beyer's testimony, which it failed to meet, was not dependant on the defense's knowledge of the false testimony. ......................... 7

          4.    The defense's proposed curative instruction would have properly informed the jury that Beyer's former employer engaged in intentional backdating. ................................................................... 9

     C.    The Government's Use of Evidence Relating to Mr. Reyes's Compensation from Brocade Went Beyond Mere Motive to Bias the Jury Against Mr. Reyes. ...................................................................................................... 11

     D.    By Disclaiming Any Significance of "What Finance Knew" and Failing to Prove That "Finance Was Deceived," the Government Circumvented the Elements of the Charges. .................................................................... 14

     E.    The Denial of Mr. Reyes's Proposed Jury Instructions Permitted the Government To Argue Unchecked a Theory of the Case in Closing that Did Not Comport With the Elements. ............................................... 16

          1.    The jury notes and evidence at trial justified Mr. Reyes's proposed instruction relating to consideration of his role as CEO of Brocade......... 17

          2.    The "Backdating Is Not Illegal" instruction from the Jensen case did not adequately instruct the jury that a conviction required more than incorrect dates on company documents. ............................................ 18

          3.    Mr. Reyes's proposed instruction that Brocade's restatement is not evidence of wrongdoing would have limited the Government's misleading arguments in closing. ............................................................. 20

          4.    Ninth Circuit case law supports Mr. Reyes's proposed instruction defining "material" information as  information that would have caused investors to "have acted differently." ............................................ 21

          5.    The government's reliance on Brocade "policies" as a proxy for criminal laws required an instruction that conduct inconsistent with company policies is not evidence of wrongdoing. ............................................ 22

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

i.

**TABLE OF CONTENTS**
(CONTINUED)

PAGE

IV.     CONCLUSION ................................................................................................................. 23

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

### TABLE OF AUTHORITIES

**PAGE**

**CASES**

*Basic Inc. v Levinson,*
    485 U.S. 224 (1988) ................................................................ 21

*Commc'ns Workers of Am. Plan for Employees' Pensions & Death Benefits v. CSK Auto Corp.*, Nos. CV06-1503-PHX-DGC (Lead) & CV06-1580-PHX-JWS, 2007 WL 951968 (D. Ariz. Mar. 28, 2007) ................................................................ 21

*DSAM Global Value Fund v. Altris Software, Inc.,*
    288 F.3d 385 (9th Cir. 2002) ................................................................ 21

*Livid Holdings, Ltd. v. Salomon Smith Barney, Inc.,*
    416 F.3d 940 (9th Cir. 2005) ................................................................ 21, 22

*TSC Indus., Inc. v. Northway, Inc.,*
    426 U.S. 438 (1976) ................................................................ 21

*United States v. Alli,*
    344 F.3d 1002 (9th Cir. 2003) ................................................................ 7

*United States v. Alston,*
    974 F.2d 1206 (9th Cir. 1992) ................................................................ 2

*United States v. Berger,*
    473 F.3d 1080 (9th Cir. 2007) ................................................................ 21

*United States v. Blueford,*
    312 F.3d 962 (9th Cir. 2002) ................................................................ 8

*United States v. Endicott,*
    869 F.2d 452 (9th Cir. 1989) ................................................................ 3

*United States v. Forbes,*
    No. 02-cr-00264 AWT (D. Conn. Oct. 31, 2006) ................................................................ 18

*United States v. Kellington,*
    217 F.3d 1084 (9th Cir. 2000) ................................................................ 2

*United States v. LaPage,*
    231 F.3d 488 (9th Cir. 2000) ................................................................ 8, 10

*United States v. Reyes,*
    577 F.3d 1069 (9th Cir. 2009) ................................................................ 21

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

1

**TABLE OF AUTHORITIES**
**(CONTINUED)**

2

**PAGE**

3     *United States v. Roberts*,
4           No. 07-cr-00100-MHP (N.D. Cal. Oct. 3, 2008) ..................................................... 21

**OTHER AUTHORITIES**

5

6     ABA, MODEL JURY INSTR.: SECURITIES LITIGATION § 2.03[2][a] (1996)...................................... 21

7     FED. JURY PRAC. & INSTR. § 18:04 (6th ed. 2008) ....................................................... 18

8     FED. JURY PRAC. & INSTR. § 62.14 (5th ed. 2000) ....................................................... 21

9     Federal Rule of Criminal Procedure 33 ...................................................................... 2, 23

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iv.

**DEF.'S MOTION FOR NEW TRIAL**
**CR06-00556 CRB**

1           <u>**Memorandum of Points and Authorities**</u>

2   **I.      Introduction**

3           Pursuant to Federal Rule of Criminal Procedure 33, Defendant Gregory L. Reyes

4   respectfully moves for an order granting a new trial.  On March 26, 2010, after four days of

5   deliberations, the jury found Mr. Reyes not guilty on Count One charging conspiracy to commit

6   securities fraud and guilty on the nine remaining counts: one count of securities fraud in

7   connection with Brocade stock (Count Two); three counts of securities fraud based on false SEC

8   filings (Counts Five, Six, and Seven); one count of falsifying books, records, and accounts of

9   Brocade (Count Eight); and four counts of making false statements to an accountant of Brocade

10  (Counts Nine, Ten, Eleven, and Twelve).  Mr. Reyes respectfully submits that due to a

11  combination of affirmative government misconduct and misleading arguments disconnected from

12  the evidence, as well as instructional error that enabled the government to obtain a verdict that

13  was substantially inconsistent with the weight of the evidence, a sufficiently serious misconduct

14  of justice has occurred to justify a new trial.

15  **II.     Summary of Argument**

16          As the Court is aware, the government's  strategy in the 2007 trial was to present

17  Elizabeth Moore as the stand-in for an entire Finance Department and argue that Brocade's

18  accounting experts were in the dark about the company's options practices.  Foreclosed by the

19  Ninth Circuit's opinion from asserting the "Finance didn't know" theory in this trial, the

20  government instead cobbled together a trio of theories that unfairly misled and distracted the jury

21  from the facts relating directly to the elements: *first*, that Brocade's options practices were

22  uniquely fraudulent among the many companies who also restated earnings based on their failure

23  to account properly for non-cash option expenses under APB 25; *second*, that Mr. Reyes designed

24  and executed the purported scheme primarily to "line his own pockets"; and *third*, that what

25  Finance (and the Audit Committee) knew or didn't know about the company's stock-option

26  practices is irrelevant to Mr. Reyes's state of mind.

27          Without specific guidance to the jury in the form of the defense's proposed jury

28  instructions, the government's misleading theories presented to the jury a path to conviction

1    based on assumptions and speculation rather than reliable evidence of Mr. Reyes's own

2    knowledge and intent.  Accordingly, and even if the evidence adduced at trial is technically

3    sufficient to sustain the verdict,[1] the cumulative and unfairly prejudicial effect of the

4    government's misconduct and improper arguments require that the Court grant a new trial to

5    serve the interest of justice.

6         Individually and collectively, the government's misconduct and the failure to sufficiently

7    instruct the jury denied Mr. Reyes his right to a fair trial and require that this case be tried to a

8    new jury.  Moreover, independent of the misconduct and instructional error, the verdict is

9    sufficiently against the weight of the evidence going to the elements of intent, causation, and

10   materiality such that a serious miscarriage of justice may have occurred.  For these reasons, Mr.

