DAVID L. ANDERSON (CSBN 149604)
Acting United States Attorney

BRIAN J. STRETCH (CSBN 163973)
Chief, Criminal Division

ADAM A. REEVES (NYSB 2363877)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102
    Telephone: (415) 436-7157
    Facsimile: (415) 436-7234
    Adam.Reeves@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>GREGORY L. REYES,<br><br>    Defendant. | No. CR 06-0556 (CRB)<br><br>**UNITED STATES' REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS POSITION ON LOSS AND RESTITUTION**<br><br>Date: June 24, 2010<br>Time: 2:00 p.m.<br>Place: Courtroom 8 |

## INTRODUCTION

One virtue of a re-trial is the opportunity to further develop the factual record. The government has done just that in this case. Much has changed since 2007 with regard to the evidence of "loss" in this case. Significantly, the United States proved that Greg Reyes received 13,272,133 backdated options, more than any other person at Brocade by over 11 million options. Exhibit 453. As significantly, the United States proved that Reyes personally gained at least $1.9 million in cash from backdated options that he exercised and sold during the scheme. Exs. 460 and 403-00046. In April 2010, the United States introduced the expert opinion of D. Paul Regan

UNITED STATES' REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS POSITION ON LOSS AND RESTITUTION
*United States v. Reyes*, Case No. CR-06-0556 (CRB)

1

of Hemming Morse, Inc., to prove that a conservative estimate of the actual pecuniary harm caused by the defendant far exceeds the $1.9 million he pocketed. We have further supplemented that expert opinion evidence and responded to the defense expert opinion evidence in the Supplemental Expert Report of D. Paul Regan dated May 21, 2010 ("Supplemental Expert Report"). *See* May 21, 2010 Declaration of AUSA Adam A. Reeves attaching the Supplemental Expert Report.

In its November 27, 2007 Order, the Court found that "the government has not put forth a satisfactory method for calculating loss." Document 737 at 11. Respectfully, the United States submits that we have proved at trial or introduced at sentencing evidence that responds to the Court's criticism and persuasively demonstrates that there was a loss, Reyes caused it and it may be conservatively estimated at $6.3 million. In the alternative, the Court may use Reyes's gain of $1.9 million as the loss figure.

## ARGUMENT

**1. THERE WAS A LOSS.**

The loss was not zero as the defendant would have the Court believe. Real people suffered real pecuniary harm as a result of this crime. David Ryan testified that he bought stock in Brocade in October and November 2004, at the culmination of the defendant's multi-year scheme to inflate Brocade's earnings, and started selling on January 7, 2005, the day he learned of the restatement. March 9, 2010 Trial Record (Ryan) at 2316:18-2318:1, 2326:18-2327:24, Exhibit 78. Ryan estimated that he lost approximately $79,000 on his Brocade investment. *Id.* at 2329:15-21. Ryan is only one example. There were at least 1,269 other victims who also experienced losses. Expert Report at 4-5. There can be no question that there was a loss in this case.

**2. REYES CAUSED THE LOSS.**

The defendant's offense conduct was the proximate cause of the investors' losses. The defendant's suggestion that he was not responsible for the 7.51 % stock drop that occurred on

UNITED STATES' REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS POSITION ON LOSS AND RESTITUTION
*United States v. Reyes*, Case No. CR-06-0556 (CRB)

2

January 7, 2005 is eviscerated by the evidence at trial and the inferences the Court can reasonably draw from it:

First, Reyes admitted that he understood the basic accounting rules for stock options. March 10, 2010 Trial Record (Martin) at 2551:8-21.  He swore that he understood the financial statements and that they were accurate. *See e.g.* Exhibit 32.1.  That was why Reyes repeatedly lied about the backdating.

Second, by backdating the options, Reyes caused compensation expenses not to be recognized in Brocade's financial statements.  March 3, 2010 Trial Record (Miotto) at 1607:7-1610:5.

Third, by causing compensation expenses not to be recognized, Reyes caused Brocade's earnings to be falsely inflated by approximately $949,538,000 over five years.  Exhibit 461.

Fourth, by falsely inflating Brocade's earnings, Reyes misled investors about Brocade's financial performance. March 9, 2010 Trial Record (Ryan) at 2320:8-15, 2322:172325:7.  As David Ryan explained, earnings are to stock prices as "Little Bo Peep" was to sheep, wherever earnings may go, stock prices are sure to follow. *Id*.  Like most officers in a public company, Reyes clearly understood the importance of earnings on stock price.  *See e.g.* Exhibit 409-12; 409-54.

Fifth, when it discovered aspects of Reyes's scheme, Brocade commenced an internal investigation and eventually announced that it would restate its performance to recognize additional compensation expenses (reducing earnings under fixed accounting).  March 3, 2010 Trial Record (Miotto) at 1618:15-17, Exhibit 781.

