United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>GREGORY L. REYES,<br><br>    Defendant.                         / | No. CR 06-0556 CRB<br><br>**ORDER DENYING MOTION FOR NEW TRIAL AND MOTION FOR JUDGMENT OF ACQUITTAL** |

Defendant Gregory Reyes moves pursuant to Rule 29(c) for a judgment of acquittal and pursuant to Rule 33 for a new trial. Reyes was convicted on March 26, 2010, of nine counts: one count of securities fraud in connection with Brocade stock, three counts of securities fraud based on false SEC filings, one count of falsifying books, records, and accounts of Brocade, and four counts of making false statements to an accountant. He was acquitted of conspiracy to commit securities fraud.

For the reasons that follow, the motions are denied.

**1.  Motion for Judgment of Acquittal**

    **a.  Legal Standard**

Rule 29(c)(1) of the Federal Rules of Criminal Procedure provides that "[a] defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." This court's task under

1  Rule 29 is to view the evidence in the light most favorable to the prosecution and evaluate
2  whether a rational juror could have concluded that the elements of the crimes were proved
3  beyond a reasonable doubt.  See United States v. Alarcon-Simi, 300 F.3d 1172, 1176 (9th
4  Cir. 2002).  The government need not provide direct evidence of all elements of the crime;
5  circumstantial evidence and reasonable inferences drawn therefrom can be sufficient to
6  sustain a conviction.  United States v. Reyes-Alvarado, 963 F.2d 1184, 1188 (9th Cir. 1992);
7  see also United States v. Nelson, 419 F.2d 1237, 1239 (9th Cir. 1969) ("For at least a third of
8  a century, this court has rejected the notion that it is improper to infer a fact issue from other
9  facts which have been established by circumstantial evidence;" "[C]ircumstantial evidence is
10 not inherently less probative than direct evidence.  Under some conditions it may even be
11 more reliable . . . .").

**b. Analysis**

  **i.    Reyes's criminal intent**

14 The Defendant contends that the Government failed to provide sufficient evidence of
15 his criminal intent.  He focuses on the fact that there was no evidence or argument that
16 Brocade's finance department was deceived by Reyes or was otherwise unaware of the
17 fraudulent practices.  He notes that "the government disclaimed the relevance of this issue in
18 closing and conceded it had not established that the gatekeepers of Brocade's financial
19 statements were deceived or coerced." Rule 29 Mot. at 2.  Defendant suggests that because
20 there is no such evidence, the Government has failed to prove that "Reyes acted with
21 criminal intent and actually caused the falsifications despite the evidence that Finance and
22 the Audit Committee were aware of backdating and determined that no compensation charge
23 was required." Id.

24 Defendant fails to explain why the Finance Department's apparent knowledge of the
25 practice absolves Defendant of criminal liability.  Defendant suggests that because
26 individuals in the Finance Department knew about the practice, Defendant neither "caused"
27 the backdating nor did he intend to do anything wrong.  This is a non-sequitur.  First, let us
28 consider the issue of causation.  Assuming, as Defendant asks us to, that individuals in the

1 Finance department knew of the fraudulent practices, Reyes still signed the fraudulent grant
2 dates, and subsequently signed the 10-Ks that reflected the backdated options. Reyes's
3 signature on the grant dates was essential to effecting those grants, and without it there would
4 be no grant. Therefore, the jury could reasonably conclude that Reyes "caused" the
5 backdated option grants. Whether or not others in Brocade knew of this scheme and
6 participated in it, this does not undermine Reyes's essential role.

7 As for Reyes's knowledge of falsity, the jury was also presented with circumstantial
8 evidence that permitted the rational conclusion that Reyes knew that he was signing false
9 documents. Take, for example, a grant allegedly made on November 28, 2001. Evidence at
10 trial reflected that the November date was actually selected on January 28, 2002, and was not
11 signed by Reyes until a few days later. As the Government notes, a rational juror could very
12 well conclude from this circumstantial evidence that Reyes signed the minutes despite the
13 fact that he knew no grant had actually been made on November 28, 2001. Because Reyes
14 would have been present at such a meeting, and because the minutes only arrived on his desk
15 two months after the alleged grant date, the jury is entitled to conclude that he knew that the
16 dates reflected on the minutes were false.