11   Reyes respectfully requests that the Court grant this motion and order a new trial.

12   **III.    ARGUMENT**

13        **A.    Applicable Standards for Motion for New Trial Under Rule 33**

14        Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the

15   court may vacate any judgment and grant a new trial if the interest of justice so requires."  As the

16   Ninth Circuit has stated, "[t]he district court need not view the evidence in the light most

17   favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the

18   credibility of the witnesses."  *United States v. Kellington*, 217 F.3d 1084, 1095 (9th Cir. 2000)

19   (quoting *United States v. Alston*, 974 F.2d 1206, 1211 (9th Cir. 1992)).  Even if there is an

20   "abstract sufficiency of the evidence to sustain the verdict," a new trial may be granted where

21   "the evidence preponderates sufficiently heavily against the verdict [such] that a serious

22   miscarriage of justice may have occurred."  *Kellington*, 217 F.3d at 1097 (internal citations

23   omitted).

24

25

26

27

28   ─────────────
     [1] Mr. Reyes has moved separately under Rule 29(c) for judgment of acquittal.  (Dkt. No. 1174.)

**B.    The Government's Misportrayal of the Options Practices at KLA-Tencor Through Stephen Beyer's Testimony Improperly Encouraged the Jury To Infer that Brocade's Options Practices Were Unique Among Companies that Restated Options Expenses.**

During trial and in closing, the government advanced the theory that Brocade's options practices were unusual, and presented that theory as a principal reason for the jury to infer guilty knowledge and fraudulent intent on the part of Mr. Reyes.  Although the Court read to the jury the parties' stipulation that "[a] substantial number of public companies . . . restated their financial reports to recognize additional noncash stock-based compensation" (Reporter's Transcript ("RT"), Vol. 12 (Mar. 9, 2010) at 2267:20–2268:3), the government resisted any effort by the defense to place Brocade's options practices—and Mr. Reyes's conduct—into context through a more detailed and comprehensive stipulation.  Instead, the government affirmatively undermined the stipulation by eliciting testimony from Stephen Beyer on redirect examination that his previous employer, KLA-Tencor, engaged in conduct "dramatically different" from Brocade.

In doing so, the government falsely bolstered the credibility of Beyer's purported concerns about the legality of Brocade's options practices.  Despite knowing that KLA-Tencor's options practices were not as Beyer described them, the government exacerbated the prejudice to Mr. Reyes in rebuttal closing by urging the jury to take Beyer's testimony (and that of the other HR witnesses) as credible and to infer that these witnesses' "concerns" were evidence that Brocade's options practices were illegal—and thus that Mr. Reyes must have known his conduct to be wrongful.[2]  Further leveraging Beyer's credibility, the government argued that the alleged scheme "was designed not to be too obvious to outsiders like the auditors and the public shareholders," and asking "How do you know?  Stephen Beyer, for starters."[3]  The jury's acceptance of Beyer as credible and reliable was critical to the government's argument that Brocade's options practices were fraudulent rather than inadvertent.  *See United States v. Endicott*, 869 F.2d 452, 456 (9th Cir. 1989) ("[W]hen the reliability of a given witness may well be determinative of guilt or

---

[2]  *See* RT, Vol. 16 (Mar. 22, 2010) at 3048:18–3049:13 (gov't closing).

[3]  RT, Vol. 16 at 3020:3–5; *see also id.* at 3020:7–3021:21 (quoting Beyer testimony).

Cooley Godward
Kronish LLP
Attorneys At Law
Palo Alto

**Def.'s Motion for New Trial
CR06-00556 CRB**

1   innocence, nondisclosure of evidence affecting credibility warrants a new trial irrespective of the

2   good faith or bad faith of the prosecution.").

3        Facing no risk that the jury would understand the similarities to KLA-Tencor's practices,

4   the government was free to argue in rebuttal closing that the jury should disregard the

5   significance of any other company's restatement:

6        Now, Counsel has emphasized that other Silicon Valley companies backdated.
         And the government stipulated to that fact and, thus, it is in evidence in this
7        case.

8        But what does that stipulation prove?  I submit, very little that's relevant to
         your inquiries.  *Were other tech companies confused about accounting rules
9        for stock options, or were they engaged in fraud like at Brocade?*

10       The *evidence in this case does not allow you to answer those questions.*  And
         you shouldn't speculate about it.
11

12   (*See id.* at 3044:6–15 (emphasis added).)

13        Mr. Reyes's motion for mistrial and dismissal of the indictment (Dkt. Nos. 1116, 1148)

14   requested in the alternative that the Court issue a curative instruction (Dkt. No. 1117-11).  That

15   instruction would have accurately informed the jury that during Beyer's tenure at KLA-Tencor,

16   his employer engaged in intentional backdating—both generally and with respect to the specific

17   exhibits introduced during Beyer's testimony.  (*See id.*)

18        Because the government's conduct in eliciting and arguing Beyer's testimony created a

19   materially false impression that Beyer's "concerns" about Brocade's options practices were

20   credible, and because the government's proposed curative instruction would only have amplified

21   that misimpression, Mr. Reyes respectfully submits that the denial of his proposed instruction was

22   error and alone justifies a new trial.

**1.     The government elicited Beyer's testimony regarding his
"concerns" about Brocade's options practices despite KLA-
Tencor's similar use of look-back pricing of stock options.**

25        On March 1, 2010, the government called Stephen Beyer, a former employee of Brocade's

26   Human Resources ("HR") Department, in its case-in-chief.  During his examination, Beyer

27   testified that he had "concerns" about Brocade's options-pricing practices.  (*See, e.g.*, RT, Vol. 7

28   (Mar. 1, 2010) at 1243:5–10.)  Before he joined Brocade's HR Department, Beyer worked at

Cooley Godward
Kronish LLP
Attorneys At Law
Palo Alto

4.

Def.'s Motion for New Trial
CR06-00556 CRB

1   KLA-Tencor between 1997 and 2001.  (*See* RT, Vol. 8 (Mar. 2, 2010) at 1341:3–5; *see also* RT,

2   Vol. 2 (June 19, 2007) at 336:9–11.)

3          During cross-examination, Beyer testified that Exhibit 3452 is a November 20, 2000 email

4   from his supervisor at KLA-Tencor, Joy Nyberg, to his co-worker Lars Sampson, in which Ms.

5   Nyberg requested that Mr. Sampson price a stock option grant several days earlier—on

6   November 10.  (RT, Vol. 8 at 1353:7–25.)  Beyer also testified that Exhibit 3453 is an email

7   chain in September 2000 in which Ms. Nyberg requested that he present KLA-Tencor CEO

8   Kenneth Schroeder and CFO Gary Dickerson with a list of stock-option grants to be signed and

9   retroactively approved with the stock price as of August 11, 2000.  (*See id.* at 1352:1–1353:6.)

10         On redirect, the prosecutor asked several leading questions that elicited testimony beyond

11   the context of the grants at issue in Exhibits 3452 and 3453.  The government's leading questions

12   and Beyer's responses suggested that in 2000, KLA-Tencor was "auto-pricing" stock options in a

13   manner "drastically" different from the process at Brocade.

14         Q.  Do you recall whether *KLA-Tencor had an automatic* process by which
15              the stock options at that particular company were priced?

16         A.  I believe that's my recollection, that they were priced on a regular
               schedule basis, yes.

17         Q.  That they were quote—withdrawn.  That *there was, quote, auto pricing at
               KLA-Tencor*?

18
19         A.  That was my recollection for the general grants going out to employees,
               yes.

20         Q.  Okay.  So as that term was used in your employment at this other
               company, *what is meant by auto pricing*?

21         A.  Well, I believe in this instance this is a—basically, a preset date.  What a
22              lot of companies will do for option granting is to regrant or price options,
               if you will, on the first Friday of every month or the first Friday of the first
23              week of every quarter.  And they'll do that, actually, looking forward.  So
               there's no speculation to the pricing process.  I think that would be an
24              accurate description of auto pricing.

25                                          * * *

26         Q.  To the best of your knowledge, Mr. Beyer, *was there so-called look-back
               pricing at KLA-Tencor*?

27         A.  I honestly don't recall that.

28         Q.  Okay.  *You do not recall that that happened at KLA-Tencor*?

A. I do not.

Q. Okay. So, in that way, *the auto pricing that you've described at your prior employer* is that different from the look-back pricing that you've described existed at Brocade?