Sixth, when Brocade announced that it would issue a restatement, its stock price dropped 7.51 % in one trading day and never bounced back all year.  Supplemental Expert Report at 10.  The stock dropped 49% during the ten (10) months it took Brocade to properly account for its option expenses.   Expert Report at Tab 14; Supplemental Expert Report at 16.  Conservatively, investors lost millions.  Expert Report at 4.

But for Reyes's scheme, Brocade would not have commenced the internal investigation.

UNITED STATES' REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS POSITION ON LOSS AND RESTITUTION
*United States v. Reyes*, Case No. CR-06-0556 (CRB)

3

March 3, 2010 Trial Record (Miotto) at 1618:15-17.  But for the internal investigation, there would have been no determination that a restatement was necessary.  March 3, 2010 Trial Record (Miotto) at 1568:13-1569:14.  But for the announced need to restate, there would have been no market uncertainty.

On January 6, 2005, when Greg Reyes's long-hidden scheme to conceal expenses to inflate his bottom line finally came to light, it was the shareholders who paid the price.  While its competitors remained unaffected, it took Brocade's stock a year and a half to recover.  Supplemental Expert Report at 8, 16.  Vague assertions about market uncertainty or the wording of the press release do not diminish the clear chain of events leading ineluctably from the executive who freely falsified corporate records – "It's not illegal if you don't get caught" – to the deceived shareholders who were sold stock in a company they were led to believe performed better than it really did.  February 23, 2010 Trial Record (Weaver) at 659:17.

But for Reyes's offense conduct, Brocade shareholders would not have lost millions.  Expert Report at 4.

3. **THE LOSS CAN BE REASONABLY ESTIMATED.**

There definitely was a loss.  Reyes definitely caused it.  The only remaining question is whether the amount of loss can be reasonably estimated.  It can.

A. **The Government Responded to the Court's Concerns about Loss.**

In its November 27, 2007 Order, the Court articulated two reasons for declining to measure loss based of actual trading losses to investors on January 7, 2005.  Document 737 at 5.  The United States has introduced evidence and modified its calculation to address both of them.

First, in 2007, the government proposed subtracting the sale price of all the shares sold on January 7, 2005, from the closing price on January 6, 2005.  *See generally* Document 588 at 8.  The Court reasoned that this method did not account for shareholders who bought stock at a price lower than its January 6 value of $6.92.  Document 737 at 5.  Regan's method addresses this concern by not using the January 6 closing price and instead calculating loss as the 7.51% reduction in proceeds each share would have earned but for the January 6 press release and the

UNITED STATES' REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS POSITION ON LOSS AND RESTITUTION
*United States v. Reyes*, Case No. CR-06-0556 (CRB)

4

resulting 7.51% market correction following the disclosure of the fraud. Supplemental Expert Report at 8-10. Because Regan measured only investors who actually sold on January 7, the Court may be assured that Regan's realized loss estimate of $6.3 million represents only actual losses. Regan's method of calculating what the shareholders' price would have been absent Reyes's misrepresentations complies in all respects with the guidance given by the Ninth Circuit in *United States v. Berger*, 587 F.3d 1038, 1046-47 (9th Cir. 2009)("While we do not dictate the exact method the district court must use, we note that whatever method is chosen should attempt to gauge the difference between [the issuer's] share price – as inflated through fraudulent representation – and what that price would have been absent the misrepresentation.").

Second, in 2007, the Court declined to adopt the one-day loss approach out of a concern that the 7.51% stock drop represented an extreme reaction to Brocade's announcement that would overstate the loss because it failed to account for a possible "bounce back" of the stock price. Document 737 at 6. In 2007, the government did not provide adequate evidence to rebut the possibility of a bounce back. In 2010, however, the United States has introduced clear evidence that demonstrates conclusively that no "bounce back" ever occurred following the announcement on January 6. Supplemental Expert Report at 10 ("Brocade's stock experienced a persistent decline for most of 2005, and did not substantially recover to $6.92 until September 2006 (except for a very brief period in April 2006).... This analysis shows that there was no "bounceback" and that application of the method described in the PSLRA [90 day average closing price] results in a larger amount of loss (Original Exhibit 3) than the loss calculated in a one-day market capitalization approach on January 7, 2005.").

### B. The Loss May Be Conservatively Estimated at $6.3 Million.

Regan provides this Court with a solid factual basis to estimate the losses of Brocade's victim shareholders under the approach endorsed by *Berger* in an "extremely conservative" amount of $137.1 million. Expert Report at 4, 18. To give the defendant every reasonable benefit, the United States submits that the sentencing range in this case should be calculated with reference to the actual losses realized by selling shareholders on the first day after the January 6,

UNITED STATES' REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS POSITION ON LOSS AND RESTITUTION
*United States v. Reyes*, Case No. CR-06-0556 (CRB)

5

2005 announcement in the amount of $6.3 million.