17 A rational juror could also conclude that Reyes acted knowingly and wilfully.
18 Defendant is quite right that the government was obligated to show beyond a reasonable
19 doubt not only that the dates on the documents were false, but also that Reyes acted
20 knowingly and wilfully for purposes of the securities laws. Defendant suggests that "if
21 Brocade's accounting experts knew of the company's options practices and did not conclude
22 that the financial statements failed to conform to APB 25, the government could not have
23 established beyond a reasonable doubt that Mr Reyes himself lacked 'a good-faith belief that
24 the alleged false or misleading statements were in fact accurate.'" Id. at 6 (quoting Jury
25 instructions at 36 ("Good Faith")).

26 This suggestion simply does not follow. Some of Brocade's "accounting experts"
27 may indeed have known that the grants violated APB 25, and yet did not speak up.
28 Alternatively, it could be that some of the "experts" knew that the grants violated APB 25

3

and others did not. The experts may also, as Defendant suggests, have concluded that the grants did not violate APB 25. But these possibilities are neither here nor there, as the nebulous "experts" are not on trial. Regardless of which of the above alternatives is true, or even if some other permutation is true, the only question relevant to Reyes is whether <u>he</u> acted knowingly and wilfully.

On that question, the jury was entitled to conclude that he did. First, as the Government notes, there was evidence that, upon being asked in an investigation whether grant dates had been selected with hindsight, Reyes responded that he selected dates by using "moving averages." <u>See</u> Trial Record, March 10, 2010, at 2548:11-2549:5. Given the copious evidence regarding the actual practices at Brocade, a juror could rationally conclude that this was simply a lie. A juror could further rationally conclude that Reyes lied because he knew he had violated the law. <u>See</u> <u>United States v. Perkins</u>, 937 F.2d 1397, 1401-1402 (9th Cir. 1991). While Defendant might be correct that a rational juror could also conclude that Defendant lied for other reasons, such competing rational inferences cannot support an order for judgment of acquittal.

Nor is it true that the jury had no evidence to support the conclusion that Reyes knew at the time of the grants that they were wrongful. The jury heard testimony from Jeff Bidzos regarding an e-mail in which Reyes wrote "IT IS ILLEGAL TO BACKDATE OPTION GRANTS." <u>See</u> Trial Record, February 22, 2010, at 341. While the Defense argued to the jury that this statement has alternate explanations that do not reflect Reyes's criminal intent, the jury was not obligated to accept the Defendant's explanation. Moreover, the jury heard testimony from June Weaver, a human resources employee who for a period of time was responsible for bringing grant documentation to Reyes's office for his signature. <u>See</u> Trial Record, February 23, 2010, at 582, 658:11-659:17. Weaver recalled hearing Reyes tell her in his office that "[i]t's not illegal if you don't get caught." <u>Id.</u> at 659:17. While Weaver did not have perfect recollection of this experience, she recalled that she would only have gone into Reyes's office for stock option grants. <u>Id.</u> at 659:3-4.

4

1  Given Reyes's lies to Martin, the e-mail in which he evinces knowledge of the
2  possible legal consequences of backdating, and his comment to Weaver, a rational juror may
3  well conclude that Reyes acted knowingly <u>and</u> wilfully.