A. Drastically different, yes.

\* \* \*

Q. Okay. *If there's auto pricing in the manner you've described, does it matter that the grant is being prepared after the auto price date*?

A. No, it doesn't, particularly, if that's a board or a compensation committee-approved process that they go through regular days. *There's, administratively, in that sort of an instance, a typical lag to process those.* It does take some time.

Q. *Is that fair to say that's what's going on in those e-mails*?

A. That's certainly a reasonable explanation.

(*Id.* at 1357:1–1358:12; *id.* at 1359:13–23 (emphasis added).)  As the prosecutor knew at the time, KLA-Tencor's options practices were far from automatic.

> **2.  KLA-Tencor's options practices were substantially similar to Brocade's, and the government's inferences to the contrary misled the jury.**

On September 28, 2006, KLA-Tencor announced it would have to restate its financial results to correct its past accounting for stock options after a special committee discovered certain of KLA-Tencor's stock options had been retroactively priced.  (KLA-Tencor Corp. Fiscal Year 2006 Form 10-K (Filed Jan. 29, 2007) at 33 (Dkt. No. 1117-6.)  In contrast to the testimony the government elicited from Beyer, in its 2006 Form 10-K KLA-Tencor admitted it previously engaged in "intentional" backdating of stock options.  (*Id.* at 33–34.)  According to the 10-K, KLA-Tencor's Special Committee concluded, among other things, that (a) the company engaged in retroactive pricing of stock options granted to all employees who received options from July 1, 1997 to June 30, 2002 (covering the entire period that Beyer worked there); (b) the company's retroactive pricing of options was intentional, not inadvertent nor the result of administrative errors; and (c) the company's retroactive pricing of options involved the selection of low exercise prices.  (*Id.* at 34.)  "The Special Committee [also] concluded that, with a few immaterial exceptions, the retroactive pricing of stock options stopped after June 30, 2002."  (*Id.*)

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

6.

DEF.'S MOTION FOR NEW TRIAL
CR06-00556 CRB

1   The prosecutors knew well that Beyer's testimony—which they intentionally elicited from

2   him—was fundamentally inconsistent with KLA-Tencor's actual options practices.  On July 25,

3   2007, the SEC in San Francisco filed charges against KLA-Tencor and its former-CEO Kenneth

4   L. Schroeder, "alleging that they engaged in an illicit scheme to backdate stock option grants."

5   (Dkt. Nos. 1117-8, 1117-9.)  The SEC complaint charged Schroeder with knowingly backdating

6   grants to employees at KLA-Tencor from mid-1999 to mid-2002.  (Dkt. No. 1117-8 at ¶ 1.)  The

7   SEC's complaint against Mr. Schroeder directly contradicts the testimony elicited from Beyer that

8   there was no "look-back pricing at KLA-Tencor."  Indeed, the SEC specifically alleges that the

9   two option grants discussed in Exhibits 3452 and 3453—the August 13, 2000 and November 10,

10   2000 grants—were among the grants that were wrongfully backdated.  (*Id.* at ¶ 25 & App'x A.)

11   The investigation of KLA-Tencor was conducted in this district and at least one SEC attorney is

12   listed on the pleadings in both the KLA-Tencor and Brocade cases.  If these facts were not

13   enough to demonstrate the willfulness of the government's misconduct, the prosecutor in this case

14   has been described as perhaps more experienced in investigating and prosecuting backdating

15   cases than anyone in the world.[4]

16           **3.      The government's obligation to correct the misimpression left**
17                   **by Beyer's testimony, which it failed to meet, was not**
                    **dependant on the defense's knowledge of the false testimony.**

18           The question presented by Mr. Reyes's motion for mistrial was not simply—or even

19   primarily—whether Beyer knowingly testified falsely.  An even greater denial of Mr. Reyes's

20   right to a fair trial was presented by the government eliciting Beyer's testimony that KLA-Tencor

21   "auto-priced" stock options.  This knowing and intentional line of questioning by the prosecutor

22   resulted in a highly prejudicial false impression that Brocade's options practices were "drastically

23   different" from KLA-Tencor's practices.  Regardless whether Beyer himself recalled that KLA-

24   Tencor engaged in backdating while he worked there, the government knew what the facts were

25   and had an *independent* obligation not to create a false impression for the jury.  *See United States*

26

27   _____

    [4]   *See* RT, Vol. 9 (Mar. 3, 2010) at 1724:6–9 ("I happen to have in the courtroom, Your Honor, someone
28   who has probably seen more backdating cases than anyone else in the world.  Or, certainly, in this
    District.").

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

7.

DEF.'S MOTION FOR NEW TRIAL
CR06-00556 CRB

1  *v. Alli*, 344 F.3d 1002, 1005-1007 (9th Cir. 2003) (prosecution had obligation to correct witness's

2  testimony that he "didn't know" that prosecutors had promised cooperation credit); *United States*

3  *v. Blueford*, 312 F.3d 962, 971 (9th Cir. 2002) (finding prosecutorial misconduct where "the

4  general inference the jury was asked to draw was against all the available confirming evidence"

5  and witness exams "were at least seriously misleading"). Yet, this is exactly what the

6  prosecutor's redirect examination accomplished.

7       Nor was the government's constitutional obligation in any way dependent on a reaction

8  from the defense. It is the prosecutor, not defense counsel, who is obligated to refrain from

9  eliciting false testimony and to correct immediately false testimony from any government

10  witness. *See United States v. LaPage*, 231 F.3d 488, 492 (9th Cir. 2000) ("[T]he government's

11  duty to correct perjury by its witnesses is not discharged merely because defense counsel knows,

12  and the jury may figure out, that the testimony is false. Where the prosecutor knows that his

13  witness has lied, he has a constitutional duty to correct the false impression of the facts.").

14       Disregarding its duty, the government intentionally and improperly elicited Beyer's

15  testimony that KLA-Tencor "auto-priced" stock options. This created a false or misleading

16  impression that Brocade's options practices were "drastically different"—and thereby suggested

17  to the jury that Beyer's purported "concerns" resulted from a stark contrast between Brocade's

18  prior practices and those at his prior employer. In short, "it appears that the prosecutor was

19  asking the jury to infer one or more facts that he either knew to be false or, at least, could not

20  have believed might be true, given that he had specific evidence indicating the contrary."

21  *Blueford*, 312 F.3d at 969. As the defense argued, these circumstances required a mistrial if not

22  dismissal, or, at a minimum, a curative instruction to attempt to dispel the prejudicial effect of the

23  government's misconduct. But only the defense's proposed instruction would have explained

24  fully and accurately the similarities between the options practices at KLA-Tencor and Brocade.

25

26

27

28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

8.

DEF.'S MOTION FOR NEW TRIAL
CR06-00556 CRB

**4.   The defense's proposed curative instruction would have properly informed the jury that Beyer's former employer engaged in intentional backdating.**

To address the false impression created by Beyer's testimony, the defense proposed a curative instruction[5] that would correct the record (as the government had failed to do) and place Beyer's testimony into proper context:

> On March 3, 2010, the government elicited testimony from Stephen Beyer relating to whether his prior employer, KLA-Tencor, engaged in a process described as "auto-pricing" of stock options that was "drastically different" from the retroactive pricing used at Brocade.  In response to the government's questions on redirect examination, Mr. Beyer's testimony on that subject was inaccurate and misleading.  Contrary to the government's questions and Mr. Beyer's responses, KLA-Tencor did not use an "auto-pricing" process in 2000.  Instead, KLA-Tencor regularly and intentionally backdated employee grants by using hindsight to pick periodic low prices during the time period that Mr. Beyer worked there.  Specifically, the November 10, 2000 stock price referenced in Exhibit 3452 was the lowest closing stock price for KLA-Tencor for both the 2000 calendar year and KLA-Tencor's Fiscal Year 2001.  The August 11, 2000 stock price referenced in Exhibit 3453 was the second-lowest closing price for the eleven weeks of KLA-Tencor's First Quarter that preceded Mr. Beyer's September 14 email.  The options referred to in these exhibits were granted "in the money," but KLA-Tencor did not take an associated compensation expense.