### C. Alternatively, The Loss May Be Estimated at $1.9 Million, The Amount of Reyes's Gain.

In 2007, the Court correctly noted that gain from the offense may substitute in the loss calculation when loss cannot be reasonably determined. Document 737 at 10. *See also* U.S.S.G. § 2B1.1 Application Note 3(B). Based on new evidence introduced during the 2010 trial, the United States proved that Reyes personally profited by at least $1,933,676.58 in cash from backdated options that he received during his scheme. March 8, 2010 Trial Record (Fujimoto), 2055:20-2066:20; Exs. 460 and 403-00046. If the Court concludes that it cannot reasonably estimate the loss to victim shareholders in the amount recommended herein, the United States requests that, in the alternative, the Court estimate loss in the amount of at least $1.9 million, the sum Reyes gained from his sale of backdated options during the scheme.

### 4. THE DEFENSE EXPERTS' CRITIQUES ARE MISPLACED.

The defense acknowledges that the January 7, 2005 stock drop was "statistically significant." October 7, 2007 Declaration of David A. Gulley (Document 1184-2) at 8. This concession validates Regan's use of 7.51% as the *amount* the stock was inflated by fraud. If the 7.51 % stock drop was precipitated by something in the press release and not by some other extraneous factor, then the only question is what was it about the press release that caused the market reaction.

The defendant answers that question by parsing the press release in a manner that drains it of any meaning. In essence, he insists that because it "made no mention of options backdating," the press release was not caused by Reyes. Defendant's Response dated May 14, 2010 (Document 1183) at 6. The defense posits that market uncertainty – not Reyes or backdating – caused the 7.51 % market correction. There are two problems with this argument: First, there can be little doubt after two trials that Reyes's scheme led to the investigation which led to the decision to restate which led to the press release which led to the 7.51 % stock drop. Second, this argument misses the obvious point that the January 6, 2005 press release announced that Brocade

UNITED STATES' REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS POSITION ON LOSS AND RESTITUTION
*United States v. Reyes*, Case No. CR-06-0556 (CRB)

6

would "restate its financial statements ... to record additional stock-based compensation expense." Exhibit 781.  As Regan points out, the import of the press release meant only one thing: reduced earnings.  Supplemental Expert Report at 2-3.  Not surprisingly, that was exactly how investors like Kevin Kilgannon interpreted the news.  Trial Transcript, March 9, 2010, 2276:4-11.  In a vacuum, the words "backdating" or "option expenses" may not be important, but this announcement did not happen in a vacuum.  It happened in a manner that clearly informed investors that earnings would be reduced because the company would be recording additional expenses.  And a reduction in earnings *always* matters to investors.  Supplemental Expert Report at 4.

Finally, the defense persists in its arguments that news that Brocade would restate its earnings to recognize additional compensation expense was not relevant to investors because Brocade already disclosed the "intrinsic value" of its options in its footnotes.  *See e.g.* May 14, 2010 Declaration of Neal J. Stephens, Exhibit 1 (Report of Kenneth Lehn) at ¶ 14.  This is a re-hash of the argument that FAS 123 disclosures are a substitute for APB 25 compliance.  It was rejected by the jury and it should be rejected now.  The January 6, 2005 press release announced – for the first time – that Brocade would restate its earnings.  The reason Brocade had to restate earnings was to recognize additional compensation expense (which would reduce earnings under fixed accounting).  Nothing Brocade had previously disclosed about the value of its options would have enabled investors to determined that its earnings had been materially misstated.

5. **RESTITUTION SHOULD BE ORDERED IN THE AMOUNT OF $37.1 MILLION.**

$37.1 million is the low end of Regan's estimate of the amount Reyes personally profited from selling Brocade stock inflated by his scheme.  Expert Report at 29.  The defendant interposes only two objections to this restitution amount.  First, he claims that Regan's use of the 7.51 % figure to calculate the amount Reyes's stock was inflated by the fraud was erroneous.  For the reasons stated herein and in the Supplemental Expert Report, 7.51 % is a reasonable estimate of the market reaction to the disclosure of the scheme and therefore it is a reasonable estimate of the amount of illegal profit Reyes gained each time he sold a share of stock during the duration of

UNITED STATES' REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS POSITION ON LOSS AND RESTITUTION
*United States v. Reyes*, Case No. CR-06-0556 (CRB)

7

the scheme.

Second, the defendant complains that Epiq Class Action and Claims Solutions is not an appropriate claims administrator to distribute the restitution fairly. Because Epiq has already been named to perform this function in the parallel Brocade securities litigation, we disagree.

## CONCLUSION

The Court should reject the defendant's misleading claims that this was a harmless crime. There was a loss in this case and Reyes caused it. But the Court should give the defendant the benefit of every possible doubt and estimate the loss at $6.3 million or, in the alternative, in the amount of his gain of $1.9 million and order restitution of $37.1 million.

DATED: May 21, 2010

DAVID L. ANDERSON
Acting United States Attorney

/s/
_____

ADAM A. REEVES
Assistant United States Attorney

UNITED STATES' REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS POSITION ON LOSS AND RESTITUTION
*United States v. Reyes*, Case No. CR-06-0556 (CRB)

8