### ii. Materiality

Reyes also argues that the Government failed to establish that any alleged false statement or omission was material. To establish materiality "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." <u>Basic, Inc. v. Levinson</u>, 485 U.S. 224, 231-32 (1988) (internal quotations and citation omitted). <u>See also</u> <u>United States v. Reyes</u>, 577 F.3d 1069, 1075 (9th Cir. 2009) ("To be material, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having altered the 'total mix of information available." (internal quotations omitted)); <u>United States v. Tarallo</u>, 380 F.3d 1174, 1183 (9th Cir. 2004) ("For securities fraud, a statement is material if there is a substantial likelihood that a reasonable investor would consider it important in making a decision.").[1]

The jury concluded that the Government had proved materiality beyond a reasonable doubt, and there is no reason to upset this conclusion. Two "investor witnesses," Kevin Kilgannon and David Ryan, testified for the government. Kilgannon is a retired New York City firefighter who considers himself a "private investor." Trial Record, March 9, 2010, at 2269, 2271:18-20. Kilgannon owned shares of Brocade and testified that Brocade's financial performance was "[v]ery important" to him. <u>Id.</u> at 2272:10. He further testified that it would have been important to him to know that, in a given year, Brocade's reported earnings were

---

[1] Defendant also cites to <u>Livid Holdings, Ltd. v. Salomon Smith Barney, Inc.</u>, 416 F.3d 940, 946 (9th Cir. 2005), which formulated the test differently. Judge Nelson wrote that "a misrepresentation is material if there is a substantial likelihood that a reasonable investor *would have acted differently* if the misrepresentation had not been made or the truth had been disclosed" (emphasis added). <u>Livid</u> cited <u>Basic</u> as support for this proposition. Defendant suggests that the Government must therefore prove not only that the statement was "important" to a reasonable investor, but that a reasonable investor would have acted differently. However, given the context, it is inappropriate to conclude that <u>Livid</u> raised the bar so substantially without comment. Ninth Circuit panels both before and after <u>Livid</u> adhered to <u>Basic</u>'s "substantial likelihood" that the misrepresentation would be taken by a reasonable investor as important. In any event, the three-judge panel in <u>Livid</u> would not have had authority to effectively overrule the standard previously articulated in <u>Tarallo</u>.

5

actually "less than half of what they said." Id. at 2272:23. The second investor, David Ryan, managed money in the stock market for a living. Id. at 2313:14. Ryan owned shares in Brocade, and at one point had "around six or seven hundred thousand dollars" invested in the company. Id. at 2318:15-16. Ryan testified that he relied on the market to account for all the public information about a company, and that while he did not pay strict attention to a company's earnings, its stated earnings were important because they were "reflected in the price of the stock and how the stock is acting in the marketplace." Id. at 2320. Upon being asked whether he would have considered it important that Brocade's reported earnings had been inflated because of the backdated options, he responded that it would. Id. at 2323. He colorfully referred to it as "the Little Bo Peep scenario, where wherever the earnings go, the stock will soon follow. And if the earnings are going higher, the stock price is going to go higher. And you can see that correlation in a lot – in – in companies that I've studied over the years." Id. at 2324:13-17.

Defendant argues that this testimony was insufficient. First, he notes that Kilgannon "testified that he did not use 10-Ks for his research," and that "Kilgannon . . . could not testify that the GAPP income statement was used in the research to which he subscribed." Rule 29 Mot. at 13. This may be true, but this does not mean that the misstatements were immaterial. Kilgannon testified Brocade's earnings—which are disclosed in 10-Ks—were very important to him, and that the knowledge that the earnings were inflated would have been important to him. Defendant does not argue in the motion that there was insufficient evidence of inflated earnings because of the backdating, and Kilgannon merely testified that, had he known the truth, it would have been important to him. Similarly, Ryan need not have read 10-Ks, nor have looked at Brocade's earnings per share, in order for the information to have been important to him. He testified that he relied on the market to account for public knowledge about a company, particularly a company's earnings. Therefore, if it were revealed that the company had inflated its earnings, this would mean to Ryan that the market had inflated the value of the company. This knowledge, according to Ryan, was important to him.