(Dkt. No. 1117-11.)  This instruction accurately reflected KLA-Tencor's options practices with respect to the exhibits referenced in Mr. Beyer's testimony, and sought to address the critical problem with the testimony: the government's use of leading questions to leave the jury with an impression of the facts concerning those practices that was directly contrary to the truth.

In contrast, the government's proposed instruction purported to focus on Mr. Beyer's state of mind while portraying KLA-Tencor as simply one of many companies that restated options expenses for unexplained and unknown reasons—leaving the jury with the continuing, related, and highly damaging misimpressions that (i) KLA had used (and Beyer had understood it to use) an "auto-pricing" system while Beyer was employed there; and thus (ii) it was credible for Beyer to testify that Brocade's "dramatically different" practices had caused him "concern":

---

[5]  Mr. Reyes's request that the Court strike Beyer's testimony regarding KLA-Tencor and read a corrective instruction to the jury was only an alternative to his request for a mistrial or dismissal based on the prosecution's intentional introduction of false or misleading testimony.  (*See* Dkt. No. 1116, at 3 n.1.)

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

**DEF.'S MOTION FOR NEW TRIAL
CR06-00556 CRB**

1

2

3

4

5

6

> During the government's case in chief, you heard testimony from Stephen Beyer about the stock-option granting process at KLA-Tencor. This testimony has been admitted for the limited purpose of establishing Mr. Beyer's state of mind about the stock-option granting process at Brocade and not to establish what occurred at KLA-Tencor. In other words, the only relevance of Mr. Beyer's testimony about KLA-Tencor is to provide information about what Mr. Beyer thought and did at Brocade and not for any other purpose. It is for you to decide whether to accept or reject Mr. Beyer's testimony in whole or in part.

7

8

9

> As you have previously heard, the parties have stipulated that a substantial number of public companies disclosed in their public filings that they backdated stock options without taking a corresponding compensation charge. In considering the testimony of Mr. Beyer, you may take into consideration that KLA-Tencor disclosed in its public filings that it backdated stock options during the time that Mr. Beyer was employed there.

10

11   (Dkt. No. 1142, at 11–12.)  As the defense explained on the record, the government's proposed

12   instruction not only would have failed to correct the core problem caused by the government's

13   improper questioning, it would have affirmatively reinforced the misleading impression created

14   by those questions and Beyer's factually inaccurate answers that Brocade's options practices were

15   materially different from those used by KLA-Tencor at the time Beyer worked there.[6]

16       Mr. Reyes respectfully submits that the government's conduct in eliciting material

17   testimony that it knew was false or—at a minimum—misleading, compounded by the failure to

18   give the defense's proposed instruction designed to address the actual damage caused by that

19   misconduct, laid the foundation for an unsustainable jury verdict.  Because the government's

20   knowing use of false testimony deprived Mr. Reyes of his constitutional right to due process of

21   law, the verdict cannot stand unless the government shows that its conduct was harmless beyond

22   a reasonable doubt.  *LaPage*, 231 F.3d at 491.  On this record, the government cannot make such

23   a showing.  *See also id.* ("[W]e must reverse if there is any reasonable likelihood that the false

24

25

26

27

28

[6]  *See* RT, Vol. 16 (Mar. 22, 2010) at 2786:10–16 ("We are concerned that both the first paragraph and the second paragraph could reinforce the concept that Mr. Beyer allegedly had concerns at Brocade, and that the auto-pricing issue was somehow drastically different at KLA-Tencor.  And we think that that is inconsistent with the 10-K, the SEC complaint, as well as the actual two e-mails.  So we are requesting that the Court not give the instruction."); *see also id.* at 2790:25–2791:3 (defense objection to government's proposed instruction: [I]t would suggest that [Beyer] had concerns, and his concerns are triggered because the practices at Brocade were drastically different than the practices at KLA-Tencor.").

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

10.

DEF.'S MOTION FOR NEW TRIAL
CR06-00556 CRB

1    testimony could have affected the judgment of the jury." (internal quotations and citations

2    omitted)).

3    **C.      The Government's Use of Evidence Relating to Mr. Reyes's**
             **Compensation from Brocade Went Beyond Mere Motive to Bias the**
4            **Jury Against Mr. Reyes.**

5            In its opening statement, the government asserted that Mr. Reyes carried out the alleged

6    backdating scheme "in order to grant millions of so-called in-the-money options *to himself* and

7    others inside Brocade."  (RT, Vol. 3 (Feb. 22, 2010) at 261:10–12 (emphasis added).)  As the

8    Court observed during the pretrial conference, this was the first time in more than three years of

9    litigation that the government had asserted that Mr. Reyes's alleged motive was anything other

10   than recruiting and retaining Brocade employees.  (RT, Pretrial Conf. (Feb. 16, 2010) at 82:8–15.)

11   In contrast, the government argued during the 2007 trial that the true purpose of Brocade's stock-

12   option program was to attract and retain highly sought after employees.  (*See* RT, Vol. 1 (Jun. 18,

13   2007) at 11:13–16 ("Mr. Reyes, was eager to use [stock options] to attract high quality talent, top

14   talent, and to keep that talent at Brocade away from its competitors, to make Brocade more

15   competitive").)

16          The Court properly excluded evidence of Mr. Reyes's salary and bonus (RT, Pretrial

17   Conf. at 91:7–8), but denied Mr. Reyes's motion *in limine* to exclude Mr. Reyes's stock sales (*id.*

18   at 91:1–2).  The Court further instructed that, based on the charges in the indictment, evidence of

19   Mr. Reyes's own options and stock sales was not to be admitted nor argued as charged conduct

20   (*id.* 90:21–24 ("He's not charged with that.  That's the beginning and the end of it.  He's not

21   charged with it.  He's not on trial for it.").  Following the Court's partial denial of his motion *in*

22   *limine*, Mr. Reyes filed an additional motion *in limine* seeking to exclude evidence of the

23   monetary value of his stock sales.  (*See* Dkt. No. 1063.)  Only then, based on the denial of its

24   initial motion, did the defense cooperate with the government on a stipulation.  The government

25   later introduced the stipulation through Special Agent Medearis.  (RT, Vol. 10 (Mar. 4, 2010)

26   at 1974:19–22 ("Mr. Reyes sold a significant amount of Brocade stock on dates between 2000

27   and 2004.").)

28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

11.

1    The government's deviation from the Court's instructions as to the permissible uses of

2    evidence relating to Mr. Reyes's options and stock sales began with opening statements.  There,

3    the government argued that Mr. Reyes was the person "who stood the most to gain from this

4    fraud" and that he "game[d] the system and pad[ded] his own pocket" at the expense of Brocade's

5    shareholders—without any suggestion that the jury should view such evidence solely as to

6    motive.  (RT, Vol. 3 (Feb. 22, 2010) at 276:20–21; *id.* 261:17–19.)  In the same breath as it

7    argued the "personal profit" theory, the government made other unsupported statements as to Mr.

8    Reyes's motive and intent for backdating.  Namely, that he was "falsely inflating Brocade's

9    performance" to make Brocade "look more profitable than it really was" (RT, Vol. 3 at 263:7–9)

10   and "misleading shareholders into thinking Brocade was really following its corporate practices

11   against options with built-in profits" (*id.* 266:11–14).