United States District Court
For the Northern District of California

1   Of course, Defendant did seek to introduce contrary evidence. As he notes, Deranleau
2   stated that the APB disclosure is "unhelpful to the investors and the investment community"
3   because it is a non-cash expense which can obscure the underlying performance of the
4   company. However, this testimony is contradicted by Kilgannon and Ryan, both of whom
5   testified that Brocade's announced earnings were, in fact, important to them. Regardless of
6   whether the two men knew exactly what went into calculating those earnings, they explained
7   that the earnings were important to them.[2] This is sufficient to satisfy the Government's
8   burden of proving materiality.

9   For these reasons, Defendant's motion for a judgment of acquittal is denied.

**2. Motion for New Trial**

**a. Legal Standard**

A district court has the power to "grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). In considering such a motion, "[t]he district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses." United States v. Kellington, 217 F.3d 1084, 1095 (9th Cir. 2000). Even if there is an "abstract sufficiency of the evidence to sustain the verdict," a new trial may be granted where "the evidence preponderates sufficiently heavily against the verdict [such] that a serious miscarriage of justice may have occurred." Id. at 1097 (internal citations omitted).

**b. Analysis**

**i. KLA-Tencor**

Defendant first argues that the Government knowingly presented false testimony through Stephen Beyer. The Government called Beyer to testify about Brocade's practice of granting stock options. During his examination, Beyer testified that he had "concerns" about

---

[2] Defendant also notes that "neither Ryan nor Kilgannon testified that they sold their stock on January 7th *because* they cared about a non-cash APD 25 compensation charge." Rule 29 Mot. at 13. But of course that it not the test. The reasonable investor need not have actually sold stock based upon a misrepresentation. Basic requires only that there "be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic, Inc., 485 U.S. at 231-32 (internal quotations and citations omitted).

7

Brocade's options-pricing practices. See, e.g., Trial Transcript, Mar. 1, 2010, at 1243:5-10. He explained that he had previously worked at another company, KLA-Tencor between 1997 and 2001, and he asserted that KLA-Tencor had, to his knowledge, not backdated options. See, e.g., id. at 1358:4-8. He testified that KLA-Tencor's method of awarding options was "drastically different" from Brocade's.

Defendant disputes the veracity of this testimony, and argues that the Government knew the testimony was false. Defendant notes that on September 28, 2007, KLA-Tencor announced that it would have to restate its financial results to correct backdating-related accounting errors. See Dkt. No. 1117-6. Contrary to Beyer's testimony, KLA-Tencor admitted that it engaged in "intentional" backdating of stock options. Id.

A conviction obtained using knowingly perjured testimony violates due process when: "(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material." Hayes v. Brown, 399 F.3d 972, 984 (9th Cir. 2005) (en banc) (internal quotations marks and alteration omitted).

Even assuming all that the Defendant says is true regarding KLA's practices, he still is not entitled to a new trial. First, there is no evidence that Beyer knew he was testifying falsely. He may well have believed that KLA-Tencor never backdated, and Defendant has no evidence to the contrary. Nevertheless, as Defendant notes, so long as the prosecutor knows of the falsity, he has an obligation to correct it. Indeed, this Court was prepared to offer a limited instruction proposed by the Government that would have corrected any perceived falsehoods. Defendant proposed his own instruction which this Court rejected as inappropriate, and Defendant thereafter requested that the Court not give the Government's proposed instruction. Therefore, the only reason the misstatement was not corrected on the record was because Defendant so requested.

As Defendant notes, the Government has an obligation to correct a witness's false testimony. See United States v. Alli, 344 F.3d 1002, 1006 (9th Cir. 2003). In conjunction with its Motion for a Declaration of Mistrial relating to this episode, the Defense proposed a

8

curative instruction, as did the Government. The Government proposed the following instruction:

> During the government's case in chief, you heard testimony from Stephen Beyer about the stock-option granting process at KLA-Tencor. This testimony has been admitted for the limited purpose of establishing Mr. Beyer's state of mind about the stock-option granting process at Brocade and not to establish what occurred at KLA-Tencor. In other words, the only relevance of Mr. Beyer's testimony about KLA-Tencor is to provide information about what Mr. Beyer thought and did at Brocade, and not for any other purpose. It is for you to decide whether to accept or reject Mr. Beyer's testimony in whole or in part.
> As you have previously heard, the parties have stipulated that a substantial number of public companies disclosed in their public filings that they backdated stock options without taking a corresponding compensation charge. In considering the testimony of Mr. Beyer, you may take into consideration that KLA-Tencor disclosed in its public filings that it backdated stock options during the time that Mr. Beyer was employed there.