12   Through the testimony of expert witness Gerald Fujimoto, the government laid the

13   foundation for its expansive use of Mr. Reyes's options beyond the limitations imposed by the

14   Court before trial.  Specifically, the government elicited testimony from Fujimoto that Mr. Reyes

15   had received more than 13 million options between 2000 and 2004 (RT, Vol. 10 (Mar. 4, 2010)

16   at 1998:21–1999:16; Ex. 453), and that the "value" of these options totaled nearly $130 million

17   (RT, Vol. 11 (Mar. 8, 2010) at 2076:11–23).  However, by the conclusion of the trial, the

18   government had failed to prove that Mr. Reyes himself profited from the alleged fraudulent

19   conduct.  Indeed, there was no evidence demonstrating that the November 1999 grant the

20   government used to demonstrate a $3 million profit to Mr. Reyes was backdated by Mr. Reyes

21   himself.  Consistent with this evidence (or lack thereof) and the Court's comments during the

22   pretrial conference, Mr. Reyes's proposed jury instruction made clear that his option grants and

23   stock sales were not to be considered as charged conduct:

24       You are here only to determine whether Mr. Reyes is guilty or not guilty of
         the charges in the indictment.  Your determination must be made only from
25       the evidence in the case.  Mr. Reyes is not on trial for any conduct or offense
         not charged in the indictment.  *In particular, Mr. Reyes is not charged with*
26       *any criminal misconduct related to his own purchases or sales of Brocade*
         *stock, nor his receipt or exercise of Brocade stock options.*  You should
27       consider evidence about the acts, statements, and intentions of others, or

28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

12.

DEF.'S MOTION FOR NEW TRIAL
CR06-00556 CRB

1  evidence about other acts of Mr. Reyes, only as they relate to the charges
2  against Mr. Reyes.

3  (Dkt. No. 1112 at 12 (emphasis added).)  The instruction ultimately given by the Court excluded

4  the text expressly referencing Mr. Reyes's options and stock sales.[7]

5    In rejecting Mr. Reyes's proposed instruction, the Court relied on its impression that the

6  government offered evidence relating to Mr. Reyes's options and stock sales in a manner limited

7  to the issue of motive.  (*See* RT, Vol. 15 (Mar. 19, 2010) at 2742:19–21; *see also generally id.*

8  at 2741:1–2744:12 (full colloquy).)  In closing, the government paid lip service to the Court's

9  instruction to view such evidence for the limited purpose of motive, but nonetheless suggested to

10  the jury that the principal purpose of the scheme charged in the indictment was personal

11  enrichment.  In doing so, the government transparently sought to inflame the jury against Mr.

12  Reyes because of his financial success as CEO of Brocade:

13    Now, take a look, if you would, please, at the column that is entitled "For
14  grants received by Mr. Reyes."  And at the bottom of that, you'll see the $129
   million number.

15    *The approximate amount of built-in profit for Greg Reyes from the backdated*
16  *options he received at the time he received them is approximately $129*
   *million.*  That's the figure that Mr. Fujimoto came to...

17    **But it is not true that the failure of Mr. Reyes to** *capitalize on his crime* **by**
18  **more than $2 million is meaningless, in any sense.**  That's a little like
   saying a bank robber did not intend to take the money because he wound up
19  getting caught and he never got to spend it.

20    At the time Greg Reyes was committing this fraud, you may reasonably infer
   that Greg Reyes hoped he would make over $100 million in hidden profit.
21  Again, that is evidence you may reasonably consider in evaluating whether he
   had a motive to commit this crime, and whether he backdated the options with
22  an intent to defraud shareholders.

23  (RT, Vol. 16 (Mar. 22, 2010) at 3051:19–3052:17 (emphasis added).)  Through this testimony

24  and argument, the government went far beyond the issue of motive to compare Mr. Reyes's

25

26  [7]  Jury Instructions, Dkt. No. 1158 at 12 ("You are here only to determine whether the defendant is guilty
   or not guilty of the charges.  Your determination must be made only from the evidence in the case.  The
27  defendant is not on trial for any conduct or offense not charged.  You should consider evidence about the
   acts, statements, and intentions of others, or evidence about other acts of the defendant, only as they relate
28  to this charge against this defendant.").

Cooley Godward
Kronish LLP
Attorneys At Law
Palo Alto

13.

Def.'s Motion for New Trial
CR06-00556 CRB

1   receipt of options to the bank robber caught mid-act.  This was a completely false analogy: Mr.

2   Reyes was not charged with criminal conduct relating to his own options.  Nonetheless, the

3   government pressed evidence of Mr. Reyes's options to encourage the jury to convict based on

4   (1) bias or resentment relating to Mr. Reyes's financial success and his position as CEO and (2) a

5   criminal scheme far broader than was charged in the indictment.  Without an instruction

6   specifically referencing Mr. Reyes's options and stock sales, the risk that the verdict rests on such

7   impermissible considerations justifies an order granting a new trial.

8          **D.      By Disclaiming Any Significance of "What Finance Knew" and
               Failing to Prove That "Finance Was Deceived," the Government**
9          **Circumvented the Elements of the Charges.**

10         As argued separately in Mr. Reyes's Rule 29(c) motion, the government failed to

11  introduce evidence relating to Mr. Reyes's alleged intent and state of mind sufficient to support a

12  guilty verdict on any of the nine counts of conviction.  But even if the Court determines that the

13  evidence relating to Mr. Reyes's state of mind was technically sufficient, the government's

14  critical failure to establish that Mr. Reyes's *conduct*—regardless of his intent—actually caused

15  the allegedly false or misleading statements or omissions justifies a new trial.  It simply does not

16  comport with the interests of justice to convict a CEO based on allegedly fraudulent conduct that

17  was (1) known to and carried out routinely by many individuals at the company; and (2) in

18  particular, known to the company's senior finance officers[8]—particularly without any affirmative

_____

19  [8]  *See* RT, Vol. 4 at 487:5–7 ("I do recall that Finance was involved, and that the controller was being
20  tapped into, as well, in terms of their guidance." (Cuevas)); *id.* at 507:8–9 ("I did understand that Finance
    was aware of the [part-time] program, yes." (Cuevas)); RT, Vol. 5 (Feb. 24, 2010) at 833:19–21 ("[Q.]
21  Mike Byrd was, in fact, reviewing that NASDAQ printout with Stephanie Jensen, correct?  A. That's what
    I took away, yes." (Lee)); JTX 77 (4/22/03 Bossi email to Weaver, Epstein, and Blucher: "New hire grants
22  can happen whenever you want."); JTX 2080 (10/20/99 Byrd email to Jensen, "Please look at whether its
    to the employees advantage to grant the option on their start date."); RT, Vol. 8 (Mar. 2, 2010) at 1311:15–
23  16 ("To my recollection, [the process by which stock options were priced] was a very open and
    communicative process with the finance organization." (Beyer)); *see also id.* at 1311:17–20 ("Q. And
24  nobody in finance ever told you that the process of look-back pricing was wrong, correct?  A. I don't recall
    ever hearing that specifically from anyone in finance." (Beyer)); JTX 2573 (4/4/02 Moore email to Beyer,
25  Jensen, paperwork for backdated Soh grant "is with Bossi waiting for signature."); RT, Vol. 7 (Mar. 1,
    2010) at 1145:15–1146:3 (Deranleau participated with Webb and Weaver in effort to improve company's
26  options-granting practices); JTX 2506 (12/15/01 Blucher email re "Share Calculation"); JTX 2431
    (7/31/01 Byrd email re "RE: Options – MBO"); JTX 2238 (11/13/00 email exchange between Gary and
27  Scott Blucher re backdating part-time start date); JTX 2083 (10/22/99 Byrd email re "Setting Stock
    Options for Board Meeting"); JTX 2070 (10/4/99 Byrd email re "Price options"); JTX 2487 (11/6/01
28  Jensen email re "Pillar List from Finance"); RT, Vol. 10 (Mar. 4, 2010) at 1806:14–22, 1813:5–23,

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

14.