Dkt. #1142.

Defendant complains that Beyer falsely testified that KLA-Tencor did not backdate options. The Government proposed instructing the jury that KLA-Tencor did, in fact, backdate options, and that it did so while Beyer was employed there. To the extent Defendant wanted to impeach Beyer's credibility, this instruction would have permitted him to do so.

Defendant, however, proposed a different instruction:

> On March 3, 2010, the government elicited testimony from Stephen Beyer relating to whether his prior employer, KLA-Tencor, engaged in a process described as "auto-pricing" of stock options that was "drastically different" from the retroactive pricing used at Brocade. In response to the government's questions on redirect examination, Mr. Beyer's testimony on that subject was inaccurate and misleading. Contrary to the government's questions and Mr. Beyer's responses, KLA-Tencor did no use an "auto-pricing" process in 2000. Instead, KLA-Tencor regularly and intentionally backdated employee grants by using hindsight to pick periodic low prices during the time period that Mr. Beyer worked there. Specifically, the November 10, 2000 stock price referenced in Exhibit 3452 was the lowest closing stock price for KLA-Tencor for both the 2000 calendar year and KLA-Tencor's Fiscal Year 2001. The August 11, 2000 stock price reference in Exhibit 2342 was the second-lowest closing price for the eleven weeks of KLA-Tencor's First Quarter that preceded Mr. Beyer's September 14 email. The options referred to in these exhibits were granted 'in the money,' but KLA-Tencor did not take an associated compensation expense.

Dkt. #1117-11. The problem for Defendant, however, is that this instruction goes farther than the evidence warrants and emphasizes KLA-Tencor instead of the real issue: Beyer's

9

credibility. This instruction ignores the fact that the relevance of Beyer's testimony was not based upon what happened at KLA-Tencor, but rather with what Beyer *understood* to be happening. Beyer repeatedly explained that, *to his knowledge*, KLA-Tencor did not backdate. This issue arose because of Beyer's testimony that Brocade's practices differed from those of his KLA-Tencor. If he believed KLA-Tencor did not backdate—which he has consistently maintained—then he may well have found Brocade's practices to be different, and there would be no grounds for impeachment. Defendant implicitly concedes that Beyer's credibility, as opposed to KLA-Tencor's practices, is the central issue, and yet his proposed instruction ignores this distinction. His credibility would only be cast into doubt if he knew that KLA-Tencor backdated, and yet testified falsely. If in fact he did not know about the backdating, and testified consistently with that belief, he could not be impeached based upon the fact that he was mistaken.

The fact remains, of course, that given Beyer's broad characterization of the situation, the jury could be led to believe that KLA-Tencor did not, in fact, backdate its options. Such a conclusion would indeed be false. But this is precisely the conclusion that the Government's proposed instruction would have corrected. The Government's instruction had the added virtue of focusing the jury's attention on the issue of Beyer's state of mind, rather than the tangential issue of KLA-Tencor. Whether or not one particular company among thousands of companies backdated its options is simply not probative of Reyes's guilt or innocence, particularly as the jury was informed by stipulation that a number of companies backdated their options. Nevertheless, the Defense requested that the Court not read the Government's proposed instruction, and the Court complied.

### ii. Reyes's Compensation

Defendant next argues that the Government's use of evidence relating to Reyes's compensation went beyond mere motive and in fact biased the jury against Reyes. However, he fails to point to any such bias.