**DEF.'S MOTION FOR NEW TRIAL
CR06-00556 CRB**

1    proof that the CEO was ever advised that the conduct created an accounting problem or that he

2    ever directed anyone to falsify the company's records or accounts.[9]

3          The government dedicated much of its case to proving that (a) "backdating happened" and

4    (b) Brocade's financial statements during the relevant period did not comply with APB 25.  It

5    failed, however, to establish a causal connection between these two points running through Mr.

6    Reyes—and thus failed to prove the elements of its case beyond a reasonable doubt.  The only

7    means by which the government could have connected these points is by proving *not only* that

8    Mr. Reyes acted with criminal knowledge and intent—which it failed to do—but also that he

9    "made or caused to be made" the alleged false statements upon which every count rests.[10]  Yet,

10   the evidence was uncontroverted that Brocade's senior finance officers (as well as the Audit

11   Committee) bore responsibility for stock-options accounting.[11]  Beyond mere sufficiency of the

12   evidence, Mr. Reyes could not have acted in bad faith or "caused" any false statements without

13   somehow preventing compliance with APB 25 through deception of, or affirmative direction to,

14   those who were principally responsible for designing, implementing, and understanding the

15   company's procedures and ensuring the accuracy of its financial statements.

16         The government failed to make any such showing beyond a reasonable doubt.  In fact, it

17   disclaimed the relevance of this issue in closing and conceded that it had not established that the

18   gatekeepers of Brocade's financial statements were deceived or coerced.[12]  Because the

19   _____

     1821:5–25, 1822:14–1823:4, 1831:2–5, & 1838:22–1840:3 (Miotto unable to conclude that 4/17/00

20   director grants to Sonsini, Nieman, Leslie, and Dempsey were not backdated).

     [9]  *See, e.g.*, RT, Vol. 5 at 723:25–724:2 ("Q. You never did anything to conceal the options-pricing

21   processes from anybody, did you?  A. Correct." (Weaver)); *id.* at 698:19–22 ("Q. You would agree with

     me that the—there was never any effort to keep that process secret or hidden from anybody, correct?  A.

22   Correct." (Weaver)); RT, Vol. 8 at 1310:18–20 ("[Q.]  And you never tried to conceal [the process by

     which stock options were priced] from anybody in the finance department, correct?  A. No. That's

23   correct." (Beyer)); RT, Vol. 4 at 541:23–25 ("Q. [Ms. Jensen] didn't do anything to try and hide the fact

     that she was looking at the price chart, did she?  A. No." (Cuevas)).

24   [10]  *See* Jury Instructions (Dkt. No. 1158) at 22 (Count Two), 25 (Counts Five, Six, and Seven), 27 (Count

25   Eight), & 31 (Counts Nine, Ten, Eleven, and Twelve).

     [11]  *See* RT, Vol. 6 (Feb. 25, 2010) at 1019:5–8 (Brocade's Finance Department, in particular its CFO, "had

26   the ultimate responsibility for ensuring that the accounting treatment for stock options in Brocade's

     financials was correct[.]" (Deranleau)); *id.* 1060:14–20 (part of Audit Committee's "charter is to have

27   oversight over the company's financial filings" and interact with Finance Department and outside

     auditors).

28   [12]  *See* RT, Vol. 16 (Mar. 22, 2010) at 3016:2–8 ("The defense has insisted that these e-mails show what

government provided no proof that Mr. Reyes (1) deceived these professionals, (2) frustrated their

ability to access the information necessary for a complete and accurate internal audit, or

(3) otherwise directed or affirmatively orchestrated misconduct, the government failed to show

that Mr. Reyes knowingly or purposefully made or caused the making of any false or fraudulent

statement or omission.  In such circumstances, the government needed convincing proof of

personal guilt to support criminal prosecution of the company's CEO for failure to comply

APB 25.  (*See* Jury Instructions, Dkt. No. 1158 at 36 ("Good Faith") (finding of criminal intent is

inconsistent with "a good-faith belief that the alleged false or misleading statements were in fact

accurate").)  Instead, the government relied only on innuendo, speculation, and carefully invoked

resentment or prejudice against a successful and hard-driving CEO.[13]  That is not—or should not

be—enough.

**E.    The Denial of Mr. Reyes's Proposed Jury Instructions Permitted the Government To Argue Unchecked a Theory of the Case in Closing that Did Not Comport With the Elements.**

The government's affirmative misconduct in creating the false impression of KLA-

Tencor's options practices through Stephen Beyer's testimony, as well as improperly arguing

evidence of causation and motive, justify a new trial.  But instructional error also contributed to a

verdict that is substantially inconsistent with the weight of the evidence.  Mr. Reyes respectfully

submits that the denial of the proposed instructions discussed below resulted, individually and

collectively, in a sufficiently serious miscarriage of justice to warrant a new trial.

---

[CFO] Mike Byrd knew about the backdating at Brocade.  Okay.  But what Mike Byrd knew and did not know about the backdating scheme does not help you answer the real question of what Mr. Reyes knew . . . . Nor is what Mike Byrd knew particularly relevant."); *id.* at 3045:1–4 ("[Y]ou really do not have a solid record to divine what the board at Brocade did and did not know.  And what the board members did and did not know does not help you answer the real question of what Mr. Reyes knew . . . .").

[13]  *See, e.g.*, RT, Vol. 16 at 3030:6–10 ("[T]here was something terribly wrong going on at Brocade.  It wasn't just a culture of execute or be executed. . . . It made the people who were asked to do the dirty work very, very uncomfortable, and with good reason."); *id.* at 2850:1–3 ("'It's not illegal if you don't get caught.'  Is there a reasonable explanation for that statement?"); id. at 3051:8–13 ("Counsel would have you believe that Mr. Reyes hardly made anything from his backdating scheme.  That's not true.  As Mr. Fujimoto testified, Greg Reyes actually pocketed approximately $2 million, from backdated options.").

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

16.

DEF.'S MOTION FOR NEW TRIAL
CR06-00556 CRB

1. **The jury notes and evidence at trial justified Mr. Reyes's proposed instruction relating to consideration of his role as CEO of Brocade.**

On March 9, 2010, more than two weeks into trial, Juror No. 6 sent to the Court a question addressing Mr. Reyes's role as CEO of Brocade:

> Dear Judge Breyer,
>
> Wondering if . . .
>
> we will get additional instruction/direction from the court (or prosecution) regarding how we are to interpret the facts for and against the defendant.
>
> What I'm asking is, for the charges against Mr. Reyes are we looking at these for him as an individual or him as CEO?  CEO meaning person ultimately responsible for [the] company.
>
> from your super novice juror,
>
> [name redacted]

(Dkt. No. 1169 at 5.)  In response to the note from Juror No. 6, the Court stated to the jury that it would provide instruction relating to the issue raised by the note—*i.e.*, "specifically about issues of the law relating to liability, and what should be looked at, and how roles should be considered and so forth."[14]  Only one day before the note was submitted, the defense had submitted a proposed jury instruction that would properly have charged the jury that any consideration of Mr. Reyes's culpability—and particularly his state of mind—must be judged solely from the evidence of Mr. Reyes's personal knowledge:

> You have heard testimony that Mr. Reyes was the Chief Executive Officer ("CEO") at Brocade Communications Systems, Inc.  *You may not infer, based solely on his position at Brocade, that Mr. Reyes engaged in or had knowledge of the alleged misconduct*.  A defendant who is an officer of a corporation is not criminally responsible for the alleged acts of his subordinates *merely because he held a senior position with the corporation*.
>
> Similarly, it is not enough for the government to merely prove that the alleged conduct occurred at Brocade or that there were misstatements or omissions in the financial statements for Mr. Reyes to be held criminally responsible.  Nor is it enough for the government to prove that one or more individuals involved in the alleged conduct reported to Mr. Reyes.  Instead, *the law requires the*

---

[14]  RT, Vol. 12 (Mar. 9, 2010) at 2385:24—2386:1; *id.* at 2386:2–5 ("And as to that communication, I don't have to read it to you, but it is the Court's intention to address those issues at the time just before the closing arguments and the time when you're going to deliberate.").