For example, Defendant points to the Government's opening statements, in which the Government contended that Reyes was the person "who stood the most to gain from this

10

fraud" and that he "game[d] the system and pad[ded] his own pocket" at the expense of Brocade's shareholders. Trial Transcripts, Feb. 22, 2010, at 276:20-21, 261:177-19. Defendant notes that there was no "suggestion that the jury should view such evidence solely as to motive." Rule 33 Mot. at 12. However, no authority requires the Government to make such a suggestion. These statements are clearly relevant to motive: they explain why Reyes would have engaged in this conduct, and as such are perfectly appropriate. The same is true of the testimony of expert witness Gerald Fujimoto, who opined that the value of Reyes's stock options totaled nearly $130 million dollars. Id., Mar. 8, 2010, at 2076:11-23. The Government is entitled to present evidence of how much money Reyes had on the line, as such evidence is once again clearly relevant to his motive. There is no reason to hamstring the Government by refusing to permit it to fix a numerical estimate on the monetary stakes. Such a rule would give an unfair advantage to wealthy defendants as opposed to poor defendants: a wealthy defendant could escape the jury hearing exactly what he had to gain based upon vague concerns of bias, while a poor defendant would have no such recourse.

Next, the Defendant argues that "the government transparently sought to inflame the jury against Mr. Reyes because of his financial success as CEO of Brocade." Rule 33 Mot. at 13. In support, Defendant cites to the Government's closing, where it discussed the "approximate amount of built-in profit," and argued that "it is not true that the failure of Mr. Reyes to capitalize on his crime by more than $2 million is meaningless, in any sense. That's a little like saying a bank robber did not intend to take the money because he wound up getting caught and he never got to spend it." Trial Transcript, Mar. 22, 2010, at 3051:19-3052:17. Far from revealing the Government's appeals to bias, this passage demonstrates that the Government's argument was, in fact, based upon motive. The question was why Reyes engaged in this conduct, and the government noted that, as the scheme progressed, Reyes at one point stood to gain more than $100 million. This sum would give an individual ample motivation. The fact that, years later, he had only recovered $2 million does nothing to undermine his motive, which by definition concerned what led him to the conduct. The Government was merely explaining that the fact that a scheme was largely unsuccessful from

11

the perspective of defendant's gain does not mean that the defendant did not intend it to be successful.

### iii. What Finance knew

Next, Defendant argues that the Government failed to prove the elements of the charge by failing to prove that Finance was deceived, or to otherwise account for their participation in the scheme. This argument was also asserted in Defendant's Rule 29 motion. It fails here for the same reasons explained above. Whether members of the Finance department knew or did not know about the backdating, Reyes rises and falls on his own. Reyes has consistently failed to articulate why Reyes's guilt is in any way dependent on the role of the members of the Finance department..

### iv. Jury Instructions

Next, Defendant points to a series of jury instructions that he claims "contributed to a verdict that is substantially inconsistent with the weight of the evidence." Rule 33 Mot. at 16. As the Government notes, "[i]n reviewing jury instructions, the relevant inquiry is whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation. The trial court has substantial latitude so long as its instructions fairly and adequately cover the issues presented. A single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." United States v. Frega, 179 F.3d 793, 807 n.16 (9th Cir. 1999) (internal citations omitted).

First, Defendant points to a note sent by the jury after two weeks of trial. That note asked whether they would receive additional instruction from the Court, and asked whether "for the charges against Mr. Reyes are we looking at these for him as an individual or him as CEO? CEO meaning person ultimately responsible for [the] company." Dkt. #1169 at 5. In response, the Defendant proposed a lengthy instruction to the effect that a CEO is not responsible for all acts of his subordinates simply because he is a CEO. This instruction was not given. However, the issue was more than adequately addressed in the instructions actually given. It was made clear to the jury that Reyes must have acted wilfully in order to be convicted of most counts, and must have had knowledge as well. There is no reason to

believe these instructions were not followed, and they are entirely inconsistent with the jury finding criminal liability based solely on Reyes's position as CEO. The note from the jury was submitted before jury instructions were provided, and the juror's question was more than adequately answered by those instructions.