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

17.

DEF.'S MOTION FOR NEW TRIAL
CR06-00556 CRB

1

> *government to prove beyond a reasonable doubt that Mr. Reyes himself acted*
> *with the particular unlawful intent required for each offense*.

2

3   (Dkt. No. 1112, at 57 (emphasis added); *see also* Def.'s Pretrial Proposed Jury Instructions, Dkt.

4   No. 1037, at 66 ("Respondeat Superior Liability").)[15]  Although the defense's proposed

5   instruction directly addressed the question presented by the juror's note, and defense counsel so

6   indicated during the charge conference, the Court denied the instruction.[16]  Mr. Reyes respectfully

7   submits that the failure to instruct the jury as to the proper limits of its inquiry into the elements

8   of intent, knowledge, and willfulness—particularly in light of at least one juror's serious

9   inquiry—created a risk that Mr. Reyes was convicted merely because he was the "person

10  ultimately responsible for [the] company" in the jury's view.

11
12

**2.      The "Backdating Is Not Illegal" instruction from the Jensen
case did not adequately instruct the jury that a conviction
required more than incorrect dates on company documents.**

13      The indictment accused Mr. Reyes of falsifying a variety of documents in addition to

14  stock option grants—in particular, offer letters—and unlike the case against Stephanie Jensen,

15  Mr. Reyes was charged with much more than a books-and-records count.  Consistent with the

16  scope of the indictment, the "backdating" instruction proposed by the defense followed closely

17  the instruction given in the 2007 trial:

18
19
20

> Retroactively dating or pricing, or alternatively "backdating," stock-option
> grants or related paperwork is not, in and of itself, a violation of criminal law.
> The fact that options, grant lists, or other paperwork may have been
> retroactively dated, or that stock options may have been retroactively priced,
> does not by itself establish a criminal violation of federal securities laws.

21

22

23   [15]  *See also* Jury Charge (Dkt. No. 2597) § II.B at 11–12, *United States v. Forbes*, No. 02-cr-00264 AWT,

24   (D. Conn. Oct. 31, 2006) (affirmatively instructing jury that doctrine of *respondeat superior* has no
application in criminal case and that knowledge, willfulness, unlawful intent, and criminal responsibility

25   may not be inferred based on defendant's position); Kevin F. O'Malley, *et al.*, FED. JURY PRAC. & INSTR.
§ 18:04 (6th ed. 2008) ("A defendant who is an officer of a corporation is not criminally responsible for

26   the illegal acts of another officer, director, employee, or agent performed on behalf of that corporation
merely because of his status as an officer of the corporation.").

27   [16]  *See* RT, Vol. 15 (Mar. 19, 2010) at 2771:4–8; *id.* at 2771:11–16 ("I mean it may very well be—it
certainly is relevant.  He signs—he's the guy in charge.  He's the one who signs those forms.  He wouldn't

28   sign them if he weren't the CEO.  So I don't want to say, 'Oh, by the way, CEO, forget that.'").

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

18.

DEF.'S MOTION FOR NEW TRIAL
CR06-00556 CRB

Further, you should not consider that the Company, in response to retroactive dating or pricing, decided to restate its financial results as evidence that Mr. Reyes knew his conduct was wrong at the time.

However, evidence of such practices may be considered by you, along with other evidence, in connection with the crimes charged in the indictment.  In other words, you may consider evidence of retroactive dating or pricing, or "backdating," in light of the specific elements that must be proved in connection with each of the counts charged.

(Dkt. No. 1112, at 54; *see also* 2007 Jury Instructions (Dkt. No. 543) at 39.)  The opening and closing statements by the government further reflected that the charges in this case went beyond the limited scope in Stephanie Jensen's trial.[17]  Nonetheless, the Court's final instruction departed from the law of the case and deleted all reference to specific paperwork and grant lists in favor of a generic and abstract definition of backdating drawn from Stephanie Jensen's case—in which the only substantive charge was falsifying books and records:

"Backdating"—insofar as that term means pricing stock options on a day prior to the date of the grant—is not in and of itself, a violation of the securities laws.  However, evidence of such practices may be considered by you, along with other evidence, in connection with the crimes charged. In other words, you may consider evidence of retroactive pricing, or "backdating," in light of the specific elements that must be proved in connection with each of the counts charged.

(Jury Instructions, Dkt. No. 1158 at 37.)   Beyond the improperly narrow scope of the instruction, relative to Jensen's case, the instruction's use of the phrase "date of the grant" permitted the jury to assume that "date" for APB 25 purposes was clearly the date the document was signed.  As a result, a juror relying on this instruction could readily have concluded that Mr. Reyes could not have reasonably believed the "date of the grant" for these purposes was the date selected for pricing and "ratified" by signature.  Because a verdict based on such an analysis does not comport

---

[17] *See, e.g.*, RT, Vol. 3 (Feb. 22, 2010) at 272:6–13 (gov't opening) ("For some newer employees, who were particularly close to Mr. Reyes, these same HR witnesses were asked to backdate *offer letters and other Brocade records* so it would appear that the employees were already working at Brocade when, in fact, they had not yet begun to work there.  To successfully falsify one document like an option grant document sometimes required the falsification of *other corporate records* like the employment paperwork." (emphasis added); RT, Vol. 16 at 3027:2–3028:22 (gov't closing relating to alleged backdating of Daniel Cudgma's offer letter).

Cooley Godward
Kronish LLP
Attorneys At Law
Palo Alto

19.

Def.'s Motion for New Trial
CR06-00556 CRB

1   with any of the elements of the charges, the denial of the defense's proposed instruction was

2   error.

3          **3.     Mr. Reyes's proposed instruction that Brocade's restatement is
                   not evidence of wrongdoing would have limited the
4                  Government's misleading arguments in closing.**

5          In closing, the government argued that Brocade's restatement was strong evidence that the

6   FAS 123 disclosures were *per se* inadequate:

> [I]f it was really true that somehow Brocade's FAS 123 footnote disclosures
> were adequate and appropriate, then the company would not have had to
> restate its financial performance.  If you hold on to that fact, you really do not
> need to wade into all the details about the difference between 123 and APB
> 25.
>
> So let me repeat it for you, if I may.  If it really was true that somehow
> Brocade's FAS 123 footnote, that has drawn so much attention from Counsel
> was, in fact, adequate and appropriate, then Brocade would not have had to
> restate its financial performance.
>
> You know that Brocade did restate its financial performance.  And, therefore,
> you know that Brocade's FAS 123 footnotes were not adequate or appropriate.
> Period.

15  (RT, Vol. 16 (Mar. 22, 2010) at 3030:18–3031:8.)  This was a powerful argument, but it is simply

16  wrong, in that it confuses two entirely different concepts: (1) a failure to comply with GAAP that

17  would be sufficiently "material" as an accounting matter to require a restatement of financial

18  statements that purported to comply with GAAP, and (2) whether the same misstatement or

19  omission would be "material" as a *legal* matter, because it would be genuinely significant to a

20  reasonable investor in deciding whether to buy or sell Brocade stock.

21         As it happens, the defense had proposed an instruction that would have safeguarded, at

22  least in part, against this particular prosecution ploy for misleading the jury.  The defense's

23  proposed instruction provided that:

> Brocade's decision to restate its financial results subsequent to the events
> alleged in the indictment does not itself establish that Mr. Reyes committed
> any of the crimes alleged in the indictment, nor that he acted knowingly,
> willfully, or with intent to defraud at the time of the acts alleged in the
> indictment.  As with all evidence, you may consider this evidence to
> determine its significance and the weight that it should be given.

1   (Dkt. No. 1112, at 56.)[18]  The failure to instruct the jury that their finding on the element of

2   materiality was not to be decided by the fact of Brocade's restatement was error.

3          **4.      Ninth Circuit case law supports Mr. Reyes's proposed
                      instruction defining "material" information as  information
4                     that would have caused investors to "have acted differently."**

5          Consistent with the Ninth Circuit's opinion in *Livid Holdings, Ltd. v. Salomon Smith*

6   *Barney, Inc*., 416 F.3d 940 (9th Cir. 2005), the defense's proposed instruction provided that a

7   finding of materiality requires proof beyond a reasonable doubt that "there is a substantial

8   likelihood that a reasonable investor would have acted differently if the misrepresentation had not

9   been made or the truth had been disclosed."  *Id.* at 946–947.  Specifically, the defense's proposed

10  instruction provided that:

11          [I]nformation is "material" if there is a substantial likelihood that a reasonable
            investor would consider it important in deciding whether to purchase or sell
12          shares of Brocade stock.  "Important" means that there is a substantial
            likelihood that a reasonable investor would have acted differently if the
13          misrepresentation had not been made or the truth had been disclosed.  In
            deciding whether a piece of information was important, you must consider
14          that information in light of the "total mix" of information available about
            Brocade at the time of the alleged misrepresentation or omission.  For you to
15          find that a particular statement or omission is material, the government must
            prove beyond a reasonable doubt that there was *a substantial likelihood that*
16          *reasonable investors would have acted differently in their buying or selling*
17          *decisions at the time* if the alleged misrepresentation had not been made or the
            truth had been disclosed.
18

19  (Dkt. No. 1112, at 43 (emphasis added).)[19]  Because the *Livid* opinion remains the law in the

20  Ninth Circuit, Mr. Reyes respectfully submits that the denial of his proposed instruction was

21  ──────────────────────
    [18]  *See also DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390 (9th Cir. 2002) ("[T]he
22  mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not
    establish scienter."); *Commc'ns Workers of Am. Plan for Employees' Pensions & Death Benefits v. CSK*
23  *Auto Corp.*, Nos. CV06-1503-PHX-DGC (Lead) & CV06-1580-PHX-JWS, 2007 WL 951968, at *4 (D.
    Ariz. Mar. 28, 2007) ("The subsequent acknowledgment of GAAP violations and the restatement of
24  financial results may show negligence, but they do not rise to the level of the nefarious mental state
    necessary to constitute securities fraud." (citing *DSAM*, 288 F.3d at 391) (internal quotations and
25  alterations omitted)); Jury Instructions (Dkt. No. 138) at 28, *United States v. Roberts*, No. 07-cr-00100-
    MHP (N.D. Cal. Oct. 3, 2008).

26  [19]  *See also* Kevin F. O'Malley, *et al.*, FED. JURY PRAC. & INSTR. § 62.14 (5th ed. 2000); *Basic Inc. v*
    *Levinson*, 485 U.S. 224, 231–38 (1988); *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976);
27  *United States v. Berger*, 473 F.3d 1080, 1100 (9th Cir. 2007); *United States v. Reyes*, 577 F.3d 1069, 1076
    (9th Cir. 2009) (materiality for all counts supported by evidence that "false statements were capable of
28  misleading investors"); ABA, MODEL JURY INSTR.: SECURITIES LITIGATION § 2.03[2][a] (1996) ("A

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

21.

DEF.'S MOTION FOR NEW TRIAL
CR06-00556 CRB

1  error.  In particular, and for the reasons set forth separately in his motion for judgment of

2  acquittal, the lack of evidence that any reasonable Brocade investor would have acted differently

3  if the misrepresentation relating to Brocade's APB 25 expenses required that the jury be

4  instructed in a manner consistent with the holding in *Livid*.  (*See* Dkt. No. 1174 at 12–15.)

5           **5.     The government's reliance on Brocade "policies" as a proxy
6                   for criminal laws required an instruction that conduct
                    inconsistent with company policies is not evidence of
7                   wrongdoing.**

8           In both opening and closing, the government argued that Brocade's internal policies

9  relating to options pricing were inconsistent with the actual options practices taking place in the

10  HR Department.  This inconsistency, the government argued, was strong evidence that Brocade's

11  practices were illegal—and that Mr. Reyes would have realized his conduct was wrongful.  For

12  example, in opening the government argued:

13          . . . Brocade's policies and financial filings represented that, with some
            exceptions, Brocade granted options at fair market value.
14
            In fact, Greg Reyes's backdating scheme was all about misleading those
15          shareholders into thinking Brocade was really following its corporate
            practices against options with built-in profits, when he knew full well it was
16          not.

17  (RT, Vol. 3 (Feb. 22, 2010) at 266:8–14.)  This same theme was repeated in closing:

18          Finally, if the backdating scheme was, in fact, so open, as defense counsel
            would have you believe, why did it so obviously violate the company's own
19          policies about how grants were priced?

20          (Document displayed)

21          So, this is a blowup from the New Employee Quick Reference Guide that Liza
            Cuevas testified about.  It specifically addresses the company's policies for
22          pricing stock options.  It says:

23              "Your stock.  Pricing of stock options will be equal to the fair market
                value of Brocade's common stock on the date the option is approved
24              by the compensation committee of the board of directors.["]

25

26  ────────────────────────────────

27  finding of materiality must be based on the facts existing when the statement was made.  Materiality
    cannot be judged by hindsight.  You may not consider events occurring after the statement or omission in
28  determining whether the statement or omission was material when it was made.  A statement or omission
    made after the time of the investment cannot be material to that investment.").

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO
                                        22.                        **DEF.'S MOTION FOR NEW TRIAL
                                                                    CR06-00556 CRB**

1
2

> Granting options at fair market value on the day of the grant is the opposite of looking back to low prices and backdating the grants.[]

3

> The fact is that Mr. Reyes's backdating scheme was a dirty little secret at Brocade.

4   (RT, Vol. 16 (Mar. 22, 2010) at 3025:2–20.)  In effect, the government suggested to the jury that

5   Brocade's internal policies should be viewed as a proxy for the law—paving the way for a

6   conviction untethered to the elements.

7         To account for the government's use of Brocade policies in this way, the defense proposed

8   an instruction providing that:

9
10
11
12
13
14

> You have heard reference during the trial about *various Brocade policies and manuals*, certain civil regulations, as well as various applicable accounting requirements—such as generally accepted accounting principles ("GAAP"), Accounting Principles Board Opinion No. 25 ("APB 25"), Financial Accounting Standards Board Interpretation No. 44 ("FIN 44"), and Financial Accounting Standard 123 ("FAS 123").  *You should not consider a violation of these policies*, standards, regulations, or requirements *as a violation of criminal law*.  As with all evidence, you may consider this evidence to determine its significance and the weight that it should be given.

15   (Dkt. No. 1112, at 55 (emphasis added).)  The defense was entitled to an instruction clarifying for

16   the jury the proper limits of its consideration of evidence relating to Brocade's internal policies,

17   and Mr. Reyes respectfully submits that the denial of this instruction was error.

18   **IV.   CONCLUSION**

19         For the reasons above, Mr. Reyes respectfully requests that the Court grant this motion

20   and exercise its discretion under Rule 33 to set aside the jury verdict and order a new trial.

21   Dated:      April 9, 2010                    COOLEY GODWARD KRONISH LLP

22

23                                                        */s/ Stephen C. Neal*
                                                     STEPHEN C. NEAL

24

25                                               Attorneys For Defendant
                                                 GREGORY L. REYES

26

27   843383/HN

28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

23.

DEF.'S MOTION FOR NEW TRIAL
CR06-00556 CRB