Next, Defendant quibbles with the wording of the "backdating" instruction. See Dkt. #1158 at 37. First, Defendant contends that this instruction is too narrow because it does not list the various kind of documents that could have been backdated.[3] In the first trial, the instruction referenced options themselves, grant lists, and "other paperwork" that might have been retroactively backdated. The instruction given in the second trial, however, was broader, referring to backdating "insofar as that term means pricing stock options on a day prior to the date of the grant." However, Defendant fails to explain how this change could have possibly prejudiced him. Without such argument, this Court fails to discern an error.

Defendant also argues that this instruction's "use of the phrase 'date of the grant' permitted the jury to assume that 'date' for APB 25 purposes was clearly the date the document was signed." Rule 33 Mot. at 19. Given the amount of testimony and argument regarding the interpretation of APB 25, it is unreasonable to conclude that a juror could possibly read this instruction and thereafter disregard the evidence. Any shorthand summary "backdating" will be subject to some criticism of incompleteness, but such summaries are occasionally necessary. In the context of the entire trial, this claimed error is insubstantial.

Defendant also argues that it proposed an instruction would have cured the Government's allegedly misleading closing statement. The Government argued in closing that the fact that Brocade had to restate its earnings proves that the FAS 123 footnote did not disclose all the relevant detail as to Brocade's option plans. The defense contends that this confuses two different materiality analyses: (1) whether a misstatement required a restatement because of GAAP rules, and (2) whether a misstatement would be significant to a reasonable investor in deciding whether to buy or sell stock. While the Defense did not

---

[3] As an initial matter, it is unclear how failing to offer examples is "narrower" than offering such examples.

13

object to this argument during closing, it contends that its proposed instruction would have cured this error. This is not the case. The defense did indeed propose an instruction indicating that Brocade's decision to restate its financial results "does not itself establish that Mr. Reyes committed any of the crimes alleged in the indictment," but the instruction nowhere discusses the difference between materiality under GAAP and materiality for purposes of the securities laws. On the contrary, the instruction refers to various elements of the offence—knowing participation, wilfulness, intent to defraud—but nowhere refers to materiality. In any event, the proper materiality standard, in addition to the other elements of the crimes, were adequately explained elsewhere in the instructions.

Defendant further argues that it was entitled to its preferred materiality instruction, which relied on <u>Livid</u>, which is discussed above in footnote 1. As discussed above, <u>Livid</u> did not purport to alter the standard in the Ninth Circuit. On the contrary, an analysis of that case suggests that it sought merely to reformulate the classic standard derived from the Supreme Court's opinion <u>Basic</u>. Defendant now seeks to infuse that language with further meaning, and in so doing raising the standard of materiality in this Circuit. It is a far different thing to show a likelihood that a reasonable investor would find something important than a likelihood that a reasonable investor "would have acted differently." The latter demands a much more substantial evidentiary showing, and the Ninth Circuit would not have sought to so significantly change the standard without discussion.

Finally, the Defendant objects to the "government's reliance on Brocade 'policies' as a proxy for criminal laws." Rule 33 Mot. at 22. Defendant suggests that he was entitled to "an instruction that conduct inconsistent with company policies is not evidence of wrongdoing." <u>Id.</u> Viewed in context, the Government's reference to Brocade's policies would not confuse a reasonable juror as to the appropriate legal standard. The policies were referred to by the Government simply to suggest that some effort was made to conceal the backdating practice. The Government never argued that concealment alone satisfied the applicable legal standards. In any event, the instructions given to the jury made quite clear what the Government was obligated to prove, and no reasonable juror could have concluded

that "Brocade's internal policies should be viewed as a proxy for the law." Rule 33 Mot .at 23.

### 3. Conclusion

For the reasons explained above, Defendant's motions are both DENIED. None of the purported errors raises a substantial issue of law or fact.

**IT IS SO ORDERED.**

Dated: June 24, 2010

